**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:

    **MARY ALICE HUFFMAN,**                 **CASE NO. 12-00177-NPO**

    **DEBTOR.**                          **CHAPTER 7**

**DEREK A. HENDERSON, AS CHAPTER 7**
**TRUSTEE FOR THE BANKRUPTCY**
**ESTATE OF MARY ALICE HUFFMAN**         **PLAINTIFF**

**VS.**                  **ADV. PROC. NO. 12-00099-NPO**

**LEGAL HELPERS DEBT RESOLUTION,**     **DEFENDANTS**
**L.L.C., MACEY, ALEMAN, HYSLIP &**
**SEARNS, THOMAS G. MACEY,**
**JEFFREY J. ALEMAN, JEFFREY**
**HYSLIP AND JASON SEARNS**

**MEMORANDUM OPINION**
**AND ORDER DENYING MOTION TO COMPEL ARBITRATION**
**AND TO STAY ADVERSARY PROCEEDING PENDING ARBITRATION**

This matter came before the Court for hearing on January 11, 2013 (the "Hearing"), on the Defendants Motion for [sic] To Compel Barry's [sic][1] Claims to Arbitration Pursuant to the Federal Arbitration Act and To Stay Pending Arbitration (the "Motion") (Adv. Dkt. 15), the Brief in Support of Defendant Legal Helpers Debt Resolution, LLC's Motion to Compel Arbitration Pursuant to the Federal Arbitration Act (the "Brief") (Adv. Dkt. 16), and the Reply Brief in Support of Defendants' Motion to Compel Arbitration Pursuant to the Federal Arbitration Act (the "Reply Brief") (Adv. Dkt. 35) filed by Legal Helpers Debt Resolution, LLC

---

[1] There is no known "Barry" in the adversary proceeding or in the main bankruptcy case. The Court can only surmise that Barry's name appears here because of a clerical error by Legal Helpers.

a/k/a the law firm of Macey, Aleman, Hyslip & Searns ("Legal Helpers")[2] and Thomas G. Macey, Jeffrey J. Aleman, Jeffrey Hyslip, and Jason Searns (collectively, the "Individual Defendants")[3] in the above-styled adversary proceeding (the "Adversary").  Also before the Court at the Hearing were the Plaintiff's Response to Motion to Compel Arbitration and Stay Proceedings (Dkt. #15) (Adv. Dkt. 26) and the Plaintiff's Memorandum in Support of his Response to Motion to Compel Arbitration and Stay Proceedings (Dkt. #15) (Adv. Dkt. 27) filed by Derek A. Henderson, chapter 7 trustee (the "Trustee").  At the Hearing, Jason Graeber represented the Trustee, and Richard W. Epstein represented Legal Helpers and the Individual Defendants.  Having considered the pleadings, briefs, and the arguments of counsel, the Court finds for the following reasons that the Motion is not well taken and should be denied.[4]

### Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  Notice of the Motion was proper under the circumstances.

### Facts

For purposes of the Motion, the Court accepts all factual allegations in the Complaint as true.  After incurring sizeable credit card debt, Mary Alice Huffman (the "Debtor") began experiencing financial difficulty.  On the verge of bankruptcy, she turned to Legal Helpers to review her finances and possibly negotiate lump-sum settlements of her debts.  Legal Helpers is

---

[2] Legal Helpers is the trade name for the law firm of Macey, Aleman, Hyslip & Searns.

[3] The Individual Defendants are the named partners of the law firm of Macey, Aleman, Hyslip & Searns.  The Individual Defendants filed a motion to dismiss for lack of personal jurisdiction (Adv. Dkt. 17), but later obtained an order allowing them to withdraw the motion (Adv. Dkt. 30).

[4] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

a self-described "debt relief agency." (Agr. ¶ I). In general, the U.S. Bankruptcy Code[5] defines a "debt relief agency" as "any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration." 11 U.S.C. § 101(12A). An "assisted person," in turn, is defined as "any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $175,750." 11 U.S.C. § 101(3).

**Legal Helpers**

Legal Helpers is a law firm offering various legal services, including debt settlement services[6] and some bankruptcy services. The services advertised by Legal Helpers in its promotional materials include: attorney review, assigning a settlement advisor, compiling an "Account Management Team," monthly case review, correspondence to creditors, creditor correspondence review, responding to creditor correspondence, debt negotiations, debt settlements, bankruptcy advice, credit counseling, and referral of Fair Debt Collection Practices Act cases. (Compl. ¶¶ 40-48 & Exs. A-C).

**Legal Helpers' Debt Settlement Programs**

Typically, a client's relationship with Legal Helpers begins with the creation of a dedicated savings account into which the client agrees to make monthly deposits. (Compl. ¶¶ 22-23). The size of the monthly deposits is determined by Legal Helpers based on the total amount of debt owed by the client and the amount of its own fees. From the savings account, the

---

[5] Hereinafter, all references either to the "Bankruptcy Code" or to the "Code" are to the U.S. Bankruptcy Code found at title 11 of the United States Code.

[6] The terms "debt settlement," "debt management," and "debt resolution" sometimes denote different types of services. In this Opinion, the Court follows the lead of the parties, who use these terms interchangeably.

client authorizes Legal Helpers to make direct withdrawals electronically.  Legal Services pays its own upfront fees before providing any debt relief services.  (Compl. ¶ 24).

After a period of time, the client's monthly payments accumulate in the savings account to provide a "lump-sum" amount to fund possible settlements of unsecured debts.  (Compl. ¶ 25).  Legal Helpers then pursues settlement on an individual, debt-by-debt basis.  Each client's debt settlement program is unique in that it is based on the amount of the client's unsecured debt and other similar variables.

**Debtor's Debt Settlement Program**

On March 30, 2010, the Debtor signed a "Retainer Agreement" (the "Agreement")[7] with Legal Helpers.  (Agr. at 4).  Attached to the Agreement is "Schedule A:  Enrolled Creditor List," which reflects a total debt of $39,265.00 owed by the Debtor to five credit card companies.  (Agr. Sch. A).  The Agreement, which appears to be a form contract, required the Debtor to pay Legal Helpers a retainer fee in the amount of $500.00, a monthly maintenance fee in the amount of $50.00, and a service fee in the amount of 15% of her total debt (approximately $6,000.00).  (Agr. ¶ VIII).  Legal Helpers calculated a single monthly payment of $496.00, which was "based on the total amount of debt to be modified, including payment of appropriate fees and costs to [Legal Helpers]."  (Compl. ¶ 52; Agr. ¶ VI.e).  This payment was electronically drafted from the Debtor's bank account each month.  (Agr. ¶ IX).

---

[7] The Trustee attached as an exhibit to the Complaint an agreement signed by a client of Legal Helpers, not the Debtor.  (Compl. Ex. D, Adv. Dkt. 1).  Legal Helpers later attached a copy of the actual Agreement signed by the Debtor as an exhibit to the Declaration of Jason Searns in Support of Legal Helpers Debt Resolution LLC's Motion to Compel Arbitration and Stay Proceeding Pursuant to the Federal Arbitration Act (the "Searns Declaration") (Searns Decl. Ex. 1, Adv. Dkt. 15-1).  All references herein are to the actual Agreement attached as Exhibit 1 to the Searns Declaration.

The Agreement contains several important representations: (1) that Legal Helpers would negotiate and settle the Debtor's debts; (2) that Legal Helpers would assign an "Account Management Team" to review her account once a month and ensure progress; (3) that any debt collectors would be referred to Legal Helpers; (4) that Legal Helpers and other legally trained, licensed personnel would supervise all negotiations and customer support and ensure that the services comply with established procedures; (5) that Legal Helpers would use its best efforts to obtain a satisfactory result for the Debtor by providing basic legal services in connection with debt review and modification for the Debtor on an efficient and cost-effective basis; (6) that Legal Helpers is a full service debt resolution law firm including debt negotiation and restructuring, bankruptcy, and referral to consumer credit counseling agencies, where appropriate; and (7) that Legal Helpers would contact all of the Debtor's unsecured creditors in writing to inform them that she is represented by Legal Helpers.

**Bankruptcy Case**

After entering into the Agreement, the Debtor was harassed by her creditors and was eventually sued by a creditor for nonpayment. (Compl. ¶ 54). She informed Legal Helpers about the creditors, but to no avail. (Compl. ¶ 58). On January 19, 2012, the Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code without the help of Legal Helpers. (Dkt. 1).

**Adversary Proceeding**

**Complaint**

On September 28, 2012, the Trustee filed the Complaint (the "Complaint") (Adv. Dkt. 1) asserting five causes of action against Legal Helpers: Count I: Turnover of Estate Property (Compl. ¶¶ 66-71), Count II: Fraudulent Transfers (Compl. ¶¶ 72-76), Count III: Accounting

(Compl. ¶¶ 77-78), Count IV: 11 U.S.C. § 526 (Compl. ¶¶ 79-87), and Count V: Fraud (Compl. ¶¶ 88-109). The gist of the Trustee's allegations in the Complaint is that Legal Helpers' debt settlement program did not actually help the Debtor's precarious financial situation and in fact made it worse. (Compl. ¶ 56).

In the Complaint, the Trustee alleges numerous deceptive and abusive practices by Legal Helpers and the Individual Defendants.[8] The merits of his allegations are not yet before the Court, though the arbitration issue nevertheless requires the Court to examine the underlying factual basis for his claims. Legal Helpers has not answered the Complaint and is not required to respond until the Court has disposed of the Motion.

The Trustee posits two main allegations in support of his claims in the Complaint. First, he asserts that Legal Helpers promised debt relief services under the guise of "legal representation;" however, these services are largely outsourced to nonattorneys. (Compl. ¶¶ 16, 20). According to the Trustee, Legal Helpers "enter[s] this landscape [of debt-laden consumers] masquerading as attorneys" who provide debt solutions but "in reality, Legal Helpers' program [is] merely a scam in which [Legal Helpers] siphon[s] off thousands of dollars." (Compl. ¶¶ 28, 38). Second, the Trustee alleges in the Complaint that Legal Helpers advises its clients to stop paying their unsecured creditors. (Compl. ¶ 17). (Presumably, this strategy is based on the theory that it is easier to negotiate reductions in older debts.) According to the Trustee, Legal Helpers does not inform clients that defaulting on debts as part of a "debt management scheme" "(a) will likely increase the amount they owe to creditors due to interest, late fees and penalties on unpaid accounts; (b) will cause creditors to balk at settlement offers or reject them entirely;

---

[8] The Trustee alleges that the Individual Defendants are liable "through the principals of alter ego, piercing the corporate veil, agency, joint venture, or respondeat superior." (Compl. ¶ 64).

(c) [will] increase collection activity; and (d) [will] increase tax liability due to debt forgiveness." (Compl. ¶¶ 21, 26).

The Trustee contends that Legal Helpers engages in the same type of deceptive practices that the Federal Trade Commission ("FTC") addressed in the 2010 amendment to its Telemarketing Sales Rule,[9] 16 C.F.R. § 310.1-310.9 (Aug. 10, 2010) (Compl. ¶ 30).   In the amendments, the FTC prohibits debt relief providers (who use telemarketing to solicit potential clients) from collecting fees until after they have actually provided the debt relief services (except for certain fees charged on a proportional basis) and from making misrepresentations about material aspects of their debt relief services, including their success rates.  The FTC also requires debt relief providers to disclose certain material information about their services.  The Trustee contends that the Government Accountability Office (the "GAO") likewise has issued a report on the dangers posed by entities like Legal Helpers, especially given that fewer than 10% of consumers ever successfully complete debt settlement programs.[10]  (Compl. ¶ 31).

**Motion**

On November 14, 2012, Legal Helpers filed the Motion under Rule 7012 of the Federal Rules of Bankruptcy Procedure.[11]   The Motion is based on an arbitration clause found in the Agreement, which provides, in pertinent part:

> **XVIII.  Arbitration**:  In the event of any claim or dispute between [Debtor] and [Legal Helpers] related to the Agreement or related to any performance of any

---

[9] The Telemarketing Sales Rule was promulgated under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108.

[10] Debt Settlement:  Fraudulent, Abusive, and Deceptive Practices Pose Risk to Consumers, GAO-10-593T (April 22, 2012).

[11] Rule 7012(b) of the Federal Rules of Bankruptcy Procedure incorporates by reference Rule 12(b) of the Federal Rules of Civil Procedure.  Legal Helpers does not identify the subsection of Rule 7012(b) under which its Motion is brought.

services related to this Agreement, such claim or dispute shall be submitted to binding arbitration upon the request of either party upon the service of that request.

(Agr. ¶ XVIII).  Legal Helpers and the Individual Defendants ask the Court to compel the Trustee to adjudicate his claims by an arbitrator, just as the Debtor would have been required to do under the arbitration clause in the Agreement.  The Trustee, conversely, maintains that his Complaint involves rights and remedies under the Bankruptcy Code and should be decided by this Court.

**Discussion**

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*., embodies a "liberal federal policy" that favors arbitration.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  In furtherance of that policy, the FAA mandates enforcement of contractual agreements to arbitrate disputes according to their terms.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985).  The substantive provision of the FAA is found in 9 U.S.C. § 2:  "A written provision in . . . a contract evidencing a transaction involving [interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "[T]he basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate."  *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270 (1995).  A party "aggrieved" by the failure of another party "to arbitrate under a written agreement for arbitration" may seek an order "directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  "If any suit or proceeding be brought . . . upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, . . . shall on application of one of the

parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

## A.      Arbitration in Bankruptcy Proceedings

A "contrary congressional command" may override federal policy favoring arbitration. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987).  The centralized resolution of bankruptcy matters, as contemplated in the Bankruptcy Code, may present a "command" that the FAA should not apply.  "If such an intention exists, it will be discoverable in the text of the [statute], its legislative history, or an 'inherent conflict' between arbitration and the [statute's] underlying purposes."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991).  If the enforcement of an arbitration clause renders the FAA and the Bankruptcy Code incompatible, the bankruptcy court must determine whether to enforce an otherwise valid arbitration clause or to refuse enforcement and decide the underlying dispute.  The burden of proving the existence of an "inherent conflict" rests upon the party who opposes arbitration. *McMahon*, 482 U.S. at 227.

The Motion before the Court requires a two-part analysis in determining whether the Trustee should be compelled to arbitrate his claims.  *JP Morgan Chase & Co. v. Conegie ex rel. Lee*, 492 F.3d 596, 598 (5th Cir. 2007).  First, the Court must determine if the Trustee agreed to arbitrate the disputes in question.  *Tittle v. Enron Corp.,* 463 F.3d 410, 418 (5th Cir. 2006).  "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  Second, the Court must ask if the Bankruptcy Code renders any of the claims nonarbitrable.  *Mitsubishi Motors Corp. v. Soler*

*Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985).  Each step involves a series of intermediate considerations.

### 1.        Did the parties agree to arbitrate?

Arbitration is a matter of contract.  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 583 (1960).  Determining whether a party agreed to arbitrate a matter and, therefore, whether 9 U.S.C. § 4 applies, is a two-step inquiry:  (1) whether there is a valid agreement to arbitrate between the parties and (2) whether the dispute in question falls within the scope of that agreement.  *See Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772 (2010).  This inquiry is governed by Mississippi contract law.[12]  *See Washington Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004) ("[I]n determining whether the parties agreed to arbitrate a certain matter, courts apply the contract law of the particular state that governs the agreement.").

### a.        Is there a valid arbitration agreement?

Under Mississippi law, a party's acceptance of the terms of a contract may be shown by the party's actions indicating acquiescence to the agreement.  *Dockins v. Allred*, 755 So. 2d 389, 394 (Miss. 1999).  As to the Debtor, her signature (which appears only inches away from the arbitration clause itself), demonstrates that she entered into the Agreement voluntarily.  *See generally Sherer v. Green Tree Servicing LLC,* 548 F.3d 379, 382 (5th Cir. 2008).  The Trustee does not challenge the validity either of the Agreement or the arbitration clause insofar as it subjects certain disputes between the Debtor and Legal Helpers to arbitration.  In the absence of any challenge by the Trustee to its enforceability, the Court finds that the Debtor and Legal

---

[12] The parties do not dispute the application of Mississippi law.

Helpers[13] entered into a valid arbitration provision. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 866 F. Supp. 2d 315, 329-30 (D.N.J. 2011) (rejecting argument that an identical arbitration provision was obscurely located and unconscionable).

This finding, however, does not end the Court's inquiry because the clams in the Complaint are brought by the Trustee, not the Debtor, and the Agreement does not expressly apply to disputes involving the Trustee, who himself is not a signatory to the Agreement. The arbitration clause itself reflects an intent to apply only to the Debtor and Legal Helpers, and provides: "[i]n the event of any claim or dispute between *Client* and [Legal Helpers] related to the Agreement or related to any performance of any services related to this Agreement, such claim or dispute shall be submitted to binding arbitration upon the request of *either party."* (Agr. ¶ XVIII) (emphasis added). *See generally Tittle,* 463 F.3d at 422 ("[T]he scope of the Arbitration Clause is limited only to disputes, arising out of or related to the policies, that include an Insurer and one or more insureds.").

Legal Helpers contends in its Brief that "[n]o matter what claim is being asserted, [the Debtor] agreed to arbitrate any dispute with [Legal Helpers]; and now the Trustee has to live with it." (Br. at 3). This blanket contention by Legal Helpers ignores the rule that only parties to an arbitration agreement are generally bound by it. *Mitsubishi*, 473 U.S. at 625; *Tittle,* 463 F.3d at 422 (holding that an arbitration clause was unenforceable against a third party). To determine whether the Trustee is bound by the Agreement, the Court must consider the role of bankruptcy trustees in general and the role of the Trustee in this case.

---

[13] Although the Individual Defendants did not sign the Agreement, they also seek to compel arbitration under an equitable estoppel theory. *See, e.g., Chew v. KPMG, LLP*, 407 F. Supp. 2d 790, 801 (S.D. Miss. 2006) (noting that "a *nonsignatory* to an arbitration agreement *could compel to arbitration a signatory* to the agreement"). Because the Court declines to compel arbitration, it is unnecessary to address the estoppel agreement raised by the Individual Defendants.

A bankruptcy trustee is charged with the duty to maximize the value of the bankruptcy estate for creditors.  11 U.S.C. § 704.  To accomplish this task, a trustee is authorized, as the representative of the estate, to "commence and prosecute any action or proceeding in behalf of the estate before any tribunal."  FED. R. BANKR. P. 6009; 11 U.S.C. § 323.  A trustee may pursue any claim that the debtor would have had in the absence of a bankruptcy case, including breach of contract actions, and claims under federal and state laws.  Those claims exist apart from the Bankruptcy Code.  A trustee may also pursue claims for the benefit of the estate that are designed to protect creditors.  Those claims arise under the Bankruptcy Code.  A fraudulent transfer claim is an example of a claim that a bankruptcy trustee may pursue under the Bankruptcy Code on behalf of the estate.

In this way, a trustee in bankruptcy wears more than one hat.  A trustee who asserts a cause of action that is derived from the debtor's rights stands in the "shoes" of the debtor and is limited to the same extent as the debtor under nonbankruptcy law.  *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989) (holding that the trustee was bound to arbitrate the noncore claims after standing in the debtor's shoes).  Therefore, a trustee who stands in the debtor's shoes is bound by an arbitration clause to the same extent as the debtor. *See First Franklin Corp., v. Barkley (In re Anthony)*, 334 B.R. 780 (Bankr. N.D. Miss. 2005) (the trustee "stands in the shoes" of the debtors in bringing causes of action derived exclusively from contractual transactions involving the debtors).  On the other hand, a trustee who asserts claims that are not derivative of the debtor's rights stands in the "overshoes" of the creditors of the debtor and generally is not bound by the terms of the prepetition agreements entered into by the debtor.  *Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 206-07 (Bankr. S.D.N.Y. 2002).  Accordingly, whether the Trustee stands in the "shoes" of the Debtor or the

"overshoes" of the Debtor's creditors in this case depends on the nature of each of the claims he asserts, a matter addressed later in this Opinion where each of the claims are examined separately.

**b.  Do the disputes fall within the scope of the arbitration clause?**

In determining whether the Trustee's claims fall within the scope of the arbitration clause, the Court must decide as an initial matter whether the arbitration clause is "broad" or "narrow." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc*., 252 F.3d 218, 224 (2d Cir. 2001) ("[f]irst, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow."). A clause that refers to "any and all differences and disputes of whatsoever nature" is broad in scope. *Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.),* 390 B.R. 784, 790 (Bankr. S.D.N.Y. 2008). By comparison, a clause that pertains only to disputes "arising out of" a contract is narrow. *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998).

The arbitration clause between the Debtor and Legal Helpers covers "any claim or dispute . . . *related to* the Agreement or *related to* any performance of any services related to this Agreement." (Agr. ¶ XVIII) (emphasis added). The "related to" language is broad because it is not limited to claims that arise under the Agreement. *See Pennzoil Exploration & Prod. Co.*, 139 F.3d at 1067 (finding that "related to" language created a broad arbitration provision). Therefore, the scope of the arbitration clause is broad enough to cover the parties' dispute. Even so, the Court has discretion to deny arbitration if an inherent conflict exists between the FAA and the Code. As stated previously, the Trustee argues that "the Bankruptcy Code and Rules render [his] causes of action non-arbitrable." *Russell v. Queen City Furniture* (*In re Russell),* 402 B.R. 188, 192 (Bankr. N.D. Miss. 2009).

### 2.     Is there an inherent conflict?

The second step involves a determination "whether legal constraints external to the parties' agreement foreclose[s] the arbitration of those claims." *Webb v. Investacorp, Inc.,* 89 F.3d 252, 257-58 (5th Cir. 1996) (quoting *Mitsubishi*, 473 U.S. at 628). If an arbitrable dispute involves a federal statutory right, the Court must decide if Congress intended to override FAA's policy favoring enforcement.

Legal Helpers argues that *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), requires the Court to grant its motion. Specifically, Legal Helpers points out that *Concepcion* made it clear that "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *Id.* at 1745.

*Concepcion* is distinguishable because it dealt with state contract law and federal preemption issues. The issue before the Supreme Court in *Concepcion* was whether the FAA prohibits states from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures. *Concepcion*, 131 S. Ct. at 1744. Under state contract law, arbitration clauses containing class action waivers were vulnerable to the rule of unconscionability. The Supreme Court held that the FAA preempts any state law that "prohibits outright the arbitration of a particular type of claim." *Id.*

Legal Helpers next relies upon *Jenkins v. Legal Helpers Debt Resolution, L.L.C.*, No. A2401-12-00003 (Miss. Cir. Ct. Aug. 2, 2012), in which a Mississippi court granted Legal Helpers' motion to compel arbitration under a provision identical to the arbitration clause found in the Agreement. *Jenkins*, however, is factually distinguishable because it involved state law claims, which are preempted by the FAA.

Unlike *Concepcion* and *Jenkins,* both of which involved the preemption of state law, this Adversary requires consideration of a federal statute and, thus, does not involve the same preemption issue. Here, the Court must decide whether the objectives of the FAA are paramount when rights created by the Bankruptcy Code are covered by an arbitration agreement.

In a case that more closely resembles the facts here, the Supreme Court in *Compucredit Corp. v. Greenwood*, 132 S. Ct. 665 (2012), enforced the arbitration of federal statutory claims arising out of violations of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679 *et seq.* Congress enacted the CROA to protect consumers plagued with credit problems against the unfair and deceptive practices of credit repair organizations. 15 U.S.C. § 1679(b). Notwithstanding numerous references in the CROA to judicial proceedings, the Supreme Court found no evidence of a congressional intent to preclude the enforcement of arbitration agreements covering causes of action created by that statute. *Compucredit*, 132 S. Ct. at 671-72.

The Supreme Court's decision in *Compucredit* did not involve the interplay between the FAA and the Bankruptcy Code. Indeed, the Supreme Court has not yet ruled on the extent that an otherwise applicable arbitration clause is enforceable in the bankruptcy context. *See Cont'l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011, 1021 (9th Cir.), *cert. denied,* 133 S. Ct. 119 (2012) (in an issue of first impression, the Ninth Circuit joined the Fifth Circuit's holding in *National Gypsum*).

The circumstances in which disputes involving debtors in bankruptcy are subject to arbitration have been previously addressed by the Fifth Circuit in *Insurance Co. of North America v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re National Gypsum Co.*), 118 F.3d 1056 (5th Cir. 1997), and, more recently, in *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489 (5th Cir. 2002). *Concepcion* and *Compucredit*, which were decided after *National Gypsum*

and *Gandy,* did not overrule the standards they set forth. *See Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399 (5th Cir. 2012) (pursuant to the rule of orderliness, a Supreme Court decision changes Fifth Circuit law only if it is "more than merely illuminating with respect to the case before [the court]") (quoting *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001)).  In *National Gypsum*, the Fifth Circuit adopted a two-part test: whether the claim stemmed exclusively from the Bankruptcy Code, and, if so, whether arbitration would conflict with the goals of the Bankruptcy Code. *National Gypsum*, 118 F.3d at 1067.

### a.    Core/Noncore Distinction

The first step in addressing whether arbitration conflicts with the Bankruptcy Code is to determine whether the claims brought by the Trustee in the Complaint are "core" or "noncore" proceedings. *Hays*, 885 F.2d at 1161.  The core/noncore distinction arises from the structure that exists in the Code for determining the extent to which bankruptcy courts may resolve matters described in 28 U.S.C. § 1334(a) and (b).  The core/noncore distinction is helpful, though not dispositive because even a core proceeding must meet the *McMahon* standard.  Nevertheless, a finding that the arbitration of a matter conflicts with the Code is similar (but not identical) to a finding that the proceeding is core because the core/noncore distinction measures the importance of the matter to the functioning of the bankruptcy process.  Stated simply, the more "core" the proceeding, the more likely a conflict exists, but not necessarily so.  If both core and noncore matters are present, the Court must determine whether bankruptcy issues predominate. *Gandy*, 299 F.3d at 497.

### (1.)    Core Proceedings

Core proceedings are those "arising under" or "arising in" title 11 cases, directly related to a bankruptcy court's functions.[14]  28 U.S.C. § 1334(b).  Matters arising under title 11 are those based on a right created or determined by a statutory provision of the Bankruptcy Code. *Buckingham v. Baptist Mem'l Hosp.-Golden Triangle, Inc.*, 283 B.R. 691, 693 (N.D. Miss. 2002). A non-exhaustive list of core proceedings is provided in 28 U.S.C. § 157(b)(2), which includes "matters concerning the administration of the estate," "orders to turn over property of the estate," "proceedings to determine, avoid, or recover fraudulent conveyances," and "other proceedings affecting the liquidation of the assets of the estate."    11 U.S.C. § 157(b)(2)(A),(E),(H) & (O).

Prior to the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), bankruptcy courts were deemed authorized to enter final judgments and orders in all core proceedings.   The *Stern* Court held that despite statutory authority under 28 U.S.C. § 157(b)(2)(C) to adjudicate a state-law counterclaim as a core matter, the bankruptcy court lacked constitutional authority to enter a final judgment in that case.  The *Stern* Court specified that its holding is "narrow" and "does not change all that much." *Stern,* 131 S. Ct. at 2618, 2620. Even so, the Court is mindful of the argument that the designation of a matter as core in 28 U.S.C. § 157(b)(2) may not necessarily be definitive of the Court's constitutional authority.

A core proceeding may be decided by the bankruptcy court if the party opposing arbitration meets its burden of showing that arbitration would inherently conflict with the Bankruptcy Code. *National Gypsum*, 118 F.3d at 1067.  The bankruptcy court may ignore an otherwise enforceable arbitration agreement if there is an "inherent conflict of interest" or if

---

[14] Bankruptcy courts have authority to hear and determine "all core proceedings arising under title 11, or arising in a case under title 11."  28 U.S.C. § 157(b)(1).

arbitration would jeopardize the purpose of the Bankruptcy Code.[15]   *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006) (holding that a court may refuse to uphold the arbitration clause when causes of action are based on provisions of the Code which inherently conflict with the FAA or if agreeing to arbitrate would "necessarily jeopardize" the Bankruptcy Code's objectives); *National Gypsum*, 118 F.3d at 1069-70.

### (2.)   Noncore Proceedings

Bankruptcy courts generally lack authority to decide "noncore" issues.   28 U.S.C. § 1334(b).   Matters that do not raise bankruptcy issues or that are only *related to* a bankruptcy case are "noncore" issues.   28 U.S.C. § 1334(b).   "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."   *Buckingham*, 283 B.R. at 693 (quoting *Goldstein v. Marine Midland Bank, N.A. (In re Goldstein)*, 201 B.R. 1, 4-5 (Bankr. D. Me. 1996)).

Noncore proceedings are generally decided by an arbitrator because such matters do not invoke strong bankruptcy interests.   *Gandy*, 299 F.3d at 495.   It does not appear that the Fifth Circuit has ever ruled that the arbitration of a noncore proceeding would produce an inherent conflict between the Bankruptcy Code and the FAA.   The Fifth Circuit, however, has not foreclosed the possibility, that is, that a bankruptcy court could deny arbitration of a noncore proceeding if the opposing party could show it would cause an inherent conflict of interest with the Bankruptcy Code.   *Hooks v. Acceptance Loan Co., Inc.,* No. 2:10-CV-999, 2011 WL 2746238, at *3 (M.D. Ala. July 14, 2011).

---

[15] These conflicts include the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.

### b.      The Trustee's Claims

The Trustee asserts five claims in the Complaint.  It is important to note at this juncture that the merits of the Trustee's claims are not yet before the Court.  *Snap-On Tools Corp. v. Mason*, 18 F.3d 1261, 1267 (5th Cir. 1994).  On their face, four of the claims fall within the definition of a core proceeding under 28 U.S.C. § 157(b)(2):  orders to turn over property of the estate (Count I),[16] proceedings to determine, avoid, or recover fraudulent conveyances (Count II),[17] matters concerning the administration of the estate (Count III),[18] and matters concerning the liquidation of the estate (Count IV).[19]  The fraud claim (Count V) is the only claim for which the Trustee does not cite a corresponding Code provision in the Complaint.  The Court considers each claim separately.  *KPMG LLP v. Cocchi*, 132 S. Ct. 23 (2011) (the court must address whether all claims were non-arbitrable).

### (1.)      11 U.S.C. § 542(a):  Turnover of Estate Property (Count I)

In Count I, the Trustee seeks the turnover of property of the Debtor's bankruptcy estate. The Trustee asks the Court to require Legal Helpers to turn over (1) money that it collected from the Debtor or services that were not performed and/or inadequately performed and (2) records related to its debt settlement programs, including those related to individuals in Mississippi for whom Legal Helpers performed any aspect of the debt settlement program.  (Compl. ¶ 71).  The non-exhaustive list of core proceedings under 28 U.S.C. § 157(b)(2)(e) expressly includes, "orders to turn over property of the estate."  Turnover proceedings require entities holding any

---

[16] 28 U.S.C. § 157(b)(2)(E).

[17] 28 U.S.C. § 157(b)(2)(H).

[18] 28 U.S.C. § 157(b)(2)(A).

[19] 28 U.S.C. § 157(b)(2)(O).

property of the estate to turn that property over to the trustee.  The turnover power is a right created under 11 U.S.C. § 542(a) by the Bankruptcy Code, and only the trustee may bring a turnover claim in a chapter 7 case.

### (2.)   11 U.S.C. § 544:  Fraudulent Transfers (Count II)

In Count II, the Trustee alleges fraudulent transfer claims under 11 U.S.C. §§ 544. 548, 550.  Fraudulent transfer claims are claims that the Code authorizes the trustee to pursue on behalf of creditors of the estate.  The Trustee alleges in the Complaint that within two years of the filing of her petition for relief, the Debtor transferred substantial sums of money to Legal Helpers.  (Compl. ¶ 73).  The Debtor received less than a reasonably equivalent value in exchange for the transfers.  (Compl. ¶ 74).  She was insolvent on the date the transfers were made, became insolvent as a result of such transfers, and/or had unreasonable small capital in relation to her business or her transaction at the time or as a result of the transfers.  (Compl. ¶ 75).  The Trustee seeks to avoid the fraudulent transfers under 11 U.S.C. § 544 and § 548.

### (3.)   11 U.S.C. § 542:  Accounting (Count III)

In Count III, the Trustee requests all records of money exchanged and services performed (or not performed) in connection with Legal Helpers' debt settlement program in order to calculate the precise amount of money owed to the Debtor.  This claim stems from a Trustee's statutory powers under 11 U.S.C. § 542 of the Code.

### (4.)   11 U.S.C. § 526:  Debt Relief Agencies (Count IV)

The Trustee's claim in Count IV arises under 11 U.S.C. § 526, a new provision of the Code created as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  Any entity that provides bankruptcy assistance in return for payment is a "debt relief agency" subject to numerous restrictions and requirements in 11 U.S.C. § 526.  As

mentioned earlier, Legal Helpers concedes that it is a "debt relief agency"[20] and, thus, is subject to 11 U.S.C. § 526.

Section 526(a) is designed to protect debtors from abusive practices by debt relief agencies. For example, 11 U.S.C. § 526(a)(1) requires that debt relief agencies perform all promised services. There are statutory remedies for a debt relief agency's violation of its requirements. A debtor may sue the debt relief agency for remittal of fees, actual damages, and reasonable attorney's fees and costs. For an intentional abuse, the court may impose an appropriate civil penalty.

### (5.)    Fraud (Count V)

Lastly, in Count V, the Trustee alleges a state-law fraud claim based on four alleged misrepresentations made by Legal Helpers in the Agreement:

> 1.      [Legal Helpers] and other legally trained, licensed personnel will supervise all negotiations and customer support and ensure that these services comply with established procedures. (Agr. ¶ V).

> 2.      [Legal Helpers] agrees to use its best efforts to obtain a satisfactory result for [the Debtor] by providing basic legal services in connection with the debt modification for [the Debtor] on an efficient and cost-effective basis. (Agr. ¶ VII).

> 3.      [Legal Helpers] is a full service debt resolution law firm including debt negotiation and restructuring, bankruptcy services and where appropriate referral to consumer credit counseling agencies. (Agr. at Ex. A).

> 4.      [Legal Helpers] will contact all your unsecured creditors in writing to inform them that you are represented by the law firm and that we are advising you as to all alternatives for debt resolution. (Agr. at Ex. A).

---

[20] According to the Agreement, Legal Helpers promised to advise the Debtor regarding her bankruptcy options. In return, the Debtor paid Legal Helpers fees and expenses.

(*See also* Compl. ¶ 90). The Trustee contends that Legal Helpers knew the above material statements were false, that the Debtor reasonably believed she was justified in relying upon them, and that she did rely upon them to her detriment. The Trustee does not cite any legal authority in support of his fraud claim. It appears to be based on a garden variety, intentional misrepresentation claim under the common law of Mississippi.

### c.    The "Coreness" of the Trustee's Claims

Before addressing the "coreness" of the Trustee's claims, the Court must resolve an inconsistency in Legal Helpers' initial Brief and Reply Brief as to which of the Trustee's claims Legal Helpers agrees are core or noncore.

### (1.)    Inconsistent Positions

Anticipating an argument by the Trustee that the arbitration clause is unconscionable under Mississippi law,[21] Legal Helpers concentrates almost all of its efforts in its initial Brief in explaining why the arbitration clause is enforceable.[22] (Br. at 7). In the context of its conscionability argument, Legal Helpers acknowledges in its initial Brief that the "Trustee[] asserts five (5) counts, four of which are core claims and one that is [a] non-core claim." (Br. at 4). Legal Helpers then argues in the initial Brief that the Court should mandate arbitration of all of the Trustee's claims regardless of whether they are core or noncore because "[e]nforcing the parties' contract and compelling arbitration of all 'core' and 'non-core' claims does not adversely affected [sic] any underlying purpose of the Bankruptcy Code." (*Id.* at 13-14). Later,

---

[21] Under Mississippi law, a court may refuse to enforce a contract, or a contract provision, if it is found to have been unconscionable when entered into. *Entergy Miss., Inc. v. Burdette Gin Co.*, 726 So. 2d 1202, 1207 (Miss. 1998).

[22] Arbitration provisions in consumer contracts are commonly challenged as unenforceable under the rule of unconscionability. *See, e.g., Smith v. EquiFirst Corp.,* 117 F. Supp. 2d 557, 560 (S.D. Miss. 2000) (rejecting the argument that the arbitration clause was inconspicuous and, therefore, unconscionable).

in the initial Brief, Legal Helpers reiterates "the Trustee's claims include Counts I through IV, which take root from the Bankruptcy Code." (*Id.* at 15).

Without explanation, Legal Helpers shifts its position in the Reply Brief. All core claims disappear. In the Reply Brief, Legal Helpers argues that "the Court should conclude that *all* of the Trustee's claims are non-core and should compel the matter to arbitration." (Reply Br. at 5) (emphasis added). Alternatively, Legal Helpers argues, "[I]f the Court decides that Counts I through IV are core claims . . . the Court nonetheless should compel the matter in its entirety." (*Id.*).

When questioned about the inconsistency in its argument at the Hearing, counsel for Legal Helpers stated that its initial Brief reflected the Trustee's own characterization of his claims and was not intended to be an admission that any of the Trustee's claims are core.[23] Given this explanation, the Court will accept Legal Helpers' argument as framed in the Reply Brief and will ignore the statements to the contrary in the initial Brief.

### (2.)    A "War of Words"

Legal Helpers argues that all of the Trustee's causes of action are rooted in the Agreement between the Debtor and Legal Helpers, and not the Code. According to Legal Helpers, the Trustee mislabels his state-law contract claims in order to disguise them as core proceedings under the Bankruptcy Code.

Legal Helpers' position as to the turnover and accounting claims finds some support in an analogous case involving debt relief agencies in *McCallan v. Hamm*, No. 2:11-CV-784, 2012 WL 1392960, at *1 (M.D. Ala. Apr. 23, 2012). There, the parties engaged in a "war of words"

---

[23] This inconsistent position suggests a judicial estoppel claim, which the Trustee has not asserted and which the Court does not consider. *Sosebee v. Steadfast Ins. Co.*, 701 F.3d 1012 (5th Cir. 2012).

over the trustee's labeling of his claims as a "turnover of estate property" and an "accounting." *Id.* at \*4. The defendant maintained that they were actually breach of contract actions rather than core proceedings. The *McCallan* court agreed with the defendant that "[t]he label a party attaches to a claim does not require the court to wear blinders as to that claim's true substance." *Id.* at \*5.

*McCallan*, however, does not help Legal Helpers as much as it would like. Despite concluding that the turnover and accounting claims were noncore, the *McCallan* court denied the motion to compel arbitration on the ground that arbitration of these disputes would seriously disturb the objectives of the Bankruptcy Code. Legal Helpers attempts to distinguish this later ruling in *McCallan* on the ground there were extraordinary facts in that case involving the errant behavior of the debt relief agencies during litigation that do not exist here. Even so, the sole authority cited by Legal Helpers on this point ultimately declined to compel arbitration.

**B.      Is there an inherent conflict that renders the claims nonarbitrable?**

Having found that four of the claims are core,[24] the Court must still examine the reason for their "coreness"[25] and determine "whether an inherent conflict of interest exists between arbitration and the underlying purposes of the Bankruptcy Code." *Whiting-Turner Contracting Co. v. Elec. Mach. Enters., Inc. (In re Elec. Mach. Enters., Inc.)*, 479 F.3d 791, 796 (11th Cir. 2007). Are they substantively central to the purposes of the Bankruptcy Code? Although in core proceedings, a court generally has discretion to deny arbitration, this Court still "must carefully determine whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an arbitration clause and . . . should enforce such clause unless that effect would

---

[24] Even if the Trustee's causes of action are considered noncore or breach of contract claims rather than core, a court may deny arbitration. *See Hooks*, 2011 WL 2746238, at \*3.

[25] His claims are mentioned in 28 U.S.C. § 157(b)(2) and detailed in title 11.

seriously jeopardize the objectives of the [Bankruptcy] Code." *Atlantic Marine, Inc. v. Am. Classic Voyages, Co.* (*In re Am. Classic Voyages, Co*.), 298 B.R. 222, 226 (D. Del. 2003) (quoting *Hays*, 885 F.2d at 1161); *Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze)*, 434 F.3d 222, 231 (3d Cir. 2006) (in a core proceeding, the bankruptcy court may properly deny enforcement only if the *McMahon* standard is satsified).

In this case, four core claims are based on provisions of the Code. At the outset, the Court notes that arbitration more likely conflicts with the Bankruptcy Code, when the Bankruptcy Code itself created the rights in dispute.

As to the Trustee's fraudulent transfer claim, courts have frequently overridden arbitration agreements. For example, in *Bethlehem Steel Corp*, the bankruptcy court denied arbitration of a fraudulent transfer claim because of a policy conflict. *Bethlehem Steel Corp.*, 390 B.R. at 795. Also, in *Hays,* the Third Circuit refused to compel arbitration of fraudulent transfer claims. *Hays*, 885 F.2d at 1161. "[T]here is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative from one who was a party to it." *Hays*, 885 F.2d at 1155.

Recently, the Fifth Circuit upheld a court's denial of a motion compelling arbitration in a fraudulent transfer claim. *Gandy*, 299 F.3d at 500. It found that the Bankruptcy Code's purposes and policies dominated the trustee's claims and that, "the heart of the Debtor's complaint concerns the avoidance of fraudulent transfers." *Id.* Further, a peppering of Second Circuit Courts has exempted fraudulent transfer claims from arbitration agreements. *Allegaert v. Perot,* 548 F.2d 432, 436 (2d Cir. 1977); *Hagerstown Fiber Ltd. P'ship*, 277 B.R. at 206-09.

Legal Helpers cites *Sternklar v. Heritage Auction Galleries, Inc. (In re Rarities Group, Inc.)*, 434 B.R. 1 (D. Mass. 2010), a chapter 7 case in which the district court compelled

arbitration of almost all of the claims asserted by the chapter 7 trustee, one of which was a fraudulent transfer claim. The district court in *Rarities Group, Inc.* noted that the claims in question arose from a prior business relationship between the debtor and the defendant and, more notably, that "[t]here do not appear to be any other creditors or third parties in these proceedings whose interests might be affected if the claims are resolved by arbitration rather than by a bankruptcy judge." *Rarities Group, Inc.*, 434 B.R. at 11. Legal Helpers likens this case to *Rarities Group, Inc.* on the premise that no one other than the Trustee will be affected by the outcome of the Adversary. (Br. at 16). The bankruptcy schedules in this case, and the allegations of the Trustee, do not support this assertion.

As to the Trustee's claim under 11 U.S.C. § 526, Legal Helpers maintains that it is nothing more than a request for the return of the Debtor's money, a common aspect of any run-of-the-mill breach of contract claim. Legal Helpers' view conflicts with the Supreme Court's analysis of 11 U.S.C. § 526 in *Milavetz, Gallop & Milavetz, P.A. v. United States*, 130 S. Ct. 1324 (2010). There, the Supreme Court noted that Congress enacted 11 U.S.C. § 526 to correct abusive practices by debt relief agencies, which it described as an "area of substantial federal concern." *Id.* at 1332-33. Congress' "underlying purposes" for enacting 11 U.S.C. § 526 sets it apart from a simple contract dispute.

It is unlikely that Congress intended that the role of bankruptcy courts in enforcing 11 U.S.C. § 526 be overridden by private parties through prepetition contracts. Congress clearly contemplated the regulation of debt relief agencies (like Legal Helpers) through the BAPCPA. Legal Helpers insists that if Congress wanted to preclude the arbitration of claims under 11 U.S.C. § 526, it could have easily done so by adding such a provision. The text of 11 U.S.C. § 526, however, is not dispositive; rather, a "contrary congressional command" may be

discovered in the statute's "legislative history, or an 'inherent conflict' between arbitration and the [statute's] underlying purposes." *Gilmer*, 500 U.S. at 26.

Legal Helpers cites the Court's decision in *Russell*, 402 B.R. at 191-21, where the undersigned judge (who also sits by designation in the Northern District of Mississippi) denied arbitration for reasons that, according to Legal Helpers, do not exist here. In *Russell*, the Court noted that "the causes of action asserted in the Complaint are not related to the Contract itself." *Id.* at 194. In *Russell*, the chapter 13 debtor sued a creditor alleging that the creditor disclosed personal information about her in the proof of claim it filed in her bankruptcy case. The debtor asserted numerous causes of action against the creditor, including contempt of the bankruptcy court and violations of rules and policies against the disclosure of personal identifiers. She also asserted state law claims. The Court denied the creditor's request to compel the debtor to arbitrate her claims under a provision in the purchase contract signed by the debtor.

Legal Helpers contrasts the claims alleged in *Russell* with the five claims alleged here. Unlike in *Russell*, the crux of the Trustee's allegations is premised either on provisions in the Agreement or in services provided under the Agreement, according to Legal Helpers. The Trustee's state-law fraud claim, for example, clearly exists apart from the bankruptcy proceeding. *Walker v. Commercial Credit Corp.*, 192 B.R. 260, 267 (M.D. Ala. 1996).

Legal Helpers turns the Court's holding in *Russell* on its head. The Court did not rule in *Russell* that arbitration may be denied only when no claim in the complaint arises out of the parties' agreement. It just so happens that in *Russell*, the complaint "primarily asserts causes of action and seeks remedies which arise only in the context of a bankruptcy proceeding." *Russell*, 402 B.R. at 195. Legal Helpers' interpretation of *Russell* would render that decision inconsistent with *Gandy*, which included allegations of non-bankruptcy contractual and tort issues. In

affirming the denial of motions to compel arbitration, the *Gandy* court reasoned that "[w]hile some of the Debtor's remaining claims do involve her pre-petition legal or equitable rights, the bankruptcy causes of action predominate." *Gandy*, 299 F.3d at 497.

The Court finds particularly helpful the analysis of the bankruptcy court in *In re Hostess Brands, Inc.*, No. 12-22052, 2013 WL 82914 (Bankr. S.D.N.Y. Jan. 7, 2013). A creditor moved to compel arbitration of the debtor's motion for authority to use the creditor's cash collateral pursuant to 11 U.S.C. § 363(c). The creditor maintained that the cash collateral motion contemplated a breach of its underlying agreement with the debtors and that the debtors were required to arbitrate the breach under an arbitration clause in the same agreement. *Hostess Brands, Inc.*, 2013 WL 82914, at *2. The bankruptcy court found the cash collateral issue to be "substantially core" to the bankruptcy process and, thus, the issue went beyond the basic statutory definition of "core" in 28 U.S.C. § 157(b). From that finding, the court held that the parties did not in fact agree to arbitrate the dispute (although it recognized at the same time that the arbitration provision was broad). Even if they had agreed to arbitrate the dispute, it exercised its discretion to deny arbitration. *Hostess Brands, Inc.*, 2013 WL 82914, at *3.

The exercise of the Court's discretion, as thoughtfully discussed in *Hostess Brands, Inc.*, 2013 WL 82914, at *4, is not merely whether the Court should hear the disputes. The Court must also consider whether it should carve out pieces from the Debtor's bankruptcy case for an arbitrator to decide. In that regard, the Court may consider whether the issue could be resolved more quickly by the bankruptcy judge than the arbitrator, whether specialized expertise is necessary, the impact on creditors of the debtor who were never parties to the arbitration agreement, and whether arbitration threatens the assets of the estate. *Slipped Disc Inc. v. CD Warehouse Inc.* (*In re Slipped Disc Inc.*), 245 B.R. 342, 345-46 (Bankr. N.D. Iowa 2000); *Dunes*

*Hotel Assocs. v. Hyatt Corp.* (*In re Dunes Hotel Assocs.*), 194 B.R. 967, 993 (Bankr. D.S.C. 1995). As to these matters, the arbitration clause provides, in pertinent part:

> The parties shall initially agree on a single arbitrator to resolve the dispute. The matter may be arbitrated either by the Judicial Arbitration Mediation Service or American Arbitration Association, as mutually agreed upon by the parties or selected by the party filing the claim. The arbitration shall be conducted in either the county in which the [Debtor] resides, or the closest metropolitan county. Any decision of the arbitrator shall be final and may be entered into any judgment in any court of competent jurisdiction. The conduct of the arbitration shall be subject to the then current rules of the arbitration service. The costs of arbitration, excluding legal fees, will be split equally or born[e] by the losing party, as determined by the arbitrator. The parties shall bear their own legal fees.

(Agr. ¶ XVIII). Of most concern to the Court is that arbitrators on the roster of the American Arbitration Association ("AAA")[26] need not be attorneys, much less attorneys experienced in bankruptcy law. The Court has discretion to deny enforcement of arbitration agreements when arbitration, as a practical matter, would result in the loss of a party's legal rights. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000) (noting, for example, that the existence of large arbitration costs may preclude a litigant from effectively vindicating her federal statutory rights in the arbitral forum). Here, the Court finds that arbitration is not an adequate and accessible substitute to litigation in this forum, given the nature of the bankruptcy issues involved.

Protecting the creditors of the debtor is one of the chief objectives of the bankruptcy process. A number of legal, practical, and equitable considerations convince the Court that the creditors would not be adequately protected by arbitrating this proceeding. *McCallan*, 2012 WL 1392960, at *6. In the Adversary, the Trustee is acting to benefit the creditors of the Debtor's estate. The Fifth Circuit in *Gandy* denied a motion to compel arbitration where, as in this case, the bankruptcy causes of action predominated and concerned noncore matters "in only the most

---

[26] The AAA is one of the two arbitration services named in the arbitration clause.

peripheral manner." *Gandy*, 299 F.3d at 495-97 (quoting *National Gypsum*, 118 F.3d at 1067). Even Legal Helpers argues that both the core and noncore claims should be arbitrated together for the sake of judicial efficiency. (Br. at 17).

### Conclusion

In conclusion, the Court denies arbitration of the Trustee's claims. The Trustee was not a signatory to the Agreement between the Debtor and Legal Helpers. While the scope of the arbitration clause is broad, and thus favors arbitration, it applies only to disputes between the Debtor and Legal Helpers. Further, the Trustee's claims center upon four core issues and only one noncore issue. The Court has discretion to deny Legal Helpers' request for arbitration if the core proceedings derive from the Bankruptcy Code and arbitration would conflict with the "central purposes" of the Code. "[A] bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purposes of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *Startec Global Commc'ns Corp. v. Videsh Sanchar Nigam Ltd. (In re Startec Global Commc'ns Corp.)*, 292 B.R. 246, 253 (Bankr. D. Md. 2003) (quoting *National Gypsum*, 118 F.3d at 1069). Because the claims stem from the Trustee's statutory rights and because the Trustee is seeking to maximize the estate for the creditors' benefit, arbitration would conflict with the central purposes of the Code. Accordingly, the Court concludes that the Trustee's claims are more properly adjudicated in this forum rather than by an arbitrator.

IT IS, THEREFORE, ORDERED that the Motion should be, and is hereby, denied.

IT IS FURTHER ORDERED that Legal Helpers and the Individual Defendants shall file a response to the Complaint within fourteen (14) days from the date of this Opinion.

SO ORDERED.

_____
Neil P. Olack
United States Bankruptcy Judge
Dated:  February 6, 2013