**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:

    **MARY ALICE HUFFMAN,**                  **CASE NO. 12-00177-NPO**

    **DEBTOR.**                              **CHAPTER 7**

**DEREK A. HENDERSON, AS CHAPTER 7**
**TRUSTEE FOR THE BANKRUPTCY**
**ESTATE OF MARY ALICE HUFFMAN**        **PLAINTIFF**

**VS.**                        **ADV. PROC. NO. 12-00099-NPO**

**LEGAL HELPERS DEBT RESOLUTION,**        **DEFENDANTS**
**L.L.C., MACEY, ALEMAN, HYSLIP &**
**SEARNS, THOMAS G. MACEY,**
**JEFFREY J. ALEMAN, JEFFREY**
**HYSLIP, AND JASON SEARNS**

**MEMORANDUM OPINION AND ORDER**
**ON MOTION FOR JUDGMENT ON THE PLEADINGS**

      This matter came before the Court for hearing on May 14, 2013 (the "Hearing"), on the

Motion for Judgment on the Pleadings (the "Motion") (Adv. Dkt. 64)[1] filed by Legal Helpers

Debt Resolution, LLC a/k/a the law firm of Macey, Aleman, Hyslip & Searns ("Legal Helpers")

and Thomas G. Macey, Jeffrey J. Aleman, Jeffrey Hyslip, and Jason Searns (collectively, the

"Members")[2] in the above-styled adversary proceeding (the "Adversary"). The Members[2] are the

named partners of Macey, Aleman, Hyslip & Searns, and Legal Helpers is the trade name of the

law firm. Also before the Court at the Hearing were the Plaintiff's Response to Motion for

Judgment on the Pleadings (DKT #64) (Adv. Dkt. 67) and the Plaintiff's Memorandum in

---

[1] Citations to the record are as follows: (1) citations to docket entries in this adversary
proceeding are cited as "(Adv. Dkt. _____)"; and (2) citations to docket entries in the main
bankruptcy case, Case No. 12-00177-NPO, are cited as "(Bankr. Dkt. _____)".

[2] The Members filed a motion to dismiss for lack of personal jurisdiction (Adv. Dkt. 17)
but later voluntarily withdrew the motion (Adv. Dkt. 30).

Support of his Response to Motion for Judgment on the Pleadings (the "Trustee Brief") (Adv. Dkt. 68) filed by Derek A. Henderson, chapter 7 trustee (the "Trustee"). At the Hearing, Jason Graeber represented the Trustee, and Terry Levy represented Legal Helpers and the Members. The Court, having considered the pleadings, brief, and the arguments of counsel, finds for the following reasons that the Motion should be granted in part and denied in part.

## Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this case pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H) & (O).[3] Notice of the Motion was proper under the circumstances.

## Facts

The facts below are taken from the allegations in the Complaint (the "Complaint") (Adv. Dkt. 1). For purposes of the Motion, these facts are accepted as true and are viewed in the light most favorable to the Trustee.

After incurring sizeable credit card debt, Mary Alice Huffman ("Huffman") began "experiencing financial difficulty" and became "desperate for solutions" to resolve her financial debt. (Compl. ¶¶ 34, 36). On the verge of bankruptcy, she retained Legal Helpers to review her finances and possibly negotiate lump-sum settlements of her debts.

---

[3] The United States Supreme Court in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), held that bankruptcy courts lack authority to enter final judgments on state-law, compulsory counterclaims that did not "flow from a federal statutory scheme." *Id.* at 2614; *see Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 407 (5th Cir. 2012) (suggesting a narrow interpretation of *Stern* in holding that *Stern* did not, *sub silentio*, render unconstitutional the statutory powers of federal magistrate judges). In the event that a higher court disagrees that the Adversary involves "core" matters and/or otherwise determines that the Court lacks constitutional authority to enter a final judgment, the Court recommends that this Opinion be regarded as its proposed findings of fact and conclusions of law and further recommends that the District Court enter this Opinion as its own after due consideration, in accordance with 28 U.S.C. § 157(c)(1).

Huffman turned to Legal Helpers because it is a "debt relief agency." (Compl. Ex. D. ¶ I). The U.S. Bankruptcy Code[4] defines a "debt relief agency" as "any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration." 11 U.S.C. § 101(12A). An "assisted person," in turn, is defined in the Code as "any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $175,750." 11 U.S.C. § 101(3).

**Legal Helpers**

Legal Helpers and its Members offer various legal services, including debt settlement services[5] and some bankruptcy services. The services advertised by Legal Helpers in its promotional materials include: attorney review, assigning a settlement advisor, compiling an "Account Management Team," monthly case review, correspondence to creditors, creditor correspondence review, responding to creditor correspondence, debt negotiations, debt settlements, bankruptcy advice, credit counseling, and referral of Fair Debt Collection Practices Act cases. (Compl. ¶¶ 40-48 & Exs. A-C).

**Legal Helpers' Debt Settlement Programs**

Typically, a client's debt settlement program begins when she signs a retainer agreement and creates a savings account into which she agrees to make monthly deposits. (Compl. ¶¶ 22-23). The size of the monthly deposit is determined by Legal Helpers based on the total amount of debt owed by the client and the amount of its own fees. The client then authorizes Legal Helpers to make direct withdrawals electronically from the savings account. Significantly, Legal

---

[4] Hereinafter, all references either to the "Bankruptcy Code" or to the "Code" are to the U.S. Bankruptcy Code found at title 11 of the United States Code.

[5] The terms "debt settlement," "debt management," and "debt resolution" sometimes denote different types of debt relief services. In this Opinion, the Court follows the lead of the parties, who use these terms interchangeably.

Services withdraws funds from the savings account to pay its own upfront fees before distributing any portion to creditors. (Compl. ¶ 24).

After a period of time, the client's monthly payments accumulate in the savings account to provide "lump-sum" amounts to negotiate possible settlements of her debts. (Compl. ¶ 25). Legal Helpers then pursues settlement on a debt-by-debt basis. Each client's debt settlement program is somewhat unique in that it is based on the amount of the client's unsecured debt and other similar variables.

**Huffman's Debt Settlement Program**

On March 30, 2010, Huffman entered into a "Retainer Agreement" (the "Agreement")[6] with Legal Helpers. (Compl. Ex. D at 4). The Agreement, which appears to be a form contract, required Huffman to pay Legal Helpers a retainer fee of $500.00, a monthly maintenance fee of $50.00, and a service fee of 15 percent of her total debt. (Compl. Ex. D ¶ VIII). To fund her settlement program, monthly payments of $496.00 were electronically drafted from Huffman's bank account by Legal Helpers. (Compl. ¶ 52).

The Agreement contains several important representations as to the services provided by Legal Helpers: (1) that Legal Helpers would negotiate and settle Huffman's debts; (2) that Legal Helpers would assign an "Account Management Team" to review her account once a month and ensure progress; (3) that any debt collectors would be referred to Legal Helpers; (4) that Legal Helpers and other legally trained, licensed personnel would supervise all negotiations and customer support and ensure that the services comply with established procedures; (5) that Legal Helpers would use its best efforts to obtain a satisfactory result for Huffman by providing basic

---

[6] The Trustee attached as an exhibit to the Complaint an agreement signed by a client of Legal Helpers, not Huffman, but which the Trustee alleges is similar to the one Huffman signed. (Compl. Ex. D).

legal services in connection with debt review and modification for Huffman on an efficient and cost-effective basis; (6) that Legal Helpers is a full service debt resolution law firm including debt negotiation and restructuring, bankruptcy, and referral to consumer credit counseling agencies, where appropriate; and (7) that Legal Helpers would contact all of Huffman's unsecured creditors in writing to inform them that she is represented by Legal Helpers.  (Compl. ¶¶ 42-48).

**Bankruptcy Case**

Despite entering into the Agreement, Huffman continued to be harassed by her creditors and was eventually sued for nonpayment of a debt.  (Compl. ¶ 54).  She informed Legal Helpers about the harassment, but to no avail.  (Compl. ¶ 58).  Finally, Huffman ended her debt settlement program and on January 19, 2012, filed a petition for relief under chapter 7 of the Bankruptcy Code without any legal assistance or other help from Legal Helpers.  (Bankr. Dkt. 1).

**Adversary Proceeding**

**Complaint**

On September 28, 2012, the Trustee filed the Complaint asserting five causes of action on Huffman's behalf against Legal Helpers and the Members: Count I: Turnover of Estate Property (Compl. ¶¶ 66-71), Count II: Fraudulent Transfers (Compl. ¶¶ 72-76), Count III: Accounting (Compl. ¶¶ 77-78), Count IV: 11 U.S.C. § 526 (Compl. ¶¶ 79-87), and Count V: Fraud (Compl. ¶¶ 88-109).  The gist of the Trustee's allegations in the Complaint is that the debt settlement program did not actually help Huffman's precarious financial situation but in fact made it much worse.  (Compl. ¶ 56).  The Trustee alleges numerous deceptive and abusive practices by Legal Helpers and further alleges that the Members are jointly liable for these same practices "through

the principals [sic] of alter ego, piercing the corporate veil, agency, joint venture, or respondeat superior." (Compl. ¶ 64).

The Trustee posits two main allegations in support of his claims. First, he asserts that Legal Helpers promised to provide Huffman with debt relief services under the guise of "legal representation;" however, Legal Helpers outsourced these services to nonattorneys. (Compl. ¶ 16, 20). Legal Helpers "enter[s] this landscape [of debt-laden consumers] masquerading as attorneys" who provide debt solutions but "in reality, Legal Helpers' program [is] merely a scam in which [Legal Helpers] siphon[s] off thousands of dollars." (Compl. ¶¶ 28, 38). Second, the Trustee contends that Legal Helpers advised its clients to stop paying their unsecured creditors.[7] (Compl. ¶ 17). According to the Trustee, Legal Helpers does not inform clients that defaulting on debts as part of a "debt management scheme" "(a) will likely increase the amount they owe to creditors due to interest, late fees and penalties on unpaid accounts; (b) will cause creditors to balk at settlement offers or reject them entirely; (c) [will] increase collection activity; and (d) [will] increase tax liability due to debt forgiveness." (Compl. ¶¶ 21, 26).

The Trustee contends that Legal Helpers engages in the same type of deceptive practices that the Federal Trade Commission ("FTC") addressed in the 2010 amendment to its Telemarketing Sales Rule,[8] 16 C.F.R. § 310.1-310.9 (Aug. 10, 2010) (Compl. ¶ 30). In the amendments, the FTC prohibits debt relief providers, who use telemarketing to solicit potential clients, from collecting fees until after they have actually provided the debt relief services, except for certain fees charged on a proportional basis, and from making misrepresentations about

---

[7] Presumably, this strategy is based on the theory that it is easier to negotiate reductions of older debts.

[8] The Telemarketing Sales Rule was promulgated under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108.

material aspects of their debt relief services, including their success rates. The FTC also requires debt relief providers to disclose certain material information about their services. The Trustee contends that the Government Accountability Office likewise has issued a report on the dangers posed by entities like Legal Helpers, especially given that fewer than 10% of consumers ever successfully complete debt settlement programs.[9]  (Compl. ¶ 31).

### Denial of Request for Arbitration

Legal Helpers and the Members filed a motion asking the Court to compel the Trustee to arbitrate his claims. (Adv. Dkt. 15). The Court denied their request for arbitration on February 6, 2013. (*See* Memo. Op. & Order Denying Mot. to Compel Arb., Adv. Dkt. 37). On February 20, 2013, Legal Helpers and the Members filed a Notice of Appeal of the denial of their request for arbitration (Adv. Dkt. 44) and contemporaneously filed separate answers to the Complaint (Adv. Dkts. 39-43). Legal Helpers and the Members then filed a stipulation of dismissal of the appeal, and the Court entered an order dismissing the appeal pursuant to Rule 8001(c) of the Federal Rules of Bankruptcy Procedure on March 18, 2013. (Adv. Dkt. 60).

### Motion

Legal Helpers filed the present Motion on April 10, 2013. In the Motion, Legal Helpers and the Members ask the Court to dismiss all of the Trustee's alter ego claims against the Members and most of his claims against Legal Helpers. They seek the dismissal of the Trustee's claims against Legal Helpers for turnover of estate property, accounting, and fraud. They do not seek dismissal of the Trustee's claims against Legal Helpers for fraudulent transfer or for relief under 11 U.S.C. § 526.

---

[9] Debt Settlement:  Fraudulent, Abusive, and Deceptive Practices Pose Risk to Consumers, GAO-10-593T (April 22, 2010).

## Discussion

**A.      Rule 12(c) Standard**

The Motion is premised on Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)"), which is made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure.  The standard for deciding a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as the standard that applies to a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Ranger Ins., Ltd. v. Transocean Offshore Deepwater Drilling, Inc. (In re Deepwater Horizon*), 710 F.3d 338, 343 (5th Cir. 2013) (citation omitted).  As noted previously, in considering the factual sufficiency of the Complaint, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (citation omitted).  To defeat the Motion, the Complaint must satisfy the "plausibility" requirements in Rule 8 of the Federal Rules of Civil Procedure, as outlined by the U.S. Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rule 8(a)(2) of the Federal Rules of Civil Procedure (made applicable by Rule 7008 of the Federal Rules of Bankruptcy Procedure) requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

The purpose of Rule 12(c) is not to clarify vague pleadings but "to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts."  *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990).  "When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be

exposed at the point of minimum expenditure of time and money by the parties and the court."
*Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 558).  The
purpose of a Rule 12(c) inquiry is not to determine whether the plaintiff's claims have merit but
whether the plaintiff has alleged sufficient facts in a complaint.  *Ackerson v. Bean Dredging
LLC*, 589 F.3d 196, 209 (5th Cir. 2009).

**B.    Alter Ego**

The Trustee alleges in the Complaint that Legal Helpers and the Members are alter egos
and that Legal Helpers' "corporate veil" should be pierced for the purpose of holding the
Members vicariously liable.  Before reviewing the plausibility of the allegations in the Complaint
that Legal Helpers and the Members are alter egos, the Court must make a choice of law.  In the
Motion, Legal Helpers cites Nevada law, but in the Trustee Brief, the Trustee relies upon
Mississippi law.  Neither Legal Helpers nor the Trustee directly addresses which state's law
applies.

**1.    Choice of Law**

Legal Helpers is a limited liability company ("LLC") organized under the laws of Nevada
and authorized to do business in Mississippi.  The Mississippi Limited Liability Company Act
provides that the liability of members of a foreign LLC is governed by the laws of the state under
which the LLC exists.[10]  MISS. CODE ANN. § 79-29-1001.  Accordingly, Nevada law controls the
determination as to whether the Trustee can pierce Legal Helpers' veil of limited liability.  *See*

---

[10] In the Trustee Brief, the Trustee cites the provision in the Mississippi Professional
Corporation Act, MISS. CODE ANN. § 79-10-67, that extends liability to individuals employed by
a foreign professional corporation in certain circumstances.  (Trustee Br. at 6-7).  In the
Complaint, however, the Trustee alleges that Legal Helpers is a foreign limited liability
company.  (Compl. ¶ 6).

*Thorne v. Prommis Solutions Holding Corp. (In re Thorne)*, No. 10-01172-DWH, 2011 WL 2496217, at *2 (Bankr. N.D. Miss. June 22, 2011).

**2.      LLC Veil-Piercing**

Regarding the purported vicarious liability of the Members, the main allegation in the Complaint is that the Members "orchestrated, facilitated, and benefited from [Legal Helpers'] debt management scheme." (Compl. ¶ 13). There is an additional allegation that Legal Helpers and the Members "disregarded, manipulated, misused or abused the corporate or other business entity status of [Legal Helpers] and the law firm of [Macey, Aleman, Hyslip & Searns]." (Compl. ¶ 64). The question before the Court is whether these allegations support a plausible claim against the Members under an "alter ego" theory of liability. The application of this theory is important to the Trustee because the members of an LLC generally are not liable for the debts of the LLC. NEV. REV. STAT. § 86.371. The Trustee asks the Court to apply the corporate law doctrine of "veil piercing" in order to disregard the limited liability of the Members.

The parties appear to assume that an LLC, like a corporation, would be vulnerable to corporate veil-piercing law if warranted by the factual circumstances. Indeed, Nevada courts have long recognized that the limited liability of corporate shareholders may be ignored in some circumstances. *See Frank McCleary Cattle Co. v. Sewell*, 317 P.2d 957, 959 (Nev. 1957), *overruled on other grounds by Callie v. Bowling*, 160 P.3d 878 (Nev. 2007). Nevada's statutory version of the alter ego theory provides that shareholders act as the alter ego of a corporation if:

(a)  The corporation is influenced and governed by the stockholder, director or officer;

(b)  There is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; and

(c)  Adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice.

NEV. REV. STAT. § 78.747(2).  The Nevada Supreme Court has cautioned that "the corporate cloak is not lightly thrown aside."  *Baer v. Amos J. Walker, Inc.,* 452 P.2d 916, 916 (Nev. 1969) (citation omitted).  On the other hand, the Nevada Supreme Court has not hesitated to remove that "corporate cloak" if "adherence to the fiction of a separate entity . . . [would] sanction a fraud or promote injustice."  *Id.*

The Nevada Supreme Court has not applied the alter ego doctrine to an LLC.  *AE Rest. Assocs., LLC v. Giampietro (In re Giampietro)*, 317 B.R. 841, 845-46 (Bankr. D. Nev. 2004) (noting absence of authority but finding it "highly likely that Nevada courts would recognize the extension of the alter ego doctrine to members of limited liability companies").  Here, because the Trustee's allegations do not state a plausible claim for piercing the limited liability of the Members, it is unnecessary for the Court to predict how the Nevada Supreme Court would rule if confronted with the LLC-piercing issue.

As to the first two factors under NEV. REV. STAT. § 78.747(2), namely, that the Members "influenced and governed" Legal Helpers and that there was a unity of interest, there is no allegation in the Complaint that Huffman had personal contact with any Member.[11]  The closest the Trustee comes to alleging personal contact between Huffman and the Members is his conclusory allegation in the Complaint, as previously mentioned, that the Members "orchestrated, facilitated, and benefited from this debt management scheme."  (Compl. ¶ 13).  Moreover, there is no allegation that Legal Helpers was undercapitalized or unable to pay its

---

[11] At the Hearing, counsel for the Trustee stated for the first time that the signature of one of the Members appears on the Retainer Agreement that Huffman herself signed.  As noted previously, the Agreement attached to the Complaint is similar to, but not the same as the one signed by Huffman.  For purposes of Rule 12(c), the Court may only consider the Complaint and its proper attachments and, therefore, does not give counsel's statement any weight.  *See Fin. Acquisition Partners v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006).

debts, that Legal Helpers held itself out to Huffman as anything other than a separate legal entity, or that the Members commingled their personal funds with those of Legal Helpers. Curiously, there is an allegation in the Complaint that appears to contradict a finding that the Members were personally involved in Huffman's debt settlement program. The Trustee alleges that "Legal Helpers makes consumers believe that as a law firm it is providing debt settlement services when, in fact, non-attorneys from outsource providers provide most, if not all, of the debt management services." (Compl. ¶ 16). This allegation suggests that the Members maintained a "hands off" approach with respect to the debt relief services that Legal Helpers provided Huffman.

Even assuming that the Complaint contains sufficient allegations as to the first two factors under NEV. REV. STAT. § 78.747(2), the Trustee has not alleged sufficient facts showing that "adherence to the fiction of separate entity would, under the circumstances sanction a fraud or promote injustice." *Frank McCleary Cattle Co.*, 317 P.2d at 959. Although there are numerous allegations of fraud regarding the debt settlement program, there are no facts showing that the Members and Legal Helpers blurred their separate identities in order to perpetrate that fraud, as required by the third factor in NEV. STAT. § 78.747(2). It appears that the Members are being sued by the Trustee solely because of their membership status. *See N. Arlington Med. Bldg., Inc. v. Sanchez Constr. Co.*, 471 P.2d 240, 245 (Nev. 1970) (record failed to support piercing of corporate veil in that it failed to show what manner the actions of the individual sanctioned fraud or promoted an injustice). Many LLCs are small businesses that are controlled and operated in close association with their owners. In Nevada, membership in an LLC, without more, may not support an alter ego finding.

In the Trustee Brief, the Trustee criticizes Legal Helpers for disputing his alter ego analysis at this early stage of the proceedings. The Trustee promises that "[s]upport for the alter ego allegations will be developed in discovery." (Trustee Br. at 7). The focus of a Rule 12(c) inquiry, however, is not whether sufficient evidence supports the facts alleged in the complaint but whether the facts alleged in the complaint support a facially plausible claim for relief. Hence, discovery would not assist the Trustee in defending the Motion. *See Sw. Bell Tel., LP v. City of Houston*, 529 F.3d 257, 263 (5th Cir. 2008) ("AT&T maintains . . . it was entitled to discovery prior to the district court's dismissal-ruling. To the contrary, when deciding, under Rule 12(b)(6), whether to dismiss . . . the court considers, of course, only the allegations in the complaint."). As the Supreme Court noted in *Iqbal*, "Rule 8 [of the Federal Rules of Civil Procedure] marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but *it does not unlock the doors of discovery* for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79 (emphasis added).

In short, after accepting the allegations in the Complaint as true and in the light most favorable to the Trustee, the Court finds that the Trustee does not state a plausible claim for relief against the Members under the alter ego doctrine. The Court next turns to the Trustee's claims against Legal Helpers, which include turnover, accounting, and fraud claims.

## C.     Turnover of Estate Property and Records

A trustee in a chapter 7 bankruptcy case is the representative of the estate. 11 U.S.C. § 323(a). In that role, he has the right to seek turnover of estate property under § 542(a), which provides, in pertinent part:

> [A]n entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of the title shall deliver to the trustee, and

account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a). Section 542 empowers a trustee to bring property of the debtor into the bankruptcy estate when the debtor did not have possession of that property at the time the case was commenced. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205, 207-08 (1983). A trustee's right to seek turnover of estate property allows him to perform his statutory duty to "collect and reduce to money the property of the estate for which such trustee serves." 11 U.S.C. § 704(a)(1). In the Motion, Legal Helpers contests the Trustee's turnover claim on the ground "it does not identify any estate property that is subject to turnover." (Mot. ¶ 10).

The Trustee seeks the turnover of "property of the estate" and records relating to Legal Helpers' debt settlement programs, which he describes in detail in the following paragraphs of the Complaint:

> 69. [Huffman] paid fees and expenses to [Legal Helpers] and in exchange for said funds [Legal Helpers was] obligated to settle/negotiate debts and provide legal services.

> 70. [Legal Helpers has] collected substantial sums in fees from [Huffman] but [has] not adequately provided the promised services.

> 71. Trustee respectfully requests that [Legal Helpers] be required to turn over: (1) money that [it] collected in fees for services that were not performed and/or inadequately performed; and (2) any and all records (whether stored in electronic or hard copy format) related to any and all aspects of the debt settlement programs, including but not limited to, any and all records related to any and all individuals in Mississippi for whom [Legal Helpers] performed or agreed to perform any aspect of the debt settlement program.

(Compl. ¶¶ 69-71). Specifically, the Trustee's turnover action pertains to two categories of property: (1) fees and expenses that Huffman paid Legal Helpers under the Agreement and (2) records relating to Legal Helpers' debt settlement program in Mississippi.

1.      **Fees and Expenses Paid by Huffman**

Legal Helpers maintains that the Trustee has not identified a legal theory or supporting facts to show that the fees and expenses paid by Huffman pursuant to the Agreement constitute property of the estate.  Legal Helpers points out that these fees and expenses were paid by Huffman prior to her bankruptcy filing over a period of two years.

The "property" that is subject to a turnover action is defined in § 542 as "property that the trustee may use, sell, or lease under section 363" or that the debtor "may exempt under section 522." 11 U.S.C. § 542(a).  "Property" in § 542 is generally construed to mean "property of the estate." 5 COLLIER ON BANKRUPTCY ¶ 542.02 (16th ed. 2013).  As noted by the Trustee in the Trustee Brief, property of the estate is defined broadly in the Code to include "all legal or equitable interest of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  This broad definition, according to the Trustee, supports his contention that the debt at issue here is subject to his turnover claim under § 542.

The power of the Trustee to compel the turnover of a debt is expressly governed by § 542(b).  Section 542(b) provides, "[A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to . . . the trustee." 11 U.S.C. § 542(b).  The debt described in the Complaint, however, does not fit the description of a debt subject to the turnover power in § 542(b).

In that regard, the Trustee alleges that Huffman paid Legal Helpers $496.00 per month for its debt relief services.  These monthly payments total approximately $10,000.00, assuming that Huffman continued making payments on her debt settlement plan for roughly two years.  In the Complaint, the Trustee disputes whether Legal Helpers actually performed the debt relief services it promised Huffman.  (Compl. ¶¶ 69-71).  Section 542, however, is not the appropriate

mechanism for resolving a *disputed* debt.  5 COLLIER ON BANKRUPTCY § 542.02[2] (16th ed. 2013).  Here, the debt the Trustee seeks to recover from Legal Helpers is neither "mature," nor "payable on demand," nor "payable on order."  Because the debt does not fall within the Trustee's turnover power, the Trustee may not use § 542 to recover these fees and expenses.

## 2.    Records Relating to Legal Helpers' Debt Settlement Program

As to the second category of property, Legal Helpers asserts that the Trustee's request for records relating to its debt settlement programs exceeds "property of the estate" and goes well beyond the scope of bankruptcy jurisdiction.  Legal Helpers' argument in the Motion is not a model of clarity but appears to be based upon an assumption that the turnover power in § 542 reaches only property of the estate.  Although the term "property" in § 542(a) is defined to include "property of the estate," § 542(e) is different in that it pertains to records "relating to the debtor's property or financial affairs."  Section 542(e) provides, in pertinent part:

> Subject to any applicable privilege . . ., the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

11 U.S.C. § 542(e).  Therefore, Legal Helpers' assertion in the Motion that the Trustee seeks turnover of records that do not belong to Huffman is misplaced because it ignores § 542(e), which applies even "when documents are not property of the estate."  5 COLLIER ON BANKRUPTCY ¶ 542.06[1] (16th ed. 2013).  The turnover claim in the Complaint states a plausible claim for relief because the documents the Trustee seeks "relate to" the debt settlement program in Mississippi, in which Huffman was a participant.  *In re Hotels Nev., LLC,* 458 B.R. 560, 566-67 (Bankr. D. Nev. 2011).

**D.    Accounting**

With respect to his accounting claim against Legal Helpers, the Trustee contends he cannot determine the precise amount of money owed Huffman without:

> (1) knowing the amount of money that they collected in fees for services that were not performed and/or not adequately performed; and (2) acquiring any and all records (whether stored in electronic or hard copy format) relating to any and all aspects of the debt settlement program, including, but not limited to, any and all records relating to any and all individuals in Mississippi for whom Defendants performed or agreed to perform any aspect of the debt settlement program.

(Compl. ¶ 78).  The Trustee alleges that Huffman paid Legal Helpers a $500.00 retainer fee and monthly payments of approximately $496.00.  (Compl. ¶¶ 51-52).  He does not provide the total pre-petition amount paid by Huffman under the Agreement.

Under Mississippi law, courts consider three factors in determining whether an accounting is warranted:  "(1) the need of discovery, (2) the complicated character of the accounts, and (3) the existence of a fiduciary or trust relationship."  *Re-Max Real Estate Partners, Inc. v. Lindsley*, 840 So. 2d 709, 712 (Miss. 2003) (citation omitted).  In the Motion, Legal Helpers contends that Huffman has not alleged sufficient facts supporting a plausible accounting claim under Mississippi law.[12]  Legal Helpers asserts that an accounting is unnecessary because either Huffman knows how much money she paid Legal Helpers or she can easily obtain that information from her bank statements.  In the alternative, Legal Helpers insists that the Trustee can obtain the same information through ordinary discovery.  Legal Helpers likens the Trustee's request for an accounting to a "fishing expedition."

In support of its contention that the Trustee has not pled sufficient facts to state a cause of action for an accounting, Legal Helpers cites *Union Nat'l Life Ins. Co. v. Crosby*, 870 So. 2d

---

[12] At the Hearing, the Trustee did not dispute the characterization of his accounting claim as arising out of Mississippi law.

1175, 1180 (Miss. 2004).   There, the Mississippi Supreme Court viewed with skepticism a request for accounting of "all funds which were the subject of overcharging, miscollection, misappropriation, or unconscionably charged and collected [as a] 'mere disguise for what really could be accomplished through discovery.'"   *Id.* (citation omitted).

In *Crosby*, the issue addressed by the Mississippi Supreme Court was whether the chancery court erred in refusing to transfer a case to circuit court, based on the chancery court's lack of subject matter jurisdiction.   The Mississippi Constitution of 1890 limits chancery court jurisdiction to "matters in equity" and other specific areas.   MISS. CONST. art. VI, § 159.   Circuit courts differ from chancery courts because circuit courts enjoy general jurisdiction, having "original jurisdiction in all matters civil and criminal in this state not vested in another court.   *Id.* § 156; *see S. Lesiure Homes, Inc. v. Hardin*, 742 So. 2d 1088, 1090 (Miss. 1999).   Historically, the Mississippi Supreme Court has considered accounting claims to be equitable in nature and within the jurisdiction of the chancery court.   *Tillotson v. Anders*, 551 So. 2d 212, 213 (Miss. 1989).

Although the complaint in *Crosby* included a claim for an accounting of funds, the Supreme Court nevertheless concluded that the lawsuit sounded in tort and contract law instead of equity and that the chancery court should have transferred the case to circuit court.   Legal Helpers cites *Crosby* in support of its challenge to the Trustee's account claim, but the Supreme Court did not abolish or limit accounting claims beyond the three factors already mentioned.   Rather, the Supreme Court simply refused to allow litigants to use an accounting claim as a "mask to assert chancery court jurisdiction," as suggested in more recent decisions.   *Compare Briggs & Stratton Corp. v. Smith*, 854 So. 2d 1045, 1049 (Miss. 2003) (transferring case involving accounting claim to circuit court where the substance of the lawsuit was an action at

law for breach of contract) *with Re-Max Real Estate Partners, Inc.*, 840 So. 2d at 714 (leaving case involving accounting claim in chancery court where accounting claim was pivotal as to all other legal claims).  That concern, upon which the right to a jury trial is at stake, required the Supreme Court in *Crosby* to consider the actual need for an equitable accounting to determine whether the chancery court was within its authority to adjudicate all legal claims asserted in the lawsuit.

Turning to the Adversary, the distinction between chancery court and circuit court jurisdiction is irrelevant, because there is no risk that the Trustee alleged the accounting claim in the Complaint solely as a means for supporting chancery jurisdiction.  Removing the gloss placed on accounting claims by Legal Helpers in the Motion, the allegations of the Complaint are sufficient to establish a plausible claim for an accounting of funds.  An accounting will help the Trustee, in his role as the legal representative of the estate, in determining how the money paid by Huffman into her debt settlement plan has been used or distributed.

## E.      Fraud

With regard to the fraud claim asserted against Legal Helpers, the Complaint must satisfy not only the "plausibility" pleading requirement but also the "particularity" requirement of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)") (made applicable to adversary proceeding by Rule 7009 of the Federal Rules of Bankruptcy Procedure).  *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 439 (5th Cir. 1994).  Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud."  FED. R. CIV. P. 9(b).  "At a minimum Rule 9(b) requires allegations of 'the particulars of time, place, and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby.'"  *Tel-Phonic Servs., Inc. v. TBS Int'l., Inc.*, 975 F.2d 1134, 1139 (5th Cir.

1992) (quoting 5 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1297, at 590 (1990)). It "requires the who, what, when, where, and how" of a fraud claim. *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997).

Turning to the merits of the Trustee's claim, fraud in the inducement "arises when a party to a contract makes a fraudulent misrepresentation, i.e., by asserting information he knows to be untrue, for the purpose of inducing the innocent party to enter into a contract."[13] *Va. Coll., LLC v. Blackmon,* 109 So. 3d 1050, 1053 (Miss. 2013) (quotation omitted). Fraudulent misrepresentation, an essential element of a fraud in the inducement claim, consists of the following nine elements: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury." *Franklin v. Lovitt Equip. Co.*, 420 So. 2d 1370, 1373 (Miss. 1982) (citation omitted). Each of these nine elements must be supported by allegations that are factual, not conclusory. *Smith v. Union Nat'l Life Ins. Co.*, 187 F. Supp. 2d 635, 650 (S.D. Miss. 2001).

### 1.    Promises

According to Legal Helpers, the Trustee's fraud claim arises out of certain promises in the Agreement, including: (1) that Legal Helpers would supervise all negotiations and customer

---

[13] The Trustee points out that when a bankruptcy trustee, acting on behalf of the creditors of an estate, alleges fraud, some courts will adopt a more "liberal" approach. *Picard v. Estate of Chais (In re Bernard L. Madoff Inv. Sec. LLC*), 445 B.R. 206, 219 (Bankr. S.D.N.Y. 2011). The rationale is that a trustee who pleads from secondhand knowledge is at a disadvantage, and, for that reason, some courts have held that "allegations of circumstantial evidence are sufficient to establish fraudulent intent." *Pereira v. Grecogas Ltd.* (*In re Saba Enters., Inc.*), 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009) (examining particularity requirement in context of fraudulent transfer claim). The Trustee does not cite any binding authority, and the Court finds it unnecessary to consider whether to apply leniency to the Trustee's allegations, given the nature of the issues raised by Legal Helpers.

support and ensure that these services complied with established procedures; (2) that Legal Helpers would use its best efforts to obtain a satisfactory result by providing basic legal services in connection with the debt review and modification on an efficient and cost-effective basis; (3) that Legal Helpers is a debt-resolution law firm including debt negotiation and restructuring, bankruptcy and referral to consumer credit counseling agencies; and (4) that Legal Helpers would contact all of Huffman's unsecured creditors in writing and inform them that Huffman was represented by the law firm and that Legal Helpers was advising Huffman as to all alternatives for debt resolution.   (Compl. ¶ 90(a)-(d)).   Legal Helpers contends that these promises cannot support the first element of a fraud claim under Mississippi law because they are promissory in nature and, hence, relate to future conduct.   *S. Mortg. Co. v. O'Dom*, 699 F. Supp. 1223, 1226-27 (S.D. Miss. 1987).   Legal Helpers bases its argument on the general rule in Mississippi that "a mere promise to perform an act in the future is not, in the legal sense, a representation, and that a mere failure to perform it does not change its character."   *In re Posey*, 57 B.R. 858, 862 (Bankr. N.D. Miss. 1985).

Not all of the allegations in the Complaint, however, are as Legal Helpers portrays them to be.  The Trustee supports his fraud claim with numerous other representations not mentioned by Legal Helpers, such as:  (1) that Huffman should not worry when her creditors sued her and (2) that any lawsuit filed against Huffman was merely part of the debt settlement process. (Compl. ¶¶ 91-92).  Moreover, many of the allegations reflect Legal Helpers' intent before or at the time the Agreement was formed.  For example, the Trustee alleges in the Complaint:  (1) that Legal Helpers knew it would not use legally trained and licensed personnel to supervise all negotiations and customer support; (2) that Legal Helpers knew it would not use its best efforts to obtain a satisfactory result for Huffman by providing basic legal services; (3) that Legal

Helpers knew it would not contact Huffman's unsecured creditors in writing; and (4) that Legal Helpers knew that Huffman would face judgments and/or garnishments from her unpaid creditors. (Compl. ¶¶ 96-99).

Mississippi recognizes an exception to the general rule when a promise is made with the present undisclosed intent not to fulfill that promise. *Kidd v. Kidd,* 49 So. 2d 824, 827-28 (Miss. 1951); *see Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1076 (5th Cir. 1984). The following allegation in the Complaint clearly reaches conduct other than Legal Helpers' mere non-performance of a future promise:

> 38. Legal Helpers created the illusion of a law firm providing debt solutions, but in reality, Legal Helpers' program was merely a scam in which [Legal Helpers] siphoned off thousands of dollars from [Huffman] at the expense of the bankruptcy estate.

(Compl. ¶ 38). For this reason, the Court finds that Huffman has alleged sufficient facts establishing the first element of a fraud claim.

### 2.    Integration Clause

Legal Helpers also asserts that to the extent the Trustee's fraud claim is based on pre-contract promises, the allegations do not state a plausible cause of action because of an "integration" clause in the Agreement which provides, "[t]his Agreement and all schedules are the complete and exclusive statement of the Agreement of the parties and supersede any proposal, prior agreement, oral or written, and any other communication related to this matter." (Compl. Ex. D ¶ XXI). The presence of an integration clause in the Agreement, according to Legal Helpers, precludes Huffman from satisfying the reliance element of her fraud claim.

The Mississippi Supreme Court has explained that integration clauses "signal to the courts that the parties agree that the contract is to be considered completely integrated . . . . [T]hus the purpose and effect of including a merger clause is to preclude the subsequent

introduction of evidence of preliminary negotiations . . . in a proceeding in which a court interprets the document." *B.C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So. 2d 483, 490 (Miss. 2005) (citation omitted). Here, Legal Helpers relies upon the integration clause to trigger the parol evidence rule, which precludes the enforcement of inconsistent or prior agreements. *Id.* The Supreme Court, however, has noted that the parol evidence rule "is subject to many exceptions and is said to be very flexible." *Turner v. Terry*, 799 So. 2d 25, 33 (Miss. 2001). One of those exceptions applies whenever there are allegations that "the making of a written contract was procured by fraudulent representations." *Id.* at 33-34. Accordingly, the Trustee is not precluded by the parol evidence rule from relying upon pre-contract promises that Legal Helpers made to Huffman in support of his claim of fraud in the inducement. For this reason, the Court finds that the Trustee has alleged sufficient facts supporting a plausible fraud claim against Legal Helpers.

## Conclusion

Taking all of the Trustee's allegations in the Complaint as true and viewing them in the light most favorable to the Trustee, the Court concludes that the Motion should be granted in part and denied in part. The Court finds that the Trustee has not alleged sufficient facts in the Complaint supporting an alter ego claim against the Members or a turnover claim against Legal Helpers with respect to the debt arising out of Huffman's payment of fees and expenses under the Agreement for services "that were not performed and/or inadequately performed." (Compl. ¶ 71). The Court concludes that the Motion should be granted in part and that the Trustee's alter ego claims against the Members and the Trustee's claim against Legal Helpers for the turnover of fees and expense paid by Huffman under the Agreement should be dismissed. The Court further concludes that the Motion should be denied as to all other relief requested.

IT IS, THEREFORE, ORDERED that the Trustee's alter ego claims against the Members should be, and hereby are dismissed.

IT IS FURTHER ORDERED that the Trustee's turnover claim against Legal Helpers as to the fees and expenses paid by Huffman under the Agreement for services "that were not performed and/or inadequately performed" should be, and hereby is dismissed. (Comp. ¶ 71).

IT IS FURTHER ORDERED that all other relief requested in the Motion should be, and hereby is denied.

SO ORDERED.

_____
Neil P. Olack
United States Bankruptcy Judge
Dated:  June 10, 2013