

**SO ORDERED,**

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: February 6, 2014**

The Order of the Court is set forth below. The docket reflects the date entered.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

    **MARY ALICE HUFFMAN,**                      **CASE NO. 12-00177-NPO**

    **DEBTOR.**                             **CHAPTER 7**

**DEREK A. HENDERSON, AS CHAPTER 7**         **PLAINTIFF**
**TRUSTEE FOR THE BANKRUPTCY**
**ESTATE OF MARY ALICE HUFFMAN**

**VS.**                         **ADV. PROC. NO. 12-00099-NPO**

**LEGAL HELPERS DEBT RESOLUTION,**         **DEFENDANT**
**L.L.C.**

## MEMORANDUM OPINION AND ORDER
## ON THE COMPLAINT FILED BY THE TRUSTEE

This matter came before the Court for trial on November 20 and 22, 2013 (the "Trial") on

the Complaint (the "Complaint") (Adv. Dkt. 1)[1] filed by Derek A. Henderson, the chapter 7

trustee (the "Trustee"), and Legal Helpers Debt Resolution, LLC and Macey, Aleman, Hyslip &

Searns's Answer, Defenses, and Affirmative Defenses to Complaint (Adv. Dkt. 39) filed by

Legal Helpers Debt Resolution, LLC ("Legal Helpers" or "LHDR") in the above-referenced

adversary proceeding (the "Adversary"). At Trial, the Trustee was represented by Jason Graeber

---

[1] Citations to the record are as follows: (1) citations to docket entries in the Adversary are
cited as "(Adv. Dkt. _____)"; and (2) citations to docket entries in the main bankruptcy case, Case No.
12-00177-NPO, are cited as "(Bankr. Dkt. _____)".

and Matthew S. Lott; Legal Helpers was represented by Timothy D. Elliott, Derek M. Johnson, and Terry R. Levy. On the first day of Trial, the Plaintiff's Proposed Findings of Facts and Conclusions of Law (Adv. Dkt. 150), and the Legal Helpers Debt Resolution, LLC's Proposed Findings of Fact and Conclusions of Law (Adv. Dkt. 151) were submitted to the Court.

At the close of Trial, the Court left the record open for fourteen (14) days for the parties to submit into evidence the video deposition testimony of Jeffrey Aleman ("Aleman"). In anticipation of Aleman's deposition testimony, Legal Helpers objected at Trial to the admission of two (2) exhibits, marked for identification purposes as "Trustee Exhibit 1" and "Trustee Exhibit 11." The Court reserved the evidentiary issues raised by Legal Helpers for decision in this Opinion. Also, in lieu of closing arguments, the parties agreed to file simultaneous post-trial briefs within seven (7) days after the submission of Aleman's video deposition.

The Court received the video deposition on December 9, 2013. At the request of Legal Helpers, the Court granted both parties an extension of time to file post-trial briefs. On December 19, 2013, the Trustee submitted the Plaintiff's Closing Argument (the "Trustee Brief") (Adv. Dkt. 157), and the next day, Legal Helpers submitted Legal Helpers Debt Resolution LLC's Closing Argument (the "LHDR Brief") (Adv. Dkt. 158). After considering the exhibits, testimony of the witnesses, and other evidence at Trial, the Court hereby makes the following findings of fact and conclusions of law.[2]

---

[2] The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052 without regard to which section of the Opinion they are found.

# TABLE OF CONTENTS

JURISDICTION ................................................................................................6

FACTS .............................................................................................................6

A.    Legal Helpers ........................................................................................7

B.    Business Model......................................................................................8

C.    Debt Settlement Program.......................................................................9

        1.    Creation & Vetting of Debt Settlement Business Model................9

        2.    Eclipse's Role .................................................................11

                a.    Retainer Agreement ...........................................12

                b.    Savings Account ................................................14

                c.    Welcome Packet................................................14

                d.    Settlement of Debts ...........................................15

        3.    Fees for Debt Settlement Services ...................................16

        4.    Enrollment Review Process ............................................16

D.    Huffman's Enrollment ...........................................................................18

        1.    Review of Huffman's Enrollment....................................19

        2.    Proposed Payment Schedule ...........................................20

        3.    Proposed Fees for Services .............................................21

        4.    Proposed Deposits into the Savings Account ......................22

        5.    Initial Program Payments & Initial Debt Settlement Services.....23

        6.    Cancellation of Program ................................................24

        7.    Refunds to Huffman.....................................................27

E.    Others' Enrollments in the Debt Settlement Program ...............................29

PROCEDURAL HISTORY ........................................................................................30

A.      Bankruptcy Case ........................................................................................30

B.      Adversary Proceeding .................................................................................31

        1.      Complaint ..........................................................................................31

        2.      Prior Motions ....................................................................................31

                a.      Motion to Compel Arbitration ...............................................31

                b.      Motion for Judgment on the Pleadings ..................................32

                c.      Amended Discovery Motion ..................................................33

                d.      Summary Judgment Motions ..................................................33

        3.      Adversary Trial .................................................................................34

DISCUSSION ......................................................................................................34

A.      Evidentiary Objections ...............................................................................35

        1.      Trustee Exhibit 1:  Aleman's Emails ................................................36

        2.      Trustee Exhibit 11:  Answer to Illinois ARDC Complaint ..............37

        3.      Rule 402-Admissibility .....................................................................38

        4.      Rule 401-Relevancy ..........................................................................38

                a.      Trustee Exhibit 1:  Aleman's Emails ....................................39

                b.      Trustee Exhibit 11:  Answer to Illinois ARDC Complaint .....39

        5.      Rule 403-Prejudice ...........................................................................40

B.      Count 1:  Turnover of Estate Property .......................................................40

C.      Count II:  Fraudulent Transfer ...................................................................41

        1.      Less Than Reasonably Equivalent Value ..........................................42

        2.      Insolvency .........................................................................................47

D.     Count III:  Accounting ....................................................................................48

E.     Count IV:  Violations of § 526 & § 527 ........................................................50

   1.     Did Legal Helpers provide bankruptcy assistance? ............................51

   2.     Did Legal Helpers violate § 526 & § 527?  ......................................58

        a.     Failing to Perform Services ...................................................58

        b.     Misrepresentations ................................................................59

        c.     Disclosures & Notice .............................................................59

   3.     Is Huffman entitled to damages?  ......................................................60

   4.     Did Legal Helpers act intentionally to violate § 526
          or engage in a clear and consistent pattern of violating § 526? ...........61

F.     Count V:  Fraud ...........................................................................................63

G.     Damages, Attorneys' Fees & Costs ...............................................................67

   1.     Fraudulent Transfers ..........................................................................67

   2.     § 526.................................................................................................67

   3.     Fraud .................................................................................................68

CONCLUSION ............................................................................................................69

## TABLE OF CHARTS

A.     Huffman's Creditors ....................................................................................18

B.     Huffman's Proposed Payment Schedule.......................................................20

C.     Proposed Allocation of Program Payments
       between Fees for Services & Savings Account. ............................................23

D.     Huffman's Actual Program Payments. .........................................................27

E.     Net Fees Paid by Huffman...........................................................................29

## JURISDICTION

The Court has jurisdiction over the parties to and the subject matter of this case pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (H) and (O).[3]  Notice of the Trial was proper under the circumstances.

## FACTS

The Debtor, Mary Alice Huffman ("Huffman"), is 84 years old and retired.  She is college educated with degrees in nursing and housekeeping.  Until 1996, she worked as a certified housekeeper at Hardy Wilson Memorial Hospital in Hazlehurst, Mississippi.  After her retirement, Huffman's income consisted mostly of Social Security benefits.  From time to time, she supplemented that income with wages earned at various jobs.

After her adult son became seriously ill, Huffman incurred unsecured credit card debt of $39,265.00 on five (5) credit cards.  (Jt. Ex. 1).[4]  Although she was current on her credit card payments, she was struggling to make the minimum monthly payments to her creditors.  On the

---

[3] This finding of core jurisdiction is undisputed.  The United States Supreme Court in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), held that notwithstanding the bankruptcy court's *statutory* authority, the bankruptcy court lacked *constitutional* authority to enter a final judgment on a state-law counterclaim that did not stem from the bankruptcy itself and that would not be resolved by the claims allowance process.  On January 14, 2014, the Supreme Court heard oral argument in *Executive Benefits Insurance Agency, Inc. v. Arkison (In re Bellingham Insurance Agency, Inc.)*, 702 F.3d 553 (9th Cir. 2012), *cert. granted*, 133 S. Ct. 2880 (2013), to consider whether the bankruptcy court lacks constitutional authority under *Stern* to enter a final judgment in an action to avoid a fraudulent conveyance against a noncreditor.  In the event that a higher court determines that the Court lacks constitutional authority to enter a final judgment in the Adversary, the Court recommends that this Opinion be regarded as its proposed findings of fact and conclusions of law and further recommends that the District Court enter this Opinion as its own after due consideration, in accordance with 28 U.S.C. § 157(c)(1).

[4] The exhibits presented jointly by the Trustee and Legal Helpers are cited at "(Jt. Ex. ____)"; the exhibits presented by the Trustee are cited as "(Trustee Ex. ____)"; and the exhibits presented by Legal Helpers are cited as "(LHDR Ex. ____)".

brink of filing bankruptcy, she received in the mail an unsolicited flyer offering debt settlement services from Legal Helpers.

## A.    Legal Helpers

Thomas G. Macey ("Macey") and Aleman are consumer bankruptcy attorneys licensed to practice law in Illinois.  They are the named partners of Macey & Aleman, the largest consumer bankruptcy law firm in the country.[5]   In early 2009, Macey, Aleman, and Jason Searns ("Searns") established Legal Helpers as a debt resolution law firm at the same address as Macey & Aleman in Chicago.  They are full equity partners, or "Class A" Members, of Legal Helpers.[6] Legal Helpers is the trade name of their Chicago law firm Macey, Aleman, Hyslip & Searns, organized as a limited liability company under the laws of Nevada.  Searns is general counsel for Legal Helpers on regulatory matters and is licensed to practice law in Colorado.  Jeffrey Hyslip ("Hyslip"), an Ohio-licensed attorney, is a former non-equity partner or a "Class B" Member. None of these attorneys is licensed to practice law in Mississippi or admitted to practice in Mississippi state or federal courts.

In almost every state, Legal Helpers retained at least one (1) local attorney, a "State Class B" Member, to manage its client files.  In Mississippi, the "State Class B" Member during the relevant time was John Windsor ("Windsor").  Windsor was the contact attorney for Legal Helpers' Mississippi clients, but he did not consider them his own clients.  He communicated by email with Hyslip, who was the conduit between Legal Helpers and Windsor, as well as all other "State Class B" Members.

---

[5]  (Test. of Searns at 10:34:25-10:34:45, Nov. 22, 2013).   Because the Trial was not transcribed, citations are to the timestamp of the audio recording.

[6]  Searns testified that Legal Helpers has not accepted any new clients in the past two (2) years but continues to provide debt settlement services to its existing clients.

B.      **Business Model**

Macey approached Searns about the ongoing debate in the debt settlement industry as to whether nonlawyers who provide debt settlement services engage in the unauthorized practice of law.   To circumvent this issue, Macey asked Searns to establish a law firm dedicated to providing debt settlement services, the result of which was Legal Helpers.   Searns created the business model for Legal Helpers' debt settlement program and drafted all of the documents used by Legal Helpers and others in the program.

Searns embraced the idea of a law firm operating within the debt settlement industry for another reason.   The amendments to the U.S. Bankruptcy Code[7] enacted by the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (2005), "introduced 'means testing' to restrict debtors who can repay at least a portion of their debts from obtaining a complete discharge under Chapter 7."   *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 761 (5th Cir. 2008); *see* 11 U.S.C. § 707(b)(2).   Searns viewed chapter 13, which generally requires debtors to repay their creditors for three (3) to five (5) years, as a poor alternative to bankruptcy relief under chapter 7.   According to Searns, Legal Helpers' mission was to provide a consumer the means for resolving debts without resorting to bankruptcy, either because that consumer was ineligible for relief under chapter 7 in the light of the new "means test" enacted by BAPCPA or because the consumer wanted to avoid the stigma of having filed a bankruptcy case.

As to the program itself, Searns remembered that his colleagues who specialized in bankruptcy law rarely filed bankruptcy petitions on behalf of their business clients but instead

---

[7] All references to the "Code" and all code sections refer to the U.S. Bankruptcy Code found at title 11 of the U.S. Code unless otherwise noted.

negotiated settlements with their creditors. Searns thought the model used for business clients would work just as well for consumer clients.

Also, most state laws regulating the business of consumer debt settlement exempt attorneys from complying with those regulations, including those that limit the amount of fees charged for such debt settlement services. *But see Smith v. Legal Helpers Debt Resolution LLC*, No. 11-5054, 2011 WL 5166494 (W.D. Wash. Oct. 31, 2011) (holding that exclusion for attorneys under Washington law did not apply to Legal Helpers because its primary business was debt adjustment services). The attorney exemption was considered a distinct advantage for Legal Helpers.

Finally, Searns also thought that Legal Helpers could distinguish itself from other debt relief companies by advertising itself as a law firm on the national landscape. Searns also testified, however, that Legal Helpers was not a bankruptcy law firm and did not provide legal services, despite its name.

## C.      Debt Settlement Program

Macey and Searns believed that the most economical means for providing debt relief services to its clients was by outsourcing those services to nonlawyers. Rather than using "in-house" paralegals and support staff, Legal Helpers decided to outsource the advertisement, sale, and servicing of its debt settlement program to other nonlawyer debt settlement companies.

### 1.      Creation & Vetting of Debt Settlement Business Model

In creating the business model for Legal Helpers, Searns researched whether aligning Legal Helpers' attorneys with nonlawyers to provide nationwide debt settlement services would violate any of the ethical standards that attorneys must maintain. Searns was most concerned with the American Bar Association's Model Rules of Professional Conduct (the "ABA Model

Rules"), which provide guidance to lawyers and a structure for regulating the conduct of lawyers through disciplinary agencies.  Searns was convinced that the program he created would not violate Rule 5.3 (Nonlawyer Assistants), Rule 5.5 (Assisting Others Engaged in Unauthorized Practice of Law), Rule 5.7 (Law-Related Services), or Rule 7.2 (Advertising) of the ABA Model Rules.

Searns retained Steven C. Krane ("Krane"), now deceased, former chairman of the American Bar Association's standing committee on ethics and professional responsibility and a partner with Proskauer Rose, to vet his proposed debt settlement business model.  According to Searns, Krane approved the business model with respect to the outsourcing of debt settlement services to nonlawyers on the condition that lawyers at Legal Helpers directly supervise their work.

Searns believed that the business model he created provided adequate supervision of its outsourced services.  For example, Searns audited Legal Helpers' contractors every three (3) months to ensure that they were following his protocols.  He set up a color-coding system for the files, which is discussed in detail later in this Opinion.  He created a "call compliance log" and a questionnaire for contractors to use during intake interviews.   He purchased "Customer Relationship Management" software to help market the program, manage client information, and provide customer support.  Searns believed that the forms he drafted and the procedures he implemented ensured adequate supervision over the contractors who worked in locations remote from Legal Helpers' office in Chicago.  Searns was confident that the services outsourced to nonlawyers under its business model would not lead to a finding that Legal Helpers assisted nonlawyers in the unauthorized practice of law in violation of the ABA Model Rules.

Notwithstanding his efforts to create a program in compliance with state laws, Searns testified that Legal Helpers has been sued in seven (7) states in various regulatory actions and by ten (10) or more of its former clients.[8]  The State of Illinois on August 1, 2011, issued a Cease and Desist Order[9] (Trustee Ex. 12) prohibiting Legal Helpers from engaging in the debt settlement business in Illinois and ordering Legal Helpers to pay a fine of $314,000.00.  Illinois had concluded that Legal Helpers was not entitled to avail itself to the exception in state law for attorneys because Hyslip, who had signed the retainer agreement, was not licensed to practice law in Illinois.

### 2.    Eclipse's Role

The nonlawyer company that Legal Helpers retained to administer most of its debt settlement program in Mississippi was Eclipse Financial, Inc. ("Eclipse").[10]  Located in Tampa, Florida, Eclipse marketed the services, conducted initial telephone interviews and intake of client information, set up and maintained files, provided client support services, and negotiated debt settlements in Mississippi.  Eclipse advertised Legal Helpers' program through direct mail, a website, and other means.  When a prospective client called the number shown on the solicitation, a representative of Eclipse (the "Eclipse Rep") answered the telephone.  The Eclipse Rep then conducted an initial telephone interview during which information about the

---

[8] There are three (3) actions pending in Mississippi against Legal Helpers, including Huffman's Adversary.

[9] Specifically, the Department of Financial and Professional Regulation, Division of Financial Institutions of the State of Illinois issued the Cease and Desist order.  (Trustee Ex. 12).

[10] Eclipse is not a party to the Adversary.

consumer's debts and assets was obtained.  This initial interview followed a sales "script" drafted by Searns.[11]

### a.    Retainer Agreement

After a consumer agreed to enroll in the program, Eclipse created a debt settlement program based upon the client's debts and his or her ability to make monthly payments to Legal Helpers.  Eclipse then sent the prospective client numerous standardized enrollment documents.  One of these documents was an eight (8)-page retainer agreement "for legal services . . . entered into . . . between [Legal Helpers] and [the client]."  (Jt. Ex. 1 at 1).  The scope of services provided by Legal Helpers was set forth in detail and included the following:

- [Legal Helpers] will negotiate and attempt to enter into settlements with creditors of the Client in an effort to modify and/or restructure Client's current unsecured debt.  (Jt. Ex. 1, ¶ III).

- [Legal Helpers] and its staff will timely respond to all Client inquiries and keep the Client informed as to all offers of debt modification.  (*Id.*).

- In the event a creditor or collector sues Client, whether related to a debt obligation or any other claim, [Legal Helpers] is under no obligation to provide representation.  [Legal Helpers] will discuss specific debt related issues with Client and, if appropriate, offer additional legal services in regard to bankruptcy or other debt resolution services for Client's consideration.  (*Id.*).

- [Legal Helpers] and other legally trained, licensed personnel will supervise all negotiations and customer support and ensure that these services comply with established procedures.  (Jt. Ex. 1, ¶ V).

- [Legal Helpers] agrees to use its best efforts to obtain a satisfactory result for Client by providing basic legal services in connection with the debt

---

[11] At Trial, Legal Helpers offered into evidence a purported "transcript" of telephone conversations between Huffman and the Eclipse Rep.  The Court sustained the Trustee's objection to the admission of the "transcript" on the ground that it did not appear to be a "transcript" but instead a questionnaire form.  Later at Trial, the Court asked Searns if he agreed with counsel's description of the excluded evidence, and Searns testified that it was not a transcript.  (Test. of Searns at 11:20:19 to 11:20:21).

modification for client on an efficient and cost-effective basis.  (Jt. Ex. 1, ¶ VII).

- [Legal Helpers] will discuss and advise Client as to the bankruptcy option, including fees and costs, at any time that Client's circumstances change or Client requests such consultation.  There are no additional fees or costs required from Client for such consultation and advice regarding bankruptcy. (Jt. Ex. 1, ¶ XVII).

- [Legal Helpers] will contact all your unsecured creditors in writing to inform them that you are represented by the law firm and that we are advising you as to all alternatives for debt resolution.  (Jt. Ex. 1A).

In the retainer agreement, Legal Helpers informed the client that a third party would perform some of the above tasks although Legal Helpers "and other legally trained licensed personnel" would supervise their work (Jt. Ex. 1, ¶ V).  In a separate paragraph entitled, "Debt Resolution Minimum Standards of Representation," Legal Helpers guaranteed "a minimum of settlement debt reduction of thirty-five percent (35%) of the debt's current face value."  (Jt. Ex. 1, ¶ XII).  Pursuant to this limited guarantee, if Legal Helpers failed to meet that minimum standard, it agreed to refund the client some of the costs associated with the program, calculated on a pro rata basis, provided that the client "act[ed] in complete compliance" with the retainer agreement and met certain other conditions.  (Jt. Ex. 1, ¶ XII).

In exchange for its debt settlement services, the client agreed to a schedule of monthly payments.  (Jt. Ex. 1, ¶ VI(e)).  The client also agreed to "forward [Legal Helpers] all correspondence from creditors, including collection letters, demands and complaints" and "not engage in debt resolution discussions."  (Jt. Ex. 1, ¶ VI(a)-(b)).

The prospective client typically signed the retainer agreement without speaking to a Legal Helpers' lawyer.  Shortly after signing the retainer agreement, the client participated in a "compliance call" conducted by Eclipse, allegedly for the purpose of making sure the client understood the program.  (LHDR Ex. 1).

### b.    Savings Account

A key feature of the program was the "special purpose account" (the "Savings Account"). Included in the enrollment documents was a "Special Purpose Account Application," which Eclipse asked the client to sign and return to establish the Savings Account.  The Special Purpose Account Application authorized Eclipse, through Global Solutions, Inc. ("Global"),[12] to debit the client's checking account to transfer funds to the Savings Account and to administer the Savings Account.   The funds deposited into the Savings Account remained there until Eclipse successfully negotiated the lump-sum settlement of a debt.

In the Special Purpose Account Application, there was a "Schedule of Fees & Charges" notifying the client that Global charged a $25.00 fee for any "Dishonored/returned deposit items."  Global structured the Savings Account to allow Legal Helpers and Eclipse to view the balances and transactions histories of clients in the program.   Although Searns drafted the paperwork that established the Savings Account, he testified that Global was a contractor of Eclipse, not of Legal Helpers.

### c.    Welcome Packet

Shortly after the client enrolled in the program, Eclipse mailed the client a "welcome packet" that included a sheet entitled, "Our Pledge to Our Clients" (the "Pledge Sheet") (Jt. Ex. 2).  In a highlighted box on the Pledge Sheet, Legal Helpers informed its new client, "You will never be without a viable alternative.  This is our commitment and our pledge to our clients." (*Id.*).  Most of the Pledge Sheet consists of the following three-step pledge:  (1) "like a security blanket, we will take control of your debt resolution issues"; (2) "we will analyze which debt resolution alternative makes the most sense for you"; and (3) "if your circumstances change or a

---

[12] Global is not a party to this Adversary.

particular debt resolution plan does not meet your needs, we will be prepared to discuss additional alternatives, including the discharge of your debt." (*Id.*). At the bottom of the Pledge Sheet, in small print, appears the following statement: "Legal Helpers Debt Resolution, LLC is a debt relief agency. We help people with their debt resolution, including filing for protection under bankruptcy laws." (*Id.*).

### d.    Settlement of Debts

According to Aleman, the process of settling a client's debts could take three (3) or more years depending upon the length of time it might take a client to accumulate enough money in the Savings Account. Typically, Eclipse settled at least one enrolled debt every six (6) months.

Eclipse instructed clients to stop paying their credit card bills during their enrollment in the program for two reasons. First, Legal Helpers thought that credit card companies were almost always less inclined to negotiate settlements with current accounts. Second, as Hyslip explained, Legal Helpers did not want its clients paying their creditors money that could be paid into the program.

The client signed a "Power of Attorney" appointing Legal Helpers as its agent "to represent me/us in negotiating the modification, reduction, settlement, and payment on any and all debts allegedly due and owing in my/our name." (LHDR Ex. 1). Using this Power of Attorney, Eclipse mailed standardized form letters to each creditor addressed "To Whom It May Concern." They were typed on Legal Helpers letterhead and signed by Hyslip, identified as Legal Helpers' managing attorney.

In the letters, Hyslip advised creditors, "Our law firm represents the above client(s) in regard to payment of the outstanding balance of the account held by your institution." (LHDR Ex. 1). Hyslip also wrote that Legal Helpers intended to "work directly with your institution

regarding resolution of this account." (*Id.*).  As contact information, Hyslip gave the telephone number and address of Eclipse's administrative offices in Tampa, Florida, though he did not identify Eclipse by name, and, as previously mentioned, Legal Helpers' letterhead appeared above Hyslip's name.  Aleman described the form letters as an "invitation" to engage in negotiations. (Aleman Dep. at 40).

Legal Helpers touted its program, administered by Eclipse, as being "high quality" and "immensely successful."  (LHDR Br. at 2, 4; Aleman Dep. at 11).  Legal Helpers claimed at Trial that it had saved clients $40 million by way of out-of-court settlements.  (*Id.*).

### 3.   Fees for Debt Settlement Services

The monthly payments due under the program were apportioned between Legal Helpers' fees and money set aside in the Savings Account for settlements of debts.  There were three components of Legal Helpers' fees:  (1) an initial flat retainer fee of $500.00; (2) a monthly maintenance fee of $50.00 lasting the length of the program; and (3) a service fee of fifteen percent (15%) of the total enrolled debt.  Legal Helpers received these fees regardless of whether it settled any debts and paid some portion of the fees to Eclipse and Global, although the precise allocation among the three (3) of them is unknown.

### 4.   Enrollment Review Process

After a client enrolled into Legal Helpers' debt settlement program, his or her file underwent a three (3)-step review process.  The file[13] contained the retainer agreement signed by the client and information about the client's debts, assets, and monthly income and expenses.

To keep track of the status of its clients' files, Searns implemented a color-coding system.  A new file was color-coded white.  After Eclipse finished setting up a client's file, it was

---

[13] The file is not a paper file but is made available electronically to the various locations of Legal Helpers' Members and support groups.

reviewed by Searns' office staff in Denver to make sure the client qualified for, and could afford, the program. (Jt. Ex. 17). Searns described the ideal client as insolvent and unable to make minimum payments on debts that were mostly unsecured. As to affordability, Legal Helpers' policy was to require that a client have a disposable income in the range of $200.00 to $250.00 each month, after all expenses are paid, including the program payment. Once approved by Searns, the file was color-coded yellow.

Hyslip and his staff in Chicago reviewed the files after they were color-coded yellow. Hyslip referred to this second layer of review as a "feasibility study." If Hyslip approved the new client, he signed the retainer agreement in the file. Hyslip was the only attorney at Legal Helpers who was authorized to sign the retainer agreements. After he signed the retainer agreement, the file was ready for the local attorney's final review.

The task of the local attorney or "State Class B" Member, was to determine whether any of the enrolled debts was a secured debt, a domestic support obligation, or a tax debt. Such debts would be difficult to settle and would render the client ineligible for the program. (Jt. Ex. 17). Windsor, the "State Class B" Member in Mississippi, testified that this final review usually took no more than twenty (20) minutes.

After the local attorney's approval, the new file was color-coded green and remained green until the client completed the program with two (2) exceptions: A file color-coded green changed to red if the client's financial situation worsened due to the loss of employment or divorce, or the file changed to black if a creditor sued the client. A file color-coded black was given greater attention than others, a procedure referred to by Searns as "triage."

D.      **Huffman's Enrollment**

A few days after receiving the solicitation in the mail from Eclipse about Legal Helpers' debt settlement program, Huffman called the number in the flyer.[14]  An Eclipse Rep returned her call and eventually persuaded Huffman to enroll her credit card debt into Legal Helpers' debt settlement program.  Huffman's enrolled creditor list is shown below in Chart A:

| CHART A:  HUFFMAN'S CREDITORS | | |
|---|---|---|
| **Creditor** | **Amount Owed** | **Months Late** |
| Bank of America | $21,514.00 | 180[15] |
| Chase | $ 7,062.00 | 0 |
| CitiFinancial | $ 3,850.00 | 0 |
| Sears/Citibank | $ 5,870.00 | 0 |
| Wells Fargo | $    969.00 | 0 |
| **TOTAL** | $39,265.00 | |

(Jt. Ex. 5; Pretrial Order at 9).  Because Huffman did not have access to a computer or fax machine at home, the Eclipse Rep suggested they meet at a local public library to review and sign documents associated with her enrollment in the program.  When Huffman arrived at the library on March 30, 2010, she was surprised to discover that no one from Legal Helpers was there in person to greet her.  Huffman called Eclipse and was told that the enrollment documents, including a retainer agreement, would be faxed to her at the library and that she should wait there.  Huffman signed the retainer agreement (the "Retainer Agreement") (Jt. Ex. 1) and other paperwork without reading most of it and returned them to Eclipse by facsimile.

Included in the paperwork that Huffman signed on March 30, 2010 was the Special Purpose Account Application (Jt. Ex. 15), which Eclipse received and forwarded to Global.  Also

---

[14] Huffman did not retain the flyer but testified at Trial about its contents.

[15] The exhibit that is the basis for Chart A shows that Huffman was 180 *months* late, rather than 180 *days* late, but this appears to be a scrivener's error.  (Jt. Ex. 5).  Regardless, Huffman disputes that she was ever late on any of her debts prior to her enrollment in the program, and Legal Helpers was unable to explain why the exhibit showed otherwise.

included was an authorization for Legal Helpers to withdraw funds automatically from her personal checking account (the "Copiah Account") maintained at Copiah Bank. (Jt. Exs. 3 & 15). A few days later, Huffman had second thoughts about her enrollment and attempted to terminate the Retainer Agreement but was unable to reach anyone.

### 1.    Review of Huffman's Enrollment

After Huffman enrolled her five (5) credit card debts in the program, her file underwent Legal Helpers' three (3)-step review process.  Searns, Hyslip, and Windsor all reviewed and approved her enrollment in the program.  All concluded that Huffman could afford the program and that none of her enrolled debts would be difficult to settle.

As to the issue of affordability, Eclipse calculated Huffman's monthly expenses at $1,467.48, which consisted of a program payment of $707.48, a mortgage of $588.00, water/sewer/trash/HOA dues of $42.00, a cable payment of $80.00, and automobile insurance of $50.00.  (Jt. Ex. 17).  Eclipse did not include in its calculation any monthly expenses for groceries or electricity.  In a note on the intake form, the Eclipse Rep indicated that Huffman's adult son paid these bills.  Hyslip testified that he approved Huffman's enrollment because the program payments would decrease in three (3) months, Huffman's son paid some of her necessary expenses, and the $80.00 cable bill, in his opinion, was not a necessary expense.

Given a net monthly income of $1,550.00, Huffman had surplus income of only $82.52[16] each month.  (Jt. Ex. 17 at 3).  The ratio between her debt and income was ninety-five percent (95%).[17]  In determining her eligibility for the program, Legal Helpers did not consider relevant that Huffman was current on all of her credit card debts or that her Social Security income was

---

[16] $82.52 = $1,550.00 - $1,467.48.

[17] 0.9467 = $1,467.48 ÷ $1,550.00.

protected from garnishment by federal law.[18]  As was customary, Hyslip signed the Retainer

Agreement on behalf of Legal Helpers.  Eclipse mailed Huffman the "welcome packet" on April

1, 2010.  (LHDR Ex. 1B).

### 2.  Proposed Payment Schedule

Attached to the Retainer Agreement is "Schedule B Payment Schedule & Fee Table" (the

"Payment Schedule") (Jt. Ex. 8) prepared by Legal Helpers.  According to the Payment

Schedule, Legal Helpers proposed a payment plan that required Huffman to contribute

$24,495.75 over a period of forty-eight (48) months from April 5, 2010 until March 5, 2014.

(*Id.*).  Chart B below reflects Huffman's proposed Payment Schedule:

| CHART B:  HUFFMAN'S PROPOSED PAYMENT SCHEDULE | | | | | |
|---|---|---|---|---|---|
| Payment Date | Monthly Payment | Payment Date | Monthly Payment | Payment Date | Monthly Payment |
| 4-5-2010 | $707.48 | 8-5-2011 | $497.19 | 12-5-2012 | $497.19 |
| 5-5-2010 | $707.48 | 9-5-2011 | $497.19 | 1-5-2013 | $497.19 |
| 6-5-2010 | $707.48 | 10-5-2011 | $497.19 | 2-5-2013 | $497.19 |
| 7-5-2010 | $497.19 | 11-5-2011 | $497.19 | 3-5-2013 | $497.19 |
| 8-5-2010 | $497.19 | 12-5-2011 | $497.19 | 4-5-2013 | $497.19 |
| 9-5-2010 | $497.19 | 1-5-2012 | $497.19 | 5-5-2013 | $497.19 |
| 10-5-2010 | $497.19 | 2-5-2012 | $497.19 | 6-5-2013 | $497.19 |
| 11-5-2010 | $497.19 | 3-5-2012 | $497.19 | 7-5-2013 | $497.19 |
| 12-5-2010 | $497.19 | 4-5-2012 | $497.19 | 8-5-2013 | $497.19 |
| 1-5-2011 | $497.19 | 5-5-2012 | $497.19 | 9-5-2013 | $497.19 |
| 2-5-2011 | $497.19 | 6-5-2012 | $497.19 | 10-5-2013 | $497.19 |
| 3-5-2011 | $497.19 | 7-5-2012 | $497.19 | 11-5-2013 | $497.19 |
| 4-5-2011 | $497.19 | 8-5-2012 | $497.19 | 12-5-2013 | $497.19 |
| 5-5-2011 | $497.19 | 9-5-2012 | $497.19 | 1-5-2014 | $497.19 |
| 6-5-2011 | $497.19 | 10-5-2012 | $497.19 | 2-5-2014 | $497.19 |
| 7-5-2011 | $497.19 | 11-5-2012 | $497.19 | 3-5-2014 | $496.95 |
| | | | | **TOTAL** | $24,495.75 |

(Jt. Ex. 8).

---

[18]  *See* 42 U.S.C. § 407(a) (protecting Social Security benefits from "execution, levy, attachment, garnishment, or other legal process").

From the total contribution of $24,495.75, the Payment Schedule shows that $15,706.00 would be deposited into the Savings Account and $8,789.75 would be paid Legal Helpers for its debt settlement services. The amount allocated to the Savings Account ($15,706.00) was based on Legal Helpers' estimate of the cost to settle Huffman's credit card debt of $39,265.00, that is, forty percent (40%) of the debt owed ($15,706.00 = 40% × $39,265.00).

The portion of the total contribution allocated to Legal Helpers ($8,789.75) consisted of: (1) an initial flat retainer of $500.00; (2) $2,400.00 in maintenance fees; and (3) a service fee of $5,889.75, representing fifteen percent (15%) of her enrolled debts ($5,889.75 = $39,265.00 × 15%).

Her monthly payments were supposed to be $497.19, except for the first three months and the last month of the forty-eight (48)-month program. For the first three (3) months, from April 5, 2010 through June 5, 2010, Huffman was expected to pay $707.48 per month; then, for the next forty-four (44) months, from July 5, 2010 through February 5, 2014, she was scheduled to pay $497.19 per month; and on March 5, 2014, she would make a final payment of $496.95. (Jt. Ex. 1 at 6).

### 3.    Proposed Fees for Services

For the first few months, Huffman's Payment Schedule allocates almost all payments to Legal Helpers' fees *before* any attempts were made to settle any of Huffman's enrolled debts. Specifically, the retainer fee of $500.00 is scheduled to be paid in installments during the first three (3) months of the debt settlement program from April 5, 2010 through June 5, 2010. The service fee of $5,889.75 is paid during the first fifteen (15) months from April 5, 2010 through June 5, 2011. (*Id.*). No amount is scheduled to fund the Savings Account from which creditors will be paid until July 5, 2010, which is three (3) months into the program.

### 4.      Proposed Deposits into the Savings Account

From July 5, 2010 through May 5, 2011, $79.08 of the total monthly contribution of $497.19 was scheduled to fund the Savings Account.   On June 5, 2011, the allocation to the Savings Account was increased by one (1) penny to $79.09.   By July 5, 2011, Huffman would have paid all initial fees due Legal Helpers, and only the $50.00 monthly maintenance fee would remain.   Accordingly, from July 5, 2011 until February 5, 2014, the allocation to the Savings Account would increase to $447.19 (which is $50.00 less than the amount of her full contribution), according to the Payment Schedule.   From the final payment of $496.95 on March 5, 2014, all but $50.00 ($446.95) would be allocated to the Savings Account.   Chart C below shows the proposed allocation of Huffman's payments between the Savings Account and Legal Helpers' fees:

| CHART C:  PROPOSED ALLOCATION OF PROGRAM PAYMENTS BETWEEN FEES FOR SERVICES & SAVINGS ACCOUNT | | | | | |
|---|---|---|---|---|---|
| Payment Date | Legal Helpers Fees | Savings Account | Payment Date | Legal Helpers' Fees | Savings Account |
| 4-5-2010 | $707.48 | $   0.00 | 4-5-2012 | $  50.00 | $447.19 |
| 5-5-2010 | $707.48 | $   0.00 | 5-5-2012 | $  50.00 | $447.19 |
| 6-5-2010 | $707.48 | $   0.00 | 6-5-2012 | $  50.00 | $447.19 |
| 7-5-2010 | $418.11 | $  79.08 | 7-5-2012 | $  50.00 | $447.19 |
| 8-5-2010 | $418.11 | $  79.08 | 8-5-2012 | $  50.00 | $447.19 |
| 9-5-2010 | $418.11 | $  79.08 | 9-5-2012 | $  50.00 | $447.19 |
| 10-5-2010 | $418.11 | $  79.08 | 10-5-2012 | $  50.00 | $447.19 |
| 11-5-2010 | $418.11 | $  79.08 | 11-5-2012 | $  50.00 | $447.19 |
| 12-5-2010 | $418.11 | $  79.08 | 12-5-2012 | $  50.00 | $447.19 |
| 1-5-2011 | $418.11 | $  79.08 | 1-5-2013 | $  50.00 | $447.19 |
| 2-5-2011 | $418.11 | $  79.08 | 2-5-2013 | $  50.00 | $447.19 |
| 3-5-2011 | $418.11 | $  79.08 | 3-5-2013 | $  50.00 | $447.19 |
| 4-5-2011 | $418.11 | $  79.08 | 4-5-2013 | $  50.00 | $447.19 |
| 5-5-2011 | $418.11 | $  79.08 | 5-5-2013 | $  50.00 | $447.19 |
| 6-5-2011 | $418.10 | $  79.09 | 6-5-2013 | $  50.00 | $447.19 |
| 7-5-2011 | $  50.00 | $447.19 | 7-5-2013 | $  50.00 | $447.19 |
| 8-5-2011 | $  50.00 | $447.19 | 8-5-2013 | $  50.00 | $447.19 |
| 9-5-2011 | $  50.00 | $447.19 | 9-5-2013 | $  50.00 | $447.19 |
| 10-5-2011 | $  50.00 | $447.19 | 10-5-2013 | $  50.00 | $447.19 |
| 11-5-2011 | $  50.00 | $447.19 | 11-5-2013 | $  50.00 | $447.19 |
| 12-5-2011 | $  50.00 | $447.19 | 12-5-2013 | $  50.00 | $447.19 |
| 1-5-2012 | $  50.00 | $447.19 | 1-5-2014 | $  50.00 | $447.19 |
| 2-5-2012 | $  50.00 | $447.19 | 2-5-2014 | $  50.00 | $447.19 |
| 3-5-2012 | $  50.00 | $447.19 | 3-5-2014 | $  50.00 | $446.95 |
| | | | TOTALS | $8,789.75 | $15,706.00 |

(Jt. Ex. 8).

### 5.    Initial Program Payments & Initial Debt Settlement Services

On April 8, 2010, Eclipse called Huffman to discuss charges for insufficient funds ("NSF Fees") incurred when Copiah Bank dishonored and returned drafts that Global attempted to debit from the Copiah Account.  Apparently, the Special Purpose Account Application signed by Huffman on March 30, 2010 contained the wrong number to her Copiah Account.  (Jt. Ex. 15).

Huffman signed a second Special Purpose Account Application on April 13, 2010 that also contained the wrong account number, and a third one on May 15, 2010 that had the correct account number.  A withdrawal of $732.48 was drafted automatically from her checking account on April 13, 2010 and again on May 11, 2010.  (Jt. Ex. 3).  Each of these payments included an additional $25.00 charge to cover Global's NSF fee.  Global withdrew the NSF Fees even though Huffman's Copiah Account had sufficient funds to pay the drafts.

On April 23, 2010, Eclipse sent letters addressed "To Whom It May Concern" to Huffman's five (5) creditors notifying them that "[o]ur law firm represents the above client(s)" and "[w]e are reviewing our client's financial circumstance in order to determine all feasible legal remedies."  (LHDR Ex. 1C; Pretrial Order at 10).  Eclipse sent the same letters again on or about November 10, 2010.  (*Id.*).

### 6. Cancellation of Program

Huffman began receiving past due notices, dunning letters,[19] and collection calls from the creditors whose debts she had enrolled in the debt settlement program.  (Jt. Exs. 5 & 18).  Huffman called Eclipse on April 5, 2011, about one (1) year after her enrollment in the debt settlement program, to ask specifically when her creditors would begin receiving payments.  Eclipse informed her that no creditor had yet been paid any money and that Legal Helpers could not prevent the dunning letters or collection calls.  Eclipse encouraged Huffman to stay in the program, explaining that the monthly payments would accumulate more rapidly in her Savings Account (LHDR Ex. 1B), now that she had paid Legal Helpers all of its fees.  Huffman decided

---

[19] A dunning letter is a demand for payment to a delinquent debtor.  *See* BLACK'S LAW DICTIONARY 502 (6th ed. 1990).

to stay in the program because, "I believed them because I didn't believe somebody would tell you that and you'd sign all these papers and they wouldn't be as good as their word."[20]

The account balances on her credit cards increased when Huffman stopped making her monthly payments to creditors because of late charges and increases in interest rates. In a letter to Legal Helpers dated January 18, 2011 and mailed to an address in Irvine, California (the "Settlement Letter"), Citibank (South Dakota) ("Citibank"), acting on behalf of Sears Gold Mastercard, offered to settle Huffman's $6,902.53 credit card debt for $3,796.39. Notably, the Settlement Letter was mailed to Irvine, California, not to the Tampa, Florida address given in the form letters. Then, on May 17, 2011, Citibank served Huffman with a summons and Complaint (the "Citibank Complaint") filed against her in the Circuit Court of Copiah County, Mississippi, in Civil Action 2011-0133, for nonpayment of credit card debt. (Jt. Ex. 18). Attached to the Citibank Complaint was a copy of the Settlement Letter. Huffman testified she was unaware of the Settlement Letter before the suit was filed. Although Legal Helpers disputed that it had ever received the Settlement Letter, Searns testified that the address in Irvine, California, where it was mailed, belonged to one of Legal Helpers' other "support groups."

Sometime in June 2011, Huffman informed Eclipse that Citibank had sued her. According to Huffman, the Eclipse Rep "didn't seem to care" and offered no ideas about what she should do next. When Huffman inquired about whether she should file bankruptcy, the Eclipse Rep responded, "just give [us] a few more months." When Huffman asked to speak to a Legal Helpers' attorney, the Eclipse Rep made excuses why no attorney was available. Later, Citibank obtained a Judgment by Default (Jt. Ex. 18) against Huffman of $9,203.37, which included not only the balance owed of $6,902.53 but also attorneys' fees of $2,300.84.

---

[20] (Test. of Huffman at 11:41:30 to 11:41:42, Nov. 20, 2013).

As noted previously, Legal Helpers' protocol when a client was sued was to change the color code of the file from green to black and "triage" the file. For unknown reasons, Legal Helpers did not follow this protocol with respect to Huffman's file. Searns testified that Huffman must not have asked to speak to an attorney because the compliance call log (the "Call Log") (LHDR Ex. 1B) in Huffman's file does not show that she had asked for a referral.

Sometime in June 2011, Huffman informed Legal Helpers that she was canceling the debt settlement program, and she stopped the automatic drafts of funds from her Copiah Account.[21] Huffman's cancellation occurred in the fifteenth month of the forty-eight (48)-month debt settlement program. By then, the Savings Account had accumulated only $948.97, although Huffman had paid a total of $8,139.72 into the debt settlement program. (Jt. Ex. 8). By mistake, Global withdrew another monthly payment of $497.19 from the Copiah Account in July 2011. All payments withdrawn from Huffman's Copiah Account, as reflected in her bank statements, and Legal Helpers' allocation of those payments between its fees and the Savings Account, are shown below in Chart D:

---

[21] The parties do not dispute that "Huffman was within her rights to terminate the Retainer Agreement." (LHDR Br. at 17; Jt. Ex. 1, ¶ XIV).

| CHART D:  HUFFMAN'S ACTUAL PROGRAM PAYMENTS | | | |
|---|---|---|---|
| Payment Date | Monthly Payment | Legal Helpers Fees | Savings Account |
| 4-13-2010 | $732.48 | $732.48 | $  0.00 |
| 5-11-2010 | $732.48 | $732.48 | $  0.00 |
| 6-7-2010 | $707.48 | $707.48 | $  0.00 |
| 7-6-2010 | $497.19 | $418.11 | $ 79.08 |
| 8-5-2010 | $497.19 | $418.11 | $ 79.08 |
| 9-7-2010 | $497.19 | $418.11 | $ 79.08 |
| 10-5-2010 | $497.19 | $418.11 | $ 79.08 |
| 11-5-2010 | $497.19 | $418.11 | $ 79.08 |
| 12-6-2010 | $497.19 | $418.11 | $ 79.08 |
| 1-5-2011 | $497.19 | $418.11 | $ 79.08 |
| 2-7-2011 | $497.19 | $418.11 | $ 79.08 |
| 3-7-2011 | $497.19 | $418.11 | $ 79.08 |
| 4-5-2011 | $497.19 | $418.11 | $ 79.08 |
| 5-5-2011 | $497.19 | $418.11 | $ 79.08 |
| 6-6-2011 | $497.19 | $418.10 | $ 79.09 |
| 7-5-2011 | $497.19[22] | $  0.00 | $  0.00 |
| TOTALS | $8,635.91 | $7,189.75 | $948.97 |

(Jt. Exs. 3 & 16; Pretrial Order at 10-11).  Chart D shows that the first two drafts of $732.48 are $25.00 more than the scheduled payments of $707.48.  The additional charges were incurred because Huffman's first payments into the program were returned twice by Copiah Bank for the reasons previously discussed.

Legal Helpers did not settle any of the debts Huffman had enrolled in the program. During the fifteen (15) months she was enrolled in the program, Huffman never spoke to Windsor or any other attorney associated with Legal Helpers.

## 7.  Refunds to Huffman

In July 2011, Legal Helpers refunded Huffman a total of $1,371.16 in two (2) transactions.  First, Legal Helpers refunded $497.19, the amount Eclipse automatically drafted

---

[22] Global withdrew these funds *after* Huffman had informed Legal Helpers that she had cancelled her enrollment.

from her checking account *after* she had cancelled her enrollment in the program. Legal Helpers attributes this final draft to Huffman's failure to notify Global of her cancellation of the program.

Second, Legal Helpers refunded $873.97 by check (Jt. Exs. 10 & 16) from her Savings Account. At that time, the balance in her Savings Account was $948.97. Legal Helpers refunded that amount, less $75.00.[23] Legal Helpers did not refund $75.00, because Global had charged Huffman for three (3) "Dishonored/returned deposit items." (Jt. Ex. 15). Copiah Bank returned two (2) drafts for insufficient funds. Copiah Bank also dishonored Global's draft in July 2011 after Huffman cancelled the automatic draft. Global withdrew $25.00 from the Copiah Account on April 13, 2010 and again on May 11, 2010, which increased her scheduled payments on those same dates from $707.48 to $732.48. Legal Helpers, however, deducted $75.00 from Huffman's $873.97 refund check in payment of the $25.00 incurred because of the three (3) returned drafts. It is unknown why Legal Helpers charged Huffman $75.00 by withdrawing that amount from her Savings Account when Global already had withdrawn $50.00 in April and May 2010.

Once the monies refunded by Legal Helpers are subtracted from the total amount she paid into the program, Huffman paid net fees for Legal Helpers' services of $7,264.75, as shown in Chart E, as follows:[24]

---

[23] $75.00 = $948.97 - $873.97. The Pretrial Order mistakenly shows that Huffman received a refund of $8**9**3.97 (Pretrial Order ¶ 11(L)).

[24] $7,264.75 = $7,189.75 + $75.00, and as shown in footnote 23, $75.00 = $948.97 - $873.97.

| CHART E: NET FEES PAID BY HUFFMAN | | | | |
|---|---|---|---|---|
| Payment Date | Monthly Payment | Legal Helpers' Fees | Savings Account | Refund |
| 4-13-2010 | $732.48 | $732.48 | $ 0.00 | |
| 5-11-2010 | $732.48 | $732.48 | $ 0.00 | |
| 6-7-2010 | $707.48 | $707.48 | $ 0.00 | |
| 7-6-2010 | $497.19 | $418.11 | $ 79.08 | |
| 8-5-2010 | $497.19 | $418.11 | $ 79.08 | |
| 9-7-2010 | $497.19 | $418.11 | $ 79.08 | |
| 10-5-2010 | $497.19 | $418.11 | $ 79.08 | |
| 11-5-2010 | $497.19 | $418.11 | $ 79.08 | |
| 12-6-2010 | $497.19 | $418.11 | $ 79.08 | |
| 1-5-2011 | $497.19 | $418.11 | $ 79.08 | |
| 2-7-2011 | $497.19 | $418.11 | $ 79.08 | |
| 3-7-2011 | $497.19 | $418.11 | $ 79.08 | |
| 4-5-2011 | $497.19 | $418.11 | $ 79.08 | |
| 5-5-2011 | $497.19 | $418.11 | $ 79.08 | |
| 6-6-2011 | $497.19 | $418.10 | $ 79.09 | |
| 7-5-2011 | $497.19 | | | $497.19 |
| | | | ($873.97) | $873.97 |
| NSF FEES | | $75.00 | ($75.00) | |
| TOTALS | $8,635.91 | $7,264.75 | $ 0.00 | $1,371.16 |

(Jt. Exs. 3, 10, & 16).

**E.    Others' Enrollments in the Debt Settlement Program**

At the time of Trial, Legal Helpers had enrolled 442 clients in Mississippi in its debt settlement program. In addition to Huffman, two (2) other former clients, George H. Huber ("Huber") and Melanie Barry ("Barry"), have filed petitions for bankruptcy relief and adversary proceedings against Legal Helpers after cancelling their debt settlement programs. *See Henderson v. Legal Helpers Debt Resolution, L.L.C. (In re Barry)*, Adv. Proc. No. 12-05036-KMS; *Huber v. Legal Helpers Debt Resolution, L.L.C. (In re Huber)*, Adv. Proc. No. 13-05030-KMS.

The Trustee presented Huber's testimony to support his claim that Huffman's experience was not atypical but was shared by other clients of Legal Helpers.  Huber testified that from 2009 until May 2011, he was enrolled in Legal Helpers' debt settlement program in Mississippi.  He signed a retainer agreement much like the one signed by Huffman (Adv. Proc. No. 13-05030-KMS, Adv. Dkt. 1A).  During his enrollment, his creditors called him multiple times daily.  Without Legal Helpers' help and contrary to the retainer agreement, Huber negotiated the settlement of two (2) debts, which he paid from his disposable income.  Huber ended his enrollment after Citibank and Visa had filed collection lawsuits against him.  *See Huber*, Case No. 11-51188-KMS & Adv. Proc. No. 13-05030-KMS.  When Huber informed Legal Helpers about these lawsuits, Hyslip sent him an email informing him that Legal Helpers would not represent him in these lawsuits.  (Trustee Ex. 15).  Hyslip also told Huber that Legal Helpers "can arrange for you a free consultation with [Legal Helpers] regarding how a Chapter 7 bankruptcy would likely discharge your debt." (*Id.*).  Huber filed a chapter 13 bankruptcy case without any assistance from Legal Helpers.

## PROCEDURAL HISTORY

### A.    Bankruptcy Case

Huffman retained the services of a Mississippi bankruptcy attorney, Michael G. Pond ("Pond").  With Pond's legal assistance, Huffman filed a voluntary petition for relief (the "Petition") (Bankr. Dkt. 1) on January 19, 2012 under chapter 7 (the "Bankruptcy Case"), the very contingency she had hoped to avoid by enrolling in the debt settlement program. Huffman paid Pond $1,000.00 for his legal services.  (Bankr. Dkt. 3 at 25).  Legal Helpers did not prepare the Petition that commenced Huffman's Bankruptcy Case.  (*Id.*).

When she filed her Petition, Huffman's debts exceeded her assets (Jt. Ex. 4 at 1). Her only secured debt was the mortgage on her home (*Id.* at 8). She listed in her bankruptcy schedules all of the unsecured debts that she had enrolled in the debt settlement program. (*Id.* at 10).

**B.      Adversary Proceeding**

**1.      Complaint**

On September 28, 2012, the Trustee filed the Complaint asserting five (5) causes of action on Huffman's behalf against Macey, Aleman, Hyslip, and Searns (collectively, the "Members") and Legal Helpers: Count I: Turnover of Estate Property under § 542 (Compl. ¶¶ 66-71); Count II: Fraudulent Transfers under § 548 (Compl. ¶¶ 72-76); Count III: Accounting (Compl. ¶¶ 77-78); Count IV: Violations of § 526 (Compl. ¶¶ 79-87); and Count V: Fraud (Compl. ¶¶ 88-109). The gist of the Trustee's allegations in the Complaint is that the debt settlement program did not actually help Huffman's precarious financial situation, but in fact made it much worse. Monies that she could have used to pay her creditors were paid instead to Legal Helpers. The Trustee alleges numerous deceptive and abusive practices by Legal Helpers in the Complaint and seeks to recover all assets taken by Legal Helpers for the benefit of the bankruptcy estate.

**2.      Prior Motions**

**a.      Motion to Compel Arbitration**

On November 14, 2012, Legal Helpers filed the Defendants [sic] Motion for [sic] to Compel Barry's [sic] Claims to Arbitration Pursuant to the Federal Arbitration Act and to Stay Pending Arbitration (Adv. Dkt. 15). The Court denied its request to compel arbitration on

February 6, 2013, in the Memorandum Opinion and Order Denying Motion to Compel Arbitration and to Stay Adversary Proceeding Pending Arbitration (Adv. Dkt. 37).

On February 20, 2013, Legal Helpers and the Members filed a Notice of Appeal of the denial of their request for arbitration (Adv. Dkt. 44) and contemporaneously filed separate answers to the Complaint. (Adv. Dkts. 39-43). Thereafter, Legal Helpers and the Members filed a stipulation of dismissal of the appeal. On March 18, 2013, the Court entered an order dismissing the appeal pursuant to Rule 8001(c) of the Federal Rules of Bankruptcy Procedure. (Adv. Dkt. 60).

### b.    Motion for Judgment on the Pleadings

On April 10, 2013, Legal Helpers filed the Motion for Judgment on the Pleadings (Adv. Dkt. 64), in which Legal Helpers and the Members asked the Court to dismiss all of the Trustee's alter ego claims against the Members and most of his claims against Legal Helpers. As to his claims against Legal Helpers, they sought dismissal of the turnover claim, the accounting claim, and the fraud claim. They did not seek dismissal of the Trustee's claims against Legal Helpers for fraudulent transfer or for relief under § 526. On June 10, 2013, the Court entered the Memorandum Opinion and Order on Motion for Judgment on the Pleadings (the "Rule 12(c) Opinion") (Adv. Dkt. 75) in which it granted the Motion for Judgment on the Pleadings in part on the ground that the Trustee had failed to allege sufficient facts in the Complaint supporting an alter ego claim against the Members or a turnover claim with respect to the fees and expenses paid by Huffman. (*Id.*). The claims that remained after entry of the Rule 12(c) Opinion against Legal Helpers were the Trustee's claims for turnover with respect to certain records related to Legal Helpers' program in Mississippi, fraudulent transfer, accounting, relief under § 526, and fraud.

### c.      Amended Discovery Motion

The Trustee filed an Amended Motion to Compel Discovery ("Amended Discovery Motion") (Adv. Dkt. 88) seeking an order compelling Legal Helpers to produce documents regarding the amount and method of compensation they charged and received from Huffman and a list of their Mississippi clients (the "Client List"). Legal Helpers filed a response (Adv. Dkt. 93). In the Order ("Discovery Order") (Adv. Dkt. 97) that granted in part and denied in part the Amended Discovery Motion, the Court instructed Legal Helpers to produce the Client List to the Trustee. Later, the parties entered into a Stipulated Protective Order (the "Protective Order") (Adv. Dkt. 114) that, *inter alia*, limited the use of the Client List.

### d.      Summary Judgment Motions

Legal Helpers filed the Legal Helpers Debt Resolution, LLC's Motion for Summary Judgment (the "LHDR Summary Judgment Motion") (Adv. Dkt. 98) on September 4, 2013. Legal Helpers requested summary judgment on the following claims for the reasons indicated: (1) the Trustee's turnover claim (Count I) because the Discovery Order requiring Legal Helpers to produce a list of its Mississippi clients has rendered the claim moot; (2) the Trustee's fraudulent transfer claim (Count II) because Legal Helpers provided a "reasonably equivalent value" in the services it provided Huffman; (3) the Trustee's accounting claim (Count III) because the bank statements in the Trustee's possession provide all the information necessary to determine the total amount of money Huffman paid Legal Helpers; (4) the Trustee's claim under § 526 (Count IV) because Legal Helpers did not provide any "bankruptcy assistance" to Huffman; and (5) the Trustee's fraud claim (Count V) because (a) it consists of alleged misrepresentations that Huffman could not have reasonably relied upon, (b) it consists of alleged

misrepresentations to act in the future, and (c) there is no evidence that the remaining misrepresentations were actually made. (LHDR S.J. Mot. ¶ 7).

The Trustee filed the Plaintiff's Motion for Partial Summary Judgment (the "Trustee Summary Judgment Motion") (Adv. Dkt. 104). The Trustee requested summary judgment on his claims under § 526 (Count IV). The Trustee asserted that the undisputed facts established as a matter of law that Legal Helpers violated § 526(a)(1) by failing to perform promised services and also violated § 526(a)(3) by misrepresenting the services it would provide. (Adv. Dkt. 105 at 3).

In the Memorandum Opinion and Order Denying Legal Helpers Debt Resolution, LLC's Motion for Summary Judgment and the Plaintiff's Motion for Partial Summary Judgment (Adv. Dkt. 118), the Court, exercising its discretion under Rule 7056(a) of the Federal Rules of Bankruptcy Procedure, denied both the LHDR Summary Judgment Motion and the Trustee Summary Judgment Motion in order to allow a fuller development of the record at Trial. In the alternative, the Court concluded that there were genuine issues of disputed fact and the parties failed to show that they were entitled to judgment as a matter of law.

**3.  Adversary Trial**

The pretrial order (the "Pretrial Order") (Adv. Dkt. 127) was entered on November 8, 2013. The Trial took place on November 20 and November 22, 2013. As mentioned previously, the parties filed post-trial briefs on December 19 and December 20, 2013.

## DISCUSSION

In the Adversary, the Trustee seeks the turnover of records and documents related to Legal Helpers' debt settlement program in Mississippi. The Trustee also seeks to recover the fees Huffman paid legal Helpers for its services between April 2010 and June 2011 as fraudulent transfers under § 548. The Trustee asks the Court to require Legal Helpers to provide an

accounting of the flow of monies from Huffman to Legal Helpers, Eclipse, and Global. Moreover, he contends that Legal Helpers is a debt relief agency that failed to perform promised debt settlement services and misrepresented those services to Huffman in violation of § 526. For this reason, he alleges that he is entitled to a remittal of fees Huffman paid Legal Helpers, actual damages, attorneys' fees and costs, and a civil penalty of $221,000.00. Finally, he asserts that Legal Helpers committed fraud by misrepresenting the services it intended to provide Huffman.

## A.    Evidentiary Objections

During Trial, the Trustee moved to introduce into evidence two (2) sets of documents: (1) email communications from Aleman ("Aleman's Emails" or "Trustee Exhibit 1") and (2) Aleman's Answer to a Complaint ("Answer to Illinois ARDC Complaint" or "Trustee Exhibit 11"). Trustee Exhibit 11 was filed in an action against Aleman and Macey by the Illinois Registration and Disciplinary Commission (the "Illinois ARDC").

At Trial, Legal Helpers objected to the admission of these exhibits on grounds of relevancy under Rule 402 of the Federal Rules of Evidence ("Rule 402") and on the ground their prejudicial harm substantially outweighed their probative value under Rule 403 of the Federal Rules of Evidence ("Rule 403"). At Trial, the Court deferred ruling on Legal Helpers' objections to allow more evidence to be developed during Aleman's video deposition. At Aleman's video deposition, taken after the conclusion of Trial, the parties set forth their respective positions on the record. The Court, having had the benefit of viewing the parties' arguments in their proper context, begins its analysis by considering in greater detail the contents of the challenged exhibits.

### 1.      Trustee Exhibit 1:  Aleman's Emails

Trustee Exhibit 1 is ten (10) pages of emails to and from Aleman.  (Trustee Ex. 1).  The earliest email is dated June 30, 2009 and is between Aleman and Pond, the same attorney who later represented Huffman in her bankruptcy case.   In the first email, Aleman mentions a potential partnership between Legal Helpers, P.C. and Pond.   (*Id.*).   Pond responds by summarizing a prospective client's recent experience with a debt settlement entity other than Legal Helpers.  The prospective client had enrolled $8,000.00 in credit card debt plus $2,950.00 in other debt (for a total debt of $10,950.00) in a debt settlement program similar to Legal Helpers'.   (*Id.*).   The debt settlement entity deducted a total of $5,000.00 from her checking account over twenty-five (25) months.  (*Id.*).  She was then sued by the credit card creditor for over $23,000.00.   (*Id.*).   Pond wrote that he did not "wish to be associated with any such business" and that "[a]ny lawyer who participated in or was associated with that transaction is guilty of malpractice."  (*Id.*).

In Aleman's next email, Aleman asked Pond to reconsider his position.  (Trustee Ex. 1).  Aleman wrote that the difference between Legal Helpers and "some fly by night debt settlement company" was that "[as] lawyers, [Legal Helpers] operate[s] under a much higher standard of care."  (*Id.*).  Aleman further wrote that Legal Helpers differed from other companies in the debt settlement industry because Legal Helpers had "a minimum performance standard of 35% savings."  (*Id.*).  Using Pond's scenario, Aleman explained that Legal Helpers would not have received any payment for its services unless it had settled at least $4,000.00 of the client's total debt.  (*Id.*).  "Further, had we settled her debt for greater then [sic] 35% savings – which is very highly likely – the charge for our services would have only been $1,642.50 total or 15% of her ORIGINAL debt rather then [sic] the obscene amount of $5,000.00 she was charged!!!"  (*Id.*).

The Trustee asked Aleman why Huffman's situation differed from the scenario he described for Pond in their email exchanges. Aleman explained, "Miss Huffman's situation . . . was unique in that we did not or were unable to settle . . . debts within the normal time frame. . . . [M]y understanding of that is a one-off. Normally that does not happen. We typically settle debts, you know, every 6 to 8 months. Again, that's historic precedent." (Aleman Dep. at 23-24).

The Trustee moved to admit Trustee Exhibit 1 into evidence on the ground that Aleman's statements constituted an "admission by a party opponent." (*Id.*). Legal Helpers then renewed its objection "on grounds of relevance and [Rule] 403." (*Id.*). Legal Helpers maintained that the emails were exchanged in 2009 and did not relate specifically to Huffman, who was not a client at that time. (*Id.*).

### 2.      Trustee Exhibit 11:  Answer to Illinois ARDC Complaint

Trustee Exhibit 11 consists of a fifteen (15)-page Answer to Illinois ARDC Complaint that was jointly filed by Aleman and Macey in response to a complaint filed against them by the Hearing Board of the Illinois ARDC (the "Illinois ARDC Board"). (Trustee Ex. 11). (Both Aleman and Macey hold a license to practice law in Illinois.) In general, the Illinois ARDC Board questioned Legal Helpers' business model, which, according to Aleman, was the same business model adopted by Legal Helpers in Mississippi. (Aleman Dep. at 32).

The Trustee moved to admit Aleman's denial to the following allegation by the Illinois ARDC Board: "[A]t no time before the initiation of the attorney-client relationship did [Aleman or Macey] or an attorney from [Legal Helpers] personally confer with and advise the clients about . . . the availability, risks and benefits of other courses of action to resolve the clients' indebtedness, such as Chapter 7 or Chapter 13 bankruptcy proceedings, under each client's

particular circumstances." (Trustee Ex. 11, ¶ 17). In the Answer to Illinois ARDC Complaint, Aleman maintained "that substantially all of the prospective clients were advised of the bankruptcy remedies available under Chapters 7 and 13, either by an attorney or under an attorney's direction, by a non-attorney." (*Id*.). Legal Helpers opposes the admission of Trustee Exhibit 11 on the ground that Aleman's response was limited to clients of Legal Helpers in Illinois.

### 3.  Rule 402-Admissibility

Rule 402 renders all relevant evidence admissible, with certain exceptions, and all irrelevant evidence inadmissible. Rule 403 confers limited discretion on the Court to exclude relevant evidence if its probative worth is substantially outweighed by any one of six (6) countervailing factors.[25] Because Rule 403 applies only to evidence that is relevant, the Court considers as a threshold matter the relevancy of Trustee Exhibits 1 and 11 under Rule 401 of the Federal Rules of Evidence ("Rule 401").

### 4.  Rule 401-Relevancy

Evidence is relevant if it makes a proposition more probable than it would be without the evidence. 22 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5165, at 128 (2d ed. 2012). The burden of showing the relevance of Trustee Exhibits 1 and 11 rests on the Trustee. *See United States v. Kelly*, 556 F.2d 257, 265 (5th Cir. 1977).

---

[25] These factors are: (1) unfair prejudice, (2) confusing the issues, (3) misleading the jury, (4) undue delay, (5) wasting time, and (6) needlessly presenting cumulative evidence. FED. R. EVID. 403.

### a.      Trustee Exhibit 1:  Aleman's Emails

Trustee Exhibit 1 relates to Aleman's efforts during Legal Helpers' formative year to recruit a local attorney in Mississippi to join Legal Helpers.  Aleman's emails were sent about eight (8) months before Huffman enrolled in Legal Helpers' debt settlement program.  Even so, the Court finds that Trustee Exhibit 1 is relevant.  Searns testified at length about his vetting of the business model that Legal Helpers adopted nationally.  His testimony opened the door for the Trustee to rebut Searns' description of the program.

Legal Helpers' objection imposes a higher standard on relevancy then Rule 401 requires. Rule 401 makes evidence relevant if it has "any" probative value.  The Court rejects the argument by Legal Helpers that the emails are so remote in time to Huffman's enrollment as to affect their probative value.

### b.      Trustee Exhibit 11:  Answer to Illinois ARDC Complaint

Trustee Exhibit 11 relates to the issue of whether Legal Helpers is a "debt relief agency" and, specifically, whether Legal Helpers provided "bankruptcy assistance" to Huffman within the meaning of § 526.  The Court finds Trustee Exhibit 11 relevant in that it contains inconsistent statements by Aleman regarding the advice that all prospective clients received from Legal Helpers with respect to the remedies available to them under chapters 7 and 13 of the Code. Aleman's response to paragraph 17 casts doubt on Legal Helpers' position that it never provided bankruptcy assistance to any of its clients.  *See United States v. Lopez,* 979 F.2d 1024, 1034-35 (5th Cir. 1992) (holding that extrinsic evidence is admissible to contradict specific testimony). Legal Helpers argues that Aleman's response is irrelevant because it pertained to clients in Illinois only.  Searns and Aleman, however, testified that Legal Helpers operated the same legal debt settlement program nationwide.

### 5.   Rule 403-Prejudice

Turning to the second ground raised by Legal Helpers for excluding Trustee Exhibit 1 and 11, the Court rejects Legal Helpers' argument that these exhibits should be excluded under Rule 403 because of their unfair prejudice.  Although the Court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the problems that admission of such evidence may cause, the Court's discretion is limited.   The Fifth Circuit has cautioned courts to use Rule 403 "sparingly."   *Herrington v. Hiller*, 883 F.2d 411, 414 (5th Cir. 1989). More important, this is a bench trial, and, therefore, there are no problems of juror prejudice. "Excluding relevant evidence in a bench trial . . . on the basis of 'unfair prejudice' is a useless procedure."   *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981).

### B.   Count I: Turnover of Estate Property

Under § 542, the Court "may order an attorney . . . or other person that holds recorded information, including books, documents, records and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee."   11 U.S.C. § 542(e).  "Documents which are not property of the estate may still be subject to turnover under Section 542(e) if they relate to the debtor's property or financial affairs, subject to any claim of privilege."   *In re Crescent Res., LLC*, 457 B.R. 506, 513 (Bankr. W.D. Tex. 2011) (citation omitted).

In Count I of the Complaint, the Trustee seeks the turnover of all records related to Legal Helpers' debt settlement program in Mississippi, including records related to clients other than Huffman (Compl. ¶ 71).  The Trustee bears the burden of showing that the requested documents relate to the debtor's property or financial affairs.  *Crescent*, 457 B.R. at 513.

At Trial, counsel for the Trustee stated that he had received a list of all Mississippi clients pursuant to the Court's Discovery Order. Also, in the Trustee Brief, the Trustee asks only that the Court "consider the need for . . . turnover." (Trustee Br. at 4). After considering the evidence at Trial, the Court finds that the Trustee's turnover claim under § 542 in Count I should be denied as moot.

## C.  Count II:  Fraudulent Transfers

In Count II, the Trustee seeks to recover the funds Huffman paid Legal Helpers for debt settlement services as fraudulent transfers under § 548[26] and § 550. The Trustee contends that Huffman received virtually nothing of value from Legal Helpers in return for the $8,138.72[27] she paid into the debt settlement program as of June 6, 2011, that she was insolvent or became insolvent when she made these payments, and that these payments were made within two (2) years of the date she filed the Petition.

Section 548(a)(1)(B) provides, in relevant part:

(a)(1)  The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

---

[26] In the Pretrial Order, the Trustee cites both § 548 and § 544 in support of his fraudulent transfer claim but does not refer to § 544 in the Trustee Brief. (Pretrial Order at 5). It appears that the Trustee has abandoned his claim under § 544 in favor of § 548. In the event he did not intend to abandon his claim under § 544, the Court finds in favor of Legal Helpers on the ground that the Trustee did not identify at Trial an unsecured creditor for the purpose of standing under § 544(b). *See* 5 COLLIER ON BANKRUPTCY ¶ 544.06[1] (16th ed. 2013).

[27] The Trustee frames his argument based upon the amount of all payments made by Huffman ($8,635.91) minus the payment Global drafted by mistake ($497.19) and refunded Huffman. ($8,138.72 = $8,635.91 - $497.19). The Trustee's calculation does not take into account the additional refund of $873.97. After subtracting this additional refund, the net fees paid by Huffman are $7,264.75, which is the amount the Court uses in its analysis ($7,264.75 = $8,138.72 - $873.97).

\* \* \*

(B)(i)   received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a)(1)(B)(i)-(ii).  In sum, to prevail on his claim for fraudulent transfer under § 548(a)(1)(B), the Trustee must show that (1) transfers were made of Huffman's property, (2) the transfers were made within two (2) years of the date of the filing of the Petition on January 19, 2012, (3) Huffman received less than reasonably equivalent value for such transfers, and (4) Huffman was insolvent at the time of such transfers or became insolvent as a result of such transfers.  (*Id.*); *see Gaudet v. Babin (In re Zedda)*, 103 F.3d 1195, 1203-06 (5th Cir. 1997).  The first and second elements of § 548(a)(1)(B) are undisputed by the parties.  The third element requires the Court to engage in a fact-intensive review of the evidence to determine whether the services provided by Legal Helpers were "reasonably equivalent" to the $7,264.75[28] in net fees paid by Huffman.

### 1.      Less Than Reasonably Equivalent Value

The Bankruptcy Code does not define "reasonably equivalent value," but courts usually base the determination on factual findings "regarding the value of the property transferred and the 'value' received in exchange."  *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1495 (5th Cir. 1993) (footnote omitted) (citation omitted); *see also Tex. Truck Ins. Agency, Inc. v. Cure (In re Dunham)*, 110 F.3d 286, 289 (5th Cir. 1997) (holding that issue of "reasonably equivalent value" is generally a question of fact).  A finding of reasonably equivalent value does not require evidence of a dollar-for-dollar exchange.  On the other hand, there is no lower limit

---

[28] *See supra* note 27 and Chart E p. 29.

on reasonably equivalent value. Instead, the finding depends on the "totality of the circumstances." *Besing*, 981 F.2d at 1495 n.14. Here, the Trustee has the burden of proving by a preponderance of the evidence that the debt settlement services were not for "reasonably equivalent value" given the "totality of the circumstances."

The Trustee maintains that Huffman did not receive "reasonably equivalent value" because Legal Helpers and/or Eclipse failed to perform the promises made in the Retainer Agreement. (Trustee Br. at 6). The Trustee contends that: Eclipse scarcely made any effort at all to negotiate settlements with Huffman's creditors, as shown in the Call Log and by Huffman's testimony at Trial; Eclipse failed to respond timely to Huffman's inquiries; Eclipse failed to inform Huffman of the settlement offer made by Citibank; Eclipse failed to discuss with Huffman her legal options when Citibank sued her; and Eclipse generally failed to use its "best efforts" to obtain a satisfactory result for Huffman. The telephone conversations with the Eclipse Rep and the form letters sent to Huffman's creditors in April and November 2010 were of no help to Huffman. They did not curtail the collection calls or dunning letters and did not lead to the settlement of any debts.

Legal Helpers contends that the $7,189.75[29] in fees paid by Huffman were of "reasonably equivalent value" for the debt settlement services it performed on her behalf. Legal Helpers contends that the Trustee's fraudulent transfer claim is "premised on [the Trustee's] belief that the Retainer Agreement turned out to be a 'bad deal' for [Huffman]." (LHDR Br. at 17).

Legal Helpers relies extensively upon the language of the Retainer Agreement warning Huffman that Legal Helpers made no guarantee that it would reach any settlements. (Jt. Ex. 1,

---

[29] Apparently, Legal Helpers does not include the $75.00 NSF charges in its calculation of total fees paid by Huffman. *Compare supra* Chart D p. 27 *with supra* Chart E p. 29. Because Huffman paid these fees in connection with the program, the Court finds that they should be included.

¶¶ X(a), VII & VIII; Jt. Ex. 8).   Because of this no-guarantee language, according to Legal Helpers, it is inappropriate for the Trustee to critique the debt settlement program in hindsight, that is, to view it with the present knowledge that Legal Helpers would not succeed in settling any of Huffman's debts and that Huffman would file bankruptcy in the end.

Legal Helpers describes the Retainer Agreement as an "arms-length" transaction where there was at least some legitimate chance that Eclipse might have been able to settle some of Huffman's debts, if only she had remained in the program for two (2) more years.  Her decision to cancel the program early, according to Legal Helpers, is what prevented its success.  Because there was only $948.97 in the Savings Account when she cancelled the program, Legal Helpers claims that it was impossible for Eclipse to settle Huffman's debts of $39,265.00, which would have amounted to a debt reduction of about ninety-seven percent (97%).  (Aleman Dep. at 56-58).

It is undisputed that during the fifteen (15) months Huffman participated in the program, Legal Helpers did not negotiate the settlement of a single debt enrolled in the program.  The Trustee places great weight on this fact.  Legal Helpers' assertion that the Trustee's claim is really about a "bad deal," however, misses the mark.  Huffman testified at Trial, "They did not do nothing they told me they would do! . . . I tried to and I did pay every month until it looked like I was getting deeper in the hole."[30]  In other words, the Trustee's fraudulent transfer claim is not based solely upon the outcome of Huffman's program, as Legal Helpers suggests, but also upon the efforts made on her behalf to make her program a success.  The Trustee's summary of Eclipse's failures demonstrates how the program failed Huffman.

---

[30] (Test. of Huffman at 11:51:30 to 11:51:47 Nov. 20, 2013).

If the Eclipse Rep had followed Searns' protocol when Huffman was sued, she would have referred Huffman to Windsor, but she did not. The Eclipse Rep was the only individual who had any personal interaction with Huffman. No attorney at Legal Helpers ever spoke with her, including Windsor, and no one at Eclipse ever met with her face to face.

Based upon the experience of Huffman and despite Aleman's description of her failed program as an "anomaly," the Court is skeptical that the program provided sufficient supervision over Eclipse. Moreover, as to her initial enrollment in the program, the Court doubts that the three-step review performed by Searns, Hyslip, and Windsor was of any benefit to her.[31] Windsor's review of her file, in particular, appears to have been only perfunctory, lasting only about twenty (20) minutes. Tellingly, Windsor testified that he did not consider Huffman his client.

Legal Helpers places blame upon Huffman for ending the program with only $948.97 in the Savings Account and, thus, making it impossible for the program to succeed. Even Aleman testified, however, that Eclipse should have settled her $969.00 debt to Wells Fargo. (LHDR Ex. 1B). Indeed, applying a debt reduction of thirty-five percent (35%) (the "Debt Resolution Minimum Standards of Representation" in the Retainer Agreement), Legal Helpers should have settled the Wells Fargo debt for no more than $629.85, which Huffman had accumulated in the Savings Account by February 7, 2011. Aleman attempted to explain the failure of Eclipse to settle this debt as a "one off" and an "anomaly." (Aleman Dep. at 58). He speculated that Eclipse might have decided deliberately not to settle the Wells Fargo debt because it was such a

---

[31] Neither Windsor, Searns, nor Hyslip questioned how Huffman would benefit from the debt settlement program, given that her Social Security income is protected from garnishment by federal law.

small amount.[32]  (*Id.* at 60).  In a similar vein, Hyslip testified it would have been a disservice to Huffman for Eclipse even to try to settle the Wells Fargo debt.

Legal Helpers' placement of the blame on Huffman's early termination ignores the likelihood that the amount of upfront fees Legal Helpers charged her doomed the program from its inception.  As proposed, no funds would reach the Savings Account until three (3) months into the program and, thereafter, only about $80.00 per month during all of the following year.[33] If more of Huffman payments had reached the Savings Account earlier in the program, it would have made the settlement of her debts more probable and her early termination of the program less so.

For her part, Huffman did not miss a single payment to Legal Helpers during her enrollment in the program.[34]  In the end, she paid $7,264.75 for Legal Helpers' services, but she never spoke to any attorney at Legal Helpers, Eclipse did not settle any of her enrolled debts, and she filed her bankruptcy case after retaining Pond as counsel.

The Court is not persuaded differently by *Kaler v. Able Debt Settlement, Inc. (In re Kendall)*, 440 B.R. 526 (B.A.P. 8th Cir. 2010), a case cited by Legal Helpers as directly on point. (LHDR Br. at 15).  There, the bankruptcy court ruled that payments by debtors of $1,708.37 for debt settlement services were not fraudulent transfers under § 548(a)(1)(B).  *Id.* at 533-34. Considering the transaction as a whole, the bankruptcy court found that the value of the debt

---

[32] In comparison to the Wells Fargo debt of $969.00, the debt to Bank of America was $21,514.00; Chase, $7,062.00; CitiFinancial, $3,850.00; and Sears/Citibank, $5,870.00.  Aleman testified that these debts were too high to attempt to settle for $948.97.  *See supra* Chart A p. 18.

[33] *See supra* Chart C p. 23.

[34] Legal Helpers initially charged Huffman NSF fees for two (2) returned items, but Copiah Bank did not return those drafts because of insufficient funds in the Copiah Account but because of a scrivener's error in the account number.

settlement services was reasonably equivalent to the funds paid by the debtors into the program. In reaching this finding, the bankruptcy court rejected the trustee's contention that there was no possibility from the outset that the debtors could avoid bankruptcy by participating in the program.

The Court finds that *Kaler* is factually distinguishable. The nature and extent of the services provided to the debtors in *Kaler* differed significantly from those provided Huffman. For example, unlike Legal Helpers, the debt settlement company in *Kaler* had reached a possible settlement with one creditor and "was still in the process of negotiating with many of the creditors when the [debtors] withdrew from the program." *Id.* at 533. In affirming the bankruptcy court, the Bankruptcy Appellate Panel for the Eighth Circuit Court of Appeals noted that determining "reasonably equivalent value" is a question of fact requiring bankruptcy courts to consider whether the parties acted in good faith and whether the transaction was at arm's length.

## 2.    Insolvency

The fourth and final element of a fraudulent transfer claim under § 548(a)(1)(b) is whether Huffman was insolvent when she paid the program fees or became insolvent as a result of paying those fees. Under the Code, an individual is "insolvent" when "the sum of such [person's] debts is greater than all of such [person's] property, at a fair valuation," exclusive of property fraudulently transferred or property claimed as exempt under state or federal law. 11 U.S.C. § 101(32); *see also* 11 U.S.C. § 101(15) (defining entity as including a person).

According to the Trustee, Huffman's insolvency during the time she was enrolled in the program is evidenced by her bankruptcy schedules. (Bankr. Dkt. 3). As mentioned previously, Huffman enrolled credit card debt of $39,265.00 in the program on March 30, 2010. Huffman

testified that her assets did not change much from the date of her enrollment to the time she commenced her bankruptcy case on January 19, 2012. (Bankr. Dkt. 1). The value of her assets, according to her bankruptcy schedules, was $30,450.00, including her exempt property.[35] (Bankr. Dkt. 3). Therefore, Huffman's debts of $39,265.00 clearly exceeded her assets. The Court thus concludes that she was insolvent at the time of the transfers.

Having found that the Trustee may avoid the fraudulent transfers that Huffman paid Legal Helpers for its services, the Court also finds that the Trustee may recover these transfers for the benefit of Huffman's bankruptcy estate under § 550, which sets forth the liability of a transferee in the event of an avoided transfer. 11 U.S.C. § 550.

## D.    Count III:  Accounting

As to Count III, the basis for the Trustee's accounting claim is unclear. Legal Helpers treats the Trustee's accounting claim as a request for relief under Mississippi law.[36] (LHDR Br. at 18). Under Mississippi law, "the factors considered in determining whether an accounting is warranted include (1) the need of discovery; (2) the complicated character of the accounts; and (3) the existence of a fiduciary or trust relationship." *Teeuwissen v. JP Morgan Chase Bank, N.A.*, 902 F. Supp. 2d 826, 836 (S.D. Miss. 2011).

Legal Helpers contends that the Trustee has in his possession all of the information necessary to determine the total amount of money paid by Huffman into her debt settlement

---

[35] At Trial, Huffman testified on cross-examination that the value of her home was $72,000.00, not $25,000.00, the amount listed in her bankruptcy schedules. Because the definition of insolvency excludes the value of exempt property from the "balance sheet" calculation and because there is a homestead exemption up to $75,000.00 under Mississippi law, the discrepancy between Huffman's bankruptcy schedules and her testimony regarding the value of her home is immaterial. *See* 11 U.S.C. § 101(32); MISS. CODE ANN. § 85-3-21.

[36] Whether the Trustee asserts his claim under Mississippi law, § 542, or some discovery method, the Court's analysis is substantially the same.

program.  According to Legal Helpers, Huffman's bank statements from April 2010 through July 2011 show the amounts paid, and the Payment Schedule shows the allocation of those payments. (Jt. Exs. 3 & 8).

The Trustee, in contrast, asserts that an accounting of Huffman's payments is necessary because the substantial role of Eclipse and Global in Huffman's debt settlement program suggests they received a share of the fees paid to Legal Helpers and because the drafts reflected in Huffman's bank statements differ from the Payment Schedule.  For example, in processing Huffman's payments, Global charged Huffman $50.00 for NSF Fees in April and May 2010 and $75.00 in July 2011, a total of $125.00 in NSF fees.  The evidence at Trial, however, showed that Copiah Bank returned only three (3) items to Global and that the NSF Fee for each item was only $25.00, for a total of $75.00, less than $125.00.

Despite these discrepancies and the computation errors in the LHDR Brief,[37] the Court finds that the testimony at Trial provided an adequate accounting of the monies paid by Huffman and the apportionment of these payments between Legal Helpers and the Savings Account, as shown in the various charts in this Opinion.  Although the evidence at Trial did not disclose the split of fees between Eclipse, Global, and Legal Helpers, the Court agrees with Legal Helpers that an accounting that shows the flow of money downstream from Legal Helpers is irrelevant to the issues and claims made by the Trustee in the Adversary.  Eclipse and Global, after all, are not parties in this Adversary, and Legal Helpers does not dispute its responsibility for their actions.  For these reasons, the Court finds that the Trustee's accounting claim lacks merit and should be denied.

---

[37] For example, in setting out the allocation of Huffman's payments, Legal Helpers alleges that Huffman paid $800.00, representing the $50.00 monthly maintenance fee from April 2010 through June 2011, but the correct amount during the stated period of time (15 months) is only $750.00 ($750.00 = 15 months × $50.00). (LHDR Br. at 18).

### E.    Count IV:  Violations of § 526 & § 527

The Trustee asserts that Legal Helpers is a debt relief agency that failed to perform promised services in violation of § 526(a)(1) and misrepresented the services to be provided in violation of § 526(a)(3).  The Trustee also contends that Legal Helpers failed to provide the disclosures set forth in § 527 or the notice under § 342(b)(1).

Section 526, "Restrictions on Debt Relief Agencies," was enacted in 2005 as part of BAPCPA "to correct perceived abuses of the bankruptcy system."  *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 231-32 (2010); *Hersh*, 553 F.3d at 746 ("BAPCPA is a 'comprehensive package of reform measures' designed to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy stem and ensure that the system is fair for both debtors and creditors").  As relevant here, § 526 and § 527 regulate the conduct of a "debt relief agency," and § 526(c) and § 528 provide sanctions and remedies when a debt relief agency "intentionally or negligently" fails to comply with those regulations or engages in a clear and consistent pattern or practice of violating those regulations.  Legal Helpers disputes that it is a debt relief agency subject to § 526 and § 527.

In interpreting a statute, the Court begins with the plain language of its text.  The Code defines a debt relief agency as "any person who provides any *bankruptcy assistance* to an assisted person in return for the payment of money or other valuable consideration."[38]  11 U.S.C. § 101(12A) (emphasis added).  Bankruptcy assistance means "any goods or services sold or otherwise provided to an *assisted person* with the express or implied purpose of providing information, advice, counsel, document preparation, or filing, or attendance at a creditors' meeting or appearing in a case or proceeding on behalf of another or providing legal

---

[38] This definition lists several exceptions, none of which is at issue in this Adversary.  11 U.S.C. § 101(12A).

representation with respect to a case or proceeding" in bankruptcy.   11 U.S.C. § 101(4A) (emphasis added).  An assisted person is defined as "any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $186,825."  11 U.S.C. § 101(3) (footnote omitted).  These three (3) definitions determining whether an entity is a debt relief agency are imprecise and have led to problems in their application.  *See* 4 COLLIER ON BANKRUPTCY ¶ 526.01[3] (16th ed. 2013).  For example, until 2010, the U.S. Courts of Appeals disagreed about whether § 526 covered attorneys.  *Compare Milavetz, Gallop & Milavetz, P.A. v. United States,* 541 F.3d 785, 794 (8th Cir. 2008) *with Hersh*, 553 F.3d at 746.  The U.S. Supreme Court resolved that issue by holding that "attorneys who provide bankruptcy assistance to assisted persons are debt relief agencies."  *Milavetz,* 559 U.S. at 239.

Assuming that Legal Helpers provided bankruptcy assistance, the Court finds that Huffman is an "assisted person" and/or "prospective assisted person" under § 526(a).  Her debts consisted primarily of consumer debts,[39] and she paid Legal Helpers for its promised services. The issue before the Court is whether Legal Helpers provided any bankruptcy assistance to Huffman as defined by § 101(4A).

### 1.    Did Legal Helpers provide bankruptcy assistance?

According to Legal Helpers, in order to constitute "bankruptcy assistance," the information or advice must relate specifically to a pending bankruptcy case or to the anticipated filing of a bankruptcy petition (LHDR Br. at 19).  There do not appear to be any published cases that have addressed this precise issue.

---

[39] A "consumer debt" is a debt incurred "by an individual primarily for a personal, family, or household purpose."  11 U.S.C. § 101(8).

Legal Helpers contends that it did not counsel Huffman regarding her pending bankruptcy case, which was commenced well after she had cancelled the program, and that it did not counsel Huffman in anticipation of the filing of her bankruptcy case. In support of its position, Legal Helpers makes five (5) assertions. First, Legal Helpers insists that in accordance with its business model (and, ironically, despite its name), it provides no *legal* services to its clients, only *debt settlement* services.[40] Any client who requested bankruptcy services would be referred to another firm or bankruptcy attorney. No attorney at Legal Helpers would handle a client's bankruptcy case, mainly because, as Searns explained, the fees charged for enrollment in the program are insufficient to compensate Legal Helpers for such services.

Legal Helpers' second assertion is that it never discussed bankruptcy with Huffman. Legal Helpers contends that the Call Log reflects no conversations between Eclipse and Huffman about bankruptcy. Legal Helpers admits that Huffman asked the Eclipse Rep if she should just file bankruptcy, and the Eclipse Rep urged her not to, but insists that this advice was not "bankruptcy assistance." (*Id.* at 20). Huffman testified at Trial that the Eclipse Rep also said that she had certain documents that would tell her "what bankruptcy would do," but Huffman did not identify those documents. Legal Helpers describes Huffman's testimony about these conversations as "vague and unreliable" and urges the Court to disregard them altogether.

As to its third assertion, Legal Helpers maintains that it did not agree in the Retainer Agreement to give Huffman bankruptcy advice. Rather, Legal Helpers agreed to provide bankruptcy advice only if it was "appropriate" to do so when, for example, her circumstances changed, or she requested a consultation. (Jt. Ex. 1, ¶¶ III(c), XVII). The "appropriate

---

[40] According to Legal Helpers, to the extent it provides legal services, it does so only when they are incidental to debt settlement services.

circumstances," according to Legal Helpers, was the loss of a job or divorce, neither of which had happened to Huffman.

The fourth assertion by Legal Helpers is that the information contained in the Retainer Agreement about bankruptcy law was not provided to Huffman in connection with the Petition that Pond filed on her behalf. Indeed, Huffman testified that she retained Legal Helpers to avoid bankruptcy. As to the information in the Retainer Agreement regarding bankruptcy law and procedures, Legal Helpers embraces Windsor's description of it at Trial that it was generic information that could be found on the Internet using a search engine such as "Google."

The fifth and last assertion by Legal Helpers is the lapse of time between Huffman's cancellation of the debt settlement program in June 2011 and her filing of the Petition on January 19, 2012. This lapse of time, according to Legal Helpers, removes any connection between the bankruptcy information in the Retainer Agreement and her bankruptcy case. As may be recalled, the sequence of events is: Huffman signed the Retainer Agreement on March 30, 2010, terminated the Retainer Agreement in June 2011, retained Pond in January 2012, and filed her Petition on January 19, 2012.

The Trustee insists that because Legal Helpers admitted that it is a debt relief agency in the Retainer Agreement and in other materials in its welcome packet there is no need for the Court to consider whether Legal Helpers provided Huffman "bankruptcy assistance." (Jt. Ex. 2). Even if the Court applied the definition of "bankruptcy assistance," however, the Trustee contends that the Retainer Agreement itself is replete with actual bankruptcy advice. According to the Trustee, this advice appears, for example, in the following paragraph:

### Disclosure and Election of Services

Bankruptcy will usually discharge your unsecured debt and your creditors are not permitted to contact you once you have filed with the court. There are two kinds

of bankruptcy; Chapter 13 bankruptcy where you are generally able to keep property that is mortgaged such as your house or car and are expected to repay debts in three to five years and Chapter 7 bankruptcy where you must give up all non-exempt property and assets that you own in exchange for a discharge of most debt. Bankruptcy may be appropriate if you have pending foreclosures, collection litigation or wage garnishment, however, you will generally be unable to establish credit for up to ten years. In 2005, the bankruptcy law was changed to make it more difficult for some consumers to file Chapter 7 bankruptcy based on a financial means test and credit counseling requirements that may require a repayment of some of your debt.

(the "Disclosure") (Jt. Ex. 1). The Trustee divides the bankruptcy advice provided Huffman in the above Disclosure and in other materials into three (3) broad categories: (1) the dischargeability of consumer debts in bankruptcy, (2) the debtor's retention of secured real and personal property, and (3) general bankruptcy procedures. *See* 11 U.S.C. § 110(e)(2)(B) (defining "legal advice" that only attorneys may provide).

The Trustee points to four (4) other provisions in the Retainer Agreement that show that Legal Helpers promised to provide Huffman "bankruptcy assistance": (1) "[Legal Helpers] will discuss specific debt related issues with Client and, if appropriate, offer additional legal services in regard to bankruptcy or other debt resolution services for Client's consideration" (Jt. Ex. 1, ¶ III); (2) "[Legal Helpers] will discuss with the Client other legal remedies in the event of such circumstances including Chapter 7 or Chapter 13 bankruptcy" (*Id.* ¶ XII(e)); (3) "Client understands that there are other remedies available in regard to their goal of debt resolution including consumer credit counseling and bankruptcy" (*Id.* ¶ XVII); and (4) "Consumer Credit Counseling may impact less on the Client's credit rating and reduce interest rates on current debt, but generally will require payment of the majority of the Client's existing debt. Bankruptcy may discharge the majority of the client's debts, however Client has requested [Legal Helpers] to pursue other alternatives at this time to avoid bankruptcy. [Legal Helpers] will discuss and advise Client as to the bankruptcy option, including fees and costs, at any time that Client's

circumstances change or Client requests such consultation.  There are no additional fees or costs required from Client for such consultation and advice regarding bankruptcy." (*Id.* ¶ XVII).

Aside from the Retainer Agreement, the Trustee relies upon Huffman's testimony. Huffman testified that she spoke with the Eclipse Rep about filing a bankruptcy case in light of her deteriorating financial condition, and the Eclipse Rep discouraged her from pursuing bankruptcy relief.  The Eclipse Rep gave Huffman this advice while she was contemplating filing a bankruptcy case.

Based on the above evidence, the Court agrees with the Trustee that Legal Helpers provided and/or promised to provide bankruptcy assistance to Huffman, and thus, is a debt relief agency within the meaning of § 526.  The Court reaches this finding although it rejects the Trustee's argument that Legal Helper's self-proclaimed status as a "debt relief agency" resolves the issue without the need for any further inquiry.

None of the self-descriptions used by Legal Helpers cites § 526.  A finding of a "debt relief agency" for purposes of § 526, however, focuses upon the provision of bankruptcy assistance to an assisted person or a prospective assisted person, and not on the name an entity calls itself.  Otherwise, the entities that § 526 was intended to cover could determine for themselves whether the statute applies by selecting a name that would either opt them in or out. This is not to say, however, that the representations that Legal Helpers made to Huffman and the public at large of its status as a "debt relief agency," are wholly irrelevant, as suggested by Legal Helpers.  (LHDR Br. at 20 n.9).  The nomenclature is just one factor of many the Court must consider in applying the definitions.  Here, evidence that Legal Helpers repeatedly referred to itself in its marketing materials as a "debt relief agency" provides some support for the Trustee's position.

Similarly, the Court finds relevant the presence of language in the enrollment documents suggesting that Legal Helpers partially incorporated some of the disclosure requirements of debt relief agencies in §§ 526-528 into its practices.  For example, in small print at the bottom of the Pledge Sheet appears this statement:  "Legal Helpers Debt Resolution, LLC is a debt relief agency.  We help people with their debt resolution, including filing for protection under bankruptcy laws."  (Jt. Ex. 2).  This statement is substantially similar to the one that debt relief agencies must include in their advertisements under § 528(a):  "We are a debt relief agency.  We help people file for bankruptcy relief under the Bankruptcy Code."  11 U.S.C. § 528(a)(4).

The Trustee points out the numerous instances where Legal Helpers gave bankruptcy advice to Huffman in the Retainer Agreement.  Indeed, the word "bankruptcy" appears seventeen (17) times in the Retainer Agreement.  Searns and others testified that there is a distinct difference between "specific" and "general" bankruptcy information and that the bankruptcy information in the Retainer Agreement was too general to constitute "bankruptcy assistance."  Legal Helpers' argument overlooks the bankruptcy advice that the Eclipse Rep gave Huffman (that she should forego filing a bankruptcy case), which was specific to Huffman and made while Huffman was in contemplation of filing her own bankruptcy case.

Legal Helpers attacks Huffman's credibility and maintains that this conversation never took place.[41]  Huffman, however, was a credible witness at Trial.  On the witness stand, she demonstrated a quiet, self-confidence as she talked about her experience with Legal Helpers.  More than once, she raised her voice while describing the treatment she received during her enrollment in the program.  Her reaction was reasonable and gave credence to her testimony.

---

[41] No representative from Eclipse testified at Trial.

Page 56 of 71

As evidence that the conversation did not take place, Legal Helpers relies on the absence of the word "bankruptcy" in the Call Log. The Court does not give much weight to the Call Log because it is clearly not a transcript of everything that Huffman and the Eclipse Rep said. Moreover, the Call Log contains abbreviations making it difficult for the Court to decipher and rendering its relevance questionable. Significantly, there is an entry dated April 5, 2011 that is consistent with the gist of the conversation that Huffman described with respect to the frustration she felt with the program and Legal Helpers. The notes from that entry indicate the Eclipse Rep focused her efforts on persuading Huffman to stay in the program.

Legal Helpers argues next that it never provided bankruptcy services to any of its Mississippi clients, but Windsor contradicted that testimony at Trial. Windsor recalled filing a petition for bankruptcy relief on behalf of at least one of them.[42]

Finally, Legal Helpers cites as instructive *French v. Johnson Law Group (In re Kohlenberg)*, No. 10-3390, 2012 WL 3292854 (Bankr. N.D. Ohio Aug. 10, 2012). There, the bankruptcy court denied the trustee's motion for default judgment after concluding that the trustee was not entitled to relief under § 526(a)(3). *Id.* at *7. In *Kohlenberg,* however, the complaint failed to allege that the defendant, the Johnson Law Group, was a "debt relief agency" or allege that the Johnson Law Group prepared any document for filing or provided any bankruptcy assistance to the debtors. *Id.* Besides the obvious factual distinction between *Kohlenberg* and this Adversary as to their procedural postures, the Complaint here is replete with those allegations. In sum, the Court finds that Legal Helpers falls within the definition of a debt relief agency and its conduct is subject to the regulations in § 526 and § 527.

---

[42] As mentioned previously, the Client List is the subject of Protective Order and was not introduced into evidence at Trial.

## 2.      Did Legal Helpers violate § 526 and § 527?

Having concluded that Legal Helpers is a debt relief agency, the Court next considers whether Legal Helpers complied with § 526.[43]  The Trustee alleges that Legal Helpers failed to provide services it promised it would provide Huffman in violation of § 526(a)(1) and made misrepresentations to Huffman with respect to the services it promised it would provide in violation of § 526(a)(3)(A).  The Trustee also contends that Legal Helpers failed to provide the information required by § 342(b)(1) and § 527(b).

### a.      Failing to Perform Services

When asked if Legal Helpers reduced any of her debts, Huffman testified, "I thought they would help me. . . . They did not answer my calls or let me know what was going on."[44]  Yet, Legal Helpers promised Huffman that it would "timely respond to all Client inquiries and keep the Client informed as to all offers of debt modification."  (Jt. Ex. 1, ¶ III).  In the context of the Trustee's fraudulent transfer claim, the Court has already discussed in detail other promises made by Legal Helpers to Huffman that it failed to perform in connection with Huffman's debt

---

[43]      Section 526(a) provides, in pertinent part:

(a)      A debt relief agency shall not—

(1)      fail to provide any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title;

* * *

(3)      misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to—

      (A)      the services that such agency will provide to such person;

11 U.S.C. § 526(a).

[44] (Test. of Huffman at 1:35:32 to 1:35:36, Nov. 20, 2013).

settlement program. The Court will not repeat that analysis here. The Court finds that the Trustee has proved by a preponderance of the evidence that Legal Helpers intentionally violated § 526(a)(1) by failing to perform promised services.

### b. Misrepresentations

Legal Helpers' misrepresentations, according to the Trustee, arise out of the Retainer Agreement. The Trustee relies on the promise by Legal Helpers to provide "legal services" that relate "to advice, counseling, analysis and negotiations services." (Jt. Ex. 1). Huffman, as previously stated, never spoke to an attorney at Legal Helpers.

The Court agrees with the Trustee that Legal Helpers misrepresented the services that Huffman would receive upon enrollment in its program but disagrees with the Trustee that Huffman never received legal advice. For example, near the end of her enrollment, she was advised by the Eclipse Rep, a nonlawyer, to stay in the program and not file bankruptcy.[45] The evidence at Trial, as set forth in this Opinion regarding the Trustee's fraudulent transfer claim, established that numerous misrepresentations were made by Legal Helpers that support the Trustee's claim. For that reason, the Court finds that Legal Helpers intentionally violated § 526(a)(3)(A).

### c. Disclosures & Notice

Section 527 mandates that debt relief agencies provide disclosures to assisted persons that, among other things, (1) briefly describe the general purpose, benefits, and costs of proceedings under chapters 7, 11, 12, and 13 of the Code and the types of services available from credit counseling agencies; (2) inform them that they must make truthful and accurate

---

[45] Whether the Eclipse Rep engaged in the unauthorized practice of law and whether Legal Helpers assisted the Eclipse Rep in the unauthorized practice of law are matters that are not before the Court.

disclosures of income and assets; and (3) generally explain that litigation may be an outcome of filing for bankruptcy. 11 U.S.C. § 527. The Retainer Agreement and documents provided in the welcome packet contain some of this information but do not fully comply with § 527. For example, the documents do not include the § 342(b)(1) disclosure required by § 527(a)(1), which explains the general characteristics of the different bankruptcy chapters. The Court, however, does not need to determine whether Legal Helpers failed to comply with the "material requirements" of disclosures and notification to warrant relief because the Trustee has already established such violations of § 526.

### 3.        Is Huffman entitled to damages?

There are statutory remedies under § 526(c) for a debt relief agency's violations of § 526. The remedies relevant to the Adversary include:

> (c)(1)       Any contract for bankruptcy assistance between a debt relief agency and an assisted person that does not comply with the material requirements of this section, section 527, or section 528 shall be void and may not be enforced by any Federal or State court or by any other person, other than such assisted person.

> (2)       Any debt relief agency shall be liable to an assisted person in the amount of any fees or charges in connection with providing bankruptcy assistance to such person that such debt relief agency has received, for actual damages, and for reasonable attorneys' fees and costs if such agency is found, after notice and a hearing, to have—

> (A)       intentionally or negligently failed to comply with any provision of this section, section 527, or section 528 with respect to a case or proceeding under this title for such assisted person;

> * * *

> (C)       intentionally or negligently disregarded the material requirements of this title or the Federal Rules of Bankruptcy Procedure applicable to such agency.

> * * *

Page 60 of 71

(5)     Notwithstanding any other provision of Federal law and in addition to any other remedy provided under Federal or State law, if the court, on its own motion or on the motion of the United States trustee or the debtor, finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may—

(A)     enjoin the violation of such section; or

(B)     impose an appropriate civil penalty against such person.

11 U.S.C. § 526(c)(1)-(2), (5).  Simply put, a debt relief agency may be liable for remittal of fees, actual damages, and reasonable attorney's fees and costs.  For an intentional abuse or a pattern or practice of abuse, the Court may impose an appropriate civil penalty.

Having found that Legal Helpers intentionally violated § 526(a)(1) and § 526(a)(3)(A), the Court finds that the Retainer Agreement is void and that the Trustee is entitled to recover all fees paid by Huffman into the program, as well as actual damages, reasonable attorneys' fees, and costs.  The amount of fees, damages, and costs is discussed later in this Opinion.  The Court next considers the issue of a civil penalty.

**4.     Did Legal Helpers act intentionally to violate § 526 or engage in a clear and consistent pattern of violating § 526?**

The Trustee asks the Court to impose a civil penalty of $221,000.00 against Legal Helpers under § 526(c)(5)(B) on the ground that Legal Helpers intentionally violated § 526 and/or "engaged in a clear and consistent pattern of violating" § 526.  In support of a civil penalty, the Trustee relies upon the testimony of Huber, whose experience with Legal Helpers' debt resolution program was similar to Huffman's experience.  The Trustee also relies upon the Cease and Desist Order issued in Illinois, and the testimony of Aleman and Hyslip regarding the regulatory actions pending against Legal Helpers and/or its Members.

The Court agrees that the evidence supports a civil penalty under both prongs of § 526(c)(5)(B).  Huffman's failed program was clearly the result of Legal Helpers' flawed

business model and not an "anomaly." Legal Helpers' nationwide adoption of this program establishes a consistent pattern justifying a civil penalty.

With regard to the Cease and Desist Order and other pending regulatory proceedings against Legal Helpers, however, the Court does not give much weight to such evidence. The issue here focuses upon the promises and misrepresentations made by Legal Helpers to Huffman, whereas the issue in those regulatory actions involved the purported unauthorized practice of law by Legal Helpers and its support groups.

Turning to the issue of the amount of the civil penalty, it appears that the Trustee calculates the penalty he requests, $221,000.00, on an amount required to pay $500.00 in compensation to every Mississippi client of Legal Helpers.[46] Legal Helpers, as might be expected, argues that the evidence does not support the imposition of a civil penalty in any amount.

As a threshold matter, the Court rejects the Trustee's method for calculating the amount of the civil penalty. The Court does not have authority to award relief to other debtors in other cases. *Wells Fargo Bank, N.A., v. Stewart (In re Stewart)*, 647 F.3d 553, 558 (5th Cir. 2011) (holding that bankruptcy court lacked jurisdiction to order creditor to audit and, if necessary, to amend all proofs of claim filed in all pending cases). Moreover, the statutory basis for the civil penalty is not to compensate victims for their actual damages because § 526 provides for the recovery of "actual damages" in a separate subsection from the civil penalty provision.

There is no amount or range prescribed in § 526(c)(5)(B) for determining the amount of a civil penalty. In the absence of explicit statutory factors, the Court finds guidance in provisions in other federal laws relating to the discretionary imposition of civil penalties. *See, e.g., United*

---

[46] $221,000 = $500.00 × 442.

*States v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 858 (S.D. Miss. 1998) (surveying methodology used by courts in assessing amount of discretionary civil penalties under environmental laws). It appears that civil penalties are largely motivated by factors of deterrence and the culpability of the parties.

Here, Congress enacted §§ 526-528 as a reform measure to regulate the conduct of debt relief agencies and curtail perceived abuses in the bankruptcy system. *Milavetz*, 559 U.S. at 231-32. The evidence established that the conduct of Legal Helpers was both intentional and constituted a consistent pattern of abuse in violation of § 526. The presence of both supports a heavier penalty against Legal Helpers. Given the amount of the fee that Legal Helpers charged Huffman ($7,264.75), the Court finds that $28,000.00, a penalty of approximately four (4) times that amount is reasonable and appropriate in light of the facts and circumstances. This civil penalty is not so burdensome as to be punitive but sufficient enough to serve as a deterrent against future noncompliance by Legal Helpers. *See, e.g., Hills v. McDermott (In re Wicker)*, No. 11-12373, 2012 WL 580481, at *3 (E.D. Mich. Feb. 22, 2012) (upholding $5,000.00 civil penalty imposed by bankruptcy court under § 526 for clear pattern of violations).

## F.    Count V: Fraud

The Trustee alleges that Legal Helpers misrepresented its services. These misrepresentations, according to the Trustee, were that Legal Helpers could settle Huffman's debts for forty percent (40%) to sixty percent (60%) of the balance owed, that it would timely respond to Huffman's inquires, and that it would keep her informed.

The elements of a fraudulent or intentional misrepresentation are:  (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon and in the manner reasonable contemplated; (5)

the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his intent to rely thereon; and (9) his consequent and proximate injury. *Levens v. Campbell*, 733 So. 2d 753, 761-62 (Miss. 1999). A misrepresentation must be a statement of fact; statements of opinions are not actionable. *Thompson v. Nationwide Mut. Ins. Co.*, 971 F. Supp. 242, 243 (N.D. Miss. 1997). Moreover, a fraud claim cannot be based upon representations as to matters in the future or promises to do acts in the future because the person to whom such statements were made has no right to rely on them. *S. Mortg. Co. v. O'Dom*, 699 F. Supp. 1223, 1226 (S.D. Miss. 1987). There is an exception when a promise to perform a future act is made with the present intent of not performing. *Bank of Shaw v. Posey*, 573 So. 2d 1355, 1360 (Miss. 1990). Finally, one may not reasonably rely on an oral representation, even if fraudulently made, that contradicts the plain language of the parties' written contract. *Ballard v. Comm. Bank of DeKalb*, 991 So. 2d 1201, 1207 (Miss. 2008); *Wells v. Shelter Gen. Ins. Co.*, 217 F. Supp. 2d 744, 753 (S.D. Miss. 2002). A person has a legal obligation to read a contract before signing it and may not complain about an oral misrepresentation that would have been corrected by reading the terms of the contract. *Ballard,* 991 So. 2d at 1207; *Wells*, 217 F. Supp. 2d at 742-53.

Notwithstanding Searns' purported rigorous efforts to create and vet Legal Helpers' debt-settlement business model, the "model" did not help Huffman at all. If anything, his testimony showed that Legal Helpers was more concerned about defending itself against potential regulatory actions than creating a program that would help debt-ridden consumers outside of bankruptcy court.

Legal Helpers contends that the Trustee cannot prove his fraudulent misrepresentation claim because: (a) Legal Helpers performed the services it promised to perform and by prematurely terminating the Retainer Agreement, Huffman denied Legal Helpers the opportunity

to perform fully all of its promises; (b) Huffman had no right to rely on any alleged misrepresentation that contradicted the plain language of the Retainer Agreement; and (c) the alleged misrepresentations were promises to act in the future. *See Ballard*, 991 So. 2d at 1207 (holding that as a matter of law, one may not reasonably rely on oral representations that contradict loan documents); *O'Dom*, 699 F. Supp. at 1226 (recognizing that under Mississippi law, a fraud claim cannot be predicated upon future promises).

According to Aleman, under Legal Helpers' business model, no one other than Eclipse would have contacted any of Huffman's creditors. The Call Log, however, does not indicate that Legal Helpers ever engaged in negotiations with any of Huffman's creditors. Indeed, the Call Log shows that after her initial enrollment, Huffman initiated most of the telephone calls with Eclipse. As to the form letters mailed by Eclipse, the Court does not consider them as offers of settlement because they did not offer any settlement amount and were addressed to "Whom It May Concern." It is not reasonable to assume that a creditor would read these letters as a sincere offer of settlement. In short, the effort Legal Helpers made to settle Huffman's debts was very different from the "security blanket" promised in the Pledge Sheet.

Legal Helpers held themselves out as law firm in order to lend credence to the debt settlement services. Although Legal Helpers maintains that it provided Huffman "high quality" legal services, it does not appear that they provided her much assistance at all. The only legal advice she received, other than from the documents provided her, came from the Eclipse Rep, a nonlawyer, not from Windsor, Searns, Hyslip, or Aleman.

The Court finds the testimony about Legal Helpers' "success rate" in saving clients $40 million dubious. Legal Helpers was unable to produce any evidence establishing the percentage of the total enrolled debt settled by Legal Helpers, the percentage of the settled debt balance of

the total enrolled debt, the percentage of clients who graduated from the program (that is, for whom Legal Helpers settled most of their enrolled debts), or the percentage of clients who, like Huffman, cancelled the program. (*See* Aleman Dep. at 43-44). According to the debt settlement industry's own statistics, the cancellation rate is almost sixty percent (60%) and a majority of those consumers leave the program without a single debt having been settled. Telemarketing Sales Rule, 75 Fed. Reg. 48,458, 48,472-73 (Aug. 10, 2010) (codified at 16 C.F.R. pt. 310). Indeed, Windsor testified at Trial that he was unaware of a single Mississippi client of Legal Helpers who had successfully completed the program.

Legal Helpers points to two specific provisions in the Retainer Agreement that it contends render Huffman's reliance unreasonable: (1) that there is no guarantee that any debts will be reduced (Jt. Ex. 1, ¶¶ VII, X(a), & XVII) and (2) that Huffman could be sued by her creditors for nonpayment despite her participation in the program. (*Id.* ¶ X(d)). At the outset, the Court notes that not all of the alleged misrepresentations involve oral statements by the Eclipse Rep, but many arise from the Retainer Agreement itself. (Jt. Ex. 1). Also, the Court rejects Legal Helpers' argument that the oral statements necessarily contradict the no-guarantee and you-still-may-be-sued language in the Retainer Agreement. The alleged misrepresentations are not solely about results but about efforts made to negotiate reductions in Huffman's debts. More important, the no-guarantee language is at odds with the Debt Resolution Minimum Standards of Representation (Jt. Ex. 1, ¶ XII) provision in the Retainer Agreement that promises a thirty-five percent (35%) debt reduction.

Finally, Legal Helpers' characterization of the alleged misrepresentation as promises of future conduct is incorrect. *See Redecop v. Gerber*, 265 F. App'x 321, 323 (5th Cir. 2008) (unpublished) (holding that first element of fraud claim under Mississippi law is the

misrepresentation of a past or present fact).  For example, there are numerous statements of existing fact in the Retainer Agreement regarding the debt settlement program.  (Jt. Ex. 1). Because the program itself was fundamentally flawed, there was little chance that the services listed in the Retainer Agreement would benefit Huffman or that the program would succeed. These are misrepresentations of existing fact.

**G.    Damages, Attorneys' Fees & Costs**

The Court has already found that the Trustee has proved the elements of the following claims against Legal Helpers:  (1) fraudulent transfer, (2) violations of § 526, and (3) fraudulent misrepresentation.  The Court next considers the issue of damages, attorneys' fees, and costs as to each of these claims.

**1.    Fraudulent Transfer**

Under § 550, the Trustee may recover, for the benefit of the estate, the value of the property fraudulently transferred.  The Court has the discretion to restore the bankruptcy estate to the position it would have been in had the assets never been transferred fraudulently out of the estate.  The evidence at Trial showed that Huffman paid Legal Helpers $8,635.91.  Of that amount, Legal Helpers refunded $1,371.16.  Huffman is entitled to a refund of the remainder of the fees of $7,264.75.

**2.    § 526**

The remedy for noncompliance with the material requirements of § 526 is contract voidance and possible fee disgorgement.  As noted in the above section, the net amount of fees paid Legal Helpers was $7,264.75.  Huffman is entitled to recover that amount under § 526.

As additional damages under § 526, the Trustee seeks $39,265.00, the amount of credit card debt Huffman enrolled in the program, and $1,000.00, the amount Huffman paid Pond in

attorney's fees for filing the Petition. (Pretrial Order at 5). The Court finds that there was no evidence at Trial that Legal Helpers was responsible for causing Huffman to incur the enrolled credit card debts.[47] Huffman testified that her credit card debt arose because of living expenses associated with her son's illness. Moreover, the Court finds that the $1,000.00 fee Huffman paid Pond for his bankruptcy services was not causally connected to Legal Helpers' conduct. The Court, therefore, finds that Huffman is not entitled to these additional damages.

The Trustee also seeks reimbursement of his attorneys' fees and costs pursuant to § 526. As of November 2, 2013, he had incurred a total of $48,131.40 in attorneys' fees for the services rendered by Graber and Lott. (Pretrial Order at 5-6). In costs, the Trustee seeks $1,220.00, representing $293.00 in filing fees, $297.00 in witness fees for Windsor, $80.00 in process server fees, $50.00 in postage, and $500.00 in attorney mileage. (*Id.*) The Court finds that the Trustee is entitled to reasonable attorneys' fees and costs in an amount to be determined at a future hearing.

### 3. Fraud

In Mississippi, compensatory damages include damages that will return the plaintiff to the same position as he would have been absent the wrong or injury, *Lee v. S. Home Sites Corp.*, 429 F.2d 290, 293 (5th Cir. 1970), and the plaintiff has the burden of proving those damages with reasonable certainty. *Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 740 (Miss. 1999). Applying this standard, the Court finds that the Trustee has carried his burden of proving damages against Legal Helpers of $7,264.75.

---

[47] Arguably, Huffman incurred the additional cost of Citibank's attorney's fees of $2,300.84 because of Legal Helpers' failure to negotiate debt settlements in good faith, but the Trustee does not seek this amount as a separate component of damages and Huffman received a discharge of all of her debts in her bankruptcy case. (Bankr. Dkt. 23).

As to the Trustee's request for attorney's fees in connection with his fraud claim, Mississippi follows the American Rule and does not normally assess attorney's fees against the losing party in the absence of statutory authority. *Huggins v. Wright*, 774 So. 2d 408, 412 (Miss. 2000). His reasonable attorney's fees and costs, however, are recoverable as part of his § 526 claim, as noted previously.

## CONCLUSION

The evidence at Trial showed that Legal Helpers invested considerable time and money ensuring its debt settlement program would pass muster with state regulatory agencies. There was little evidence at Trial, however, regarding whether the business model would actually benefit consumers like Huffman.

Through Searns' testimony, Legal Helpers attempted to persuade the Court that the motive of the "Class A" Members in creating the program was based largely on a desire to help consumers affected by the introduction of "means testing" to the Code in 2005. Although Searns' testimony fell short of persuading the Court that the Members formed Legal Helpers for that purpose, it did demonstrate to the Court that the Members had specialized knowledge of consumer bankruptcy law. It is thus inconceivable to the Court that Legal Helpers could be unaware of the fundamental flaw in its program, that is, the dubious assumption that creditors would be willing to wait the length of time required to settle their debts under the program. Requiring clients to pay Legal Helpers' fees in advance exacerbates the problem by increasing the length of time that creditors must wait. Under bankruptcy law, creditors are subject to an automatic stay under § 362 that provides debtors with breathing room necessary for a repayment plan to succeed. That protection is unavailable to clients enrolled in Legal Helpers' program.

At Trial, Legal Helpers presented the Court with a series of paradoxes: (1) Legal Helpers is a debt resolution law firm but does not provide legal services; (2) Legal Helpers' retainer agreement refers to "bankruptcy" seventeen (17) times but does not contain any bankruptcy advice; (3) Legal Helpers calls itself a "debt relief agency" in its retainer agreement and enrollment documents but is not a debt relief agency under § 526; (4) Legal Helpers does not guarantee a successful outcome of its program but, in its retainer agreement, guarantees a minimum debt reduction of thirty-five percent (35%); (5) Legal Helpers pledges, like a "security blanket," to take control of its clients' debt resolution issues but requires its clients to pay for its services in advance; and (6) Legal Helpers cannot prevent creditors from suing its clients but does not represent those clients when they are sued. Needless to say, Legal Helpers and its program were not what they were held out to be.

The Court finds that the Trustee has proved by a preponderance of the evidence that Legal Helpers received fraudulent transfers during the two-year period prior to Huffman's bankruptcy under § 548 and that the Trustee is entitled to recover the transfers under § 550; that Legal Helpers is a debt relief agency that failed to provide the services promised Huffman and misrepresented the services it would provide her in violation of § 526. Accordingly, the Court concludes that the Trustee is entitled to a judgment against Legal Helpers in the amount of $7,264.75 in damages, $28,000.00 in a civil penalty, and reasonable attorney's fees and costs in an amount to be determined at a future hearing. The Court also finds that all other relief requested by the Trustee should be denied.

A separate order will be entered consistent with this Opinion. A final judgment, however, will not be entered until the final disposition of the Adversary. By separate notice, the

Court will set a status conference to schedule a date and time for a trial on the issue of attorneys' fees and costs.

##END OF OPINION##
